# EXHIBIT 6

# DEPOSITION OF DR. LANDGRAF

## June 15, 2007

## Pages 1 through 163

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              EASTERN DIVISION
4
5    KYLE BENGSTON,
6         Plaintiff,
7    Vs.              CIVIL ACTION NO.
                      3:06-CV-0059-MEF
8    DAVID BAZEMORE, O.D., and
     WAL-MART STORES, INC.
9
         Defendants.
10
11
12        * * * * * * * * * * * * *
13
14
15    DEPOSITION OF DR. THOMAS J. LANDGRAF, O.D.,

16    taken pursuant to stipulation and agreement before

17    Pamela A. Wilbanks, Registered Professional Reporter

18    and Commissioner for the State of Alabama at Large,

19    in the Law Offices of Adams, Umbach, Davidson &

20    White, 205 South Ninth Street, Auburn, Alabama, on

21    Friday, June 15, 2007, commencing at approximately    9:35

22    a.m.

23

**Page 2**

1              APPEARANCES
2    FOR THE PLAINTIFF:
3    Mr. David W. Adams
     THE NEWMAN LAW FIRM
4    Attorneys at Law
     Park Plaza - Suite 150
5    178 South Main Street
     Alpharetta, GA 30004
6
     FOR THE DEFENDANTS:
7
     Mr. Matthew W. White
8    Mr. Blake L. Oliver
     ADAMS, UMBACH, DAVIDSON & WHITE
9    Attorneys at Law
     205 South 9th Street
10   Opelika, Alabama 36803
11
12        * * * * * * * * * * * * *
13        EXAMINATION INDEX
14   BY MR. WHITE . . . . . . . . . . 4
     BY MR. ADAMS . . . . . . . . . . . 160
15        * * * * * * * * * * * *
16    DEFENDANT'S EXHIBIT INDEX
17   1  Notice of taking deposition with an    5
        attachment labeled Exhibit A
18
     2  Dr. Landgraf's entire file on Kyle    7
19      Bengston
20   3  Report of Plaintiff's Expert Witness with    56
        attached CV
21
22   4  Four office visit notes from Dr. Bazemore    133
23

**Page 3**

1                 STIPULATION
2         It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of DR. THOMAS J. LANDGRAF, O.D. is taken
5    pursuant to the Federal Rules of Civil Procedure and
6    that said deposition may be taken before Pamela A.
7    Wilbanks, Registered Professional Reporter and
8    Commissioner for the State of Alabama at Large,
9    without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time as
13   the said deposition may be offered in evidence or
14   used for any other purpose by either party provided
15   for by the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this case
18   that the filing of said deposition is hereby waived
19   and may be introduced at the trial of this case or
20   used in any other manner by either party hereto
21   provided for by the Statute regardless of the waiving
22   of the filing of the same.
23        It is further stipulated and agreed by and

**Page 4**

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is hereby
3    waived.
4
5        * * * * * * * * * * * *
6    DR. THOMAS J. LANDGRAF, O.D.
7
8        The witness, after having first been duly
9    sworn to speak the truth, the whole truth and nothing
10   but the truth testified as follows:
11        EXAMINATION
12   BY MR. WHITE:
13        Q.  If you would, please state your full name for
14          the record, sir.
15        A.  Thomas J. Landgraf.
16        Q.  What does the "J" stand for?
17        A.  Joseph.
18        Q.  Dr. Landgraf -- Do you go by Dr. Landgraf?
19        A.  Tom is fine, but Dr. Landgraf, sure.
20        Q.  What do they refer to you at work?
21        A.  Dr. Landgraf.
22        Q.  You've given a deposition before, correct?
23        A.  Yes.

Deposition of Dr. Landgraf

Page 5

1  going to be asking you questions, and you're
2  going to be responding to my questions. If I
3  ask you a question today that you don't
4  understand, if you would please ask me to
5  rephrase it, I'll be glad to do that for you.
6  Okay?
7  A. Yes.
8      (Defendant's Exhibit 1 marked for
9.     identification.)
10 Q. Let me show you what's marked as Defendant's
11    Exhibit Number 1 which has an attachment that
12    says Exhibit A to it.
13    MR. ADAMS: Let me address that real
14        quick. I apologize. I did not
15        share this with him prior to
16        coming, and that's just my
17        mistake. He did bring his entire
18        file. He can access his e-mails,
19        if necessary, the ones that he
20        saved. Now, I'm not going to
21        testify for him. I don't want
22        you to think that, but I just
23        wanted you to know that he has --

Page 6

1      a lot of these things he's
2      brought with him, but the ones
3      he hasn't brought with him, what
4      I would propose that we do --
5      Some of these things don't apply,
6      like he hasn't saved -- he
7      indicated he might have saved a
8      few depositions but not many.
9          In any event, anything that
10     he hasn't brought with him, what
11     I would propose is that we will
12     produce it to you. If you need
13     to ask him -- If it's anything
14     after you receive it that you
15     feel like you need to ask him
16     about, I would propose that we
17     take that up with a deposition by
18     phone.
19    MR. WHITE: Okay. Let me go through
20        the list, and I'll address them.
21    MR. ADAMS: And I'm sorry about
22        that.
23    MR. WHITE: That's fine.

Page 7

1  Q. Number one -- I'm referring to Exhibit A on
2     Defendant's Exhibit 1. It asked you to bring
3     your entire file regarding Kyle Bengston.
4     Have you done that?
5  A. Yes.
6  Q. Is that it there in front of you?
7  A. Yes.
8  Q. Do you mind if I flip through it and see
9     what's in there?
10 A. No problem.
11 Q. What I'd like to do -- Let me just hold off
12    for right now. Let me go through the list
13    with you. Let me do this. I'm going to mark
14    on your file folder Defendant's Exhibit 2. Is
15    that okay with you?
16 A. Yes.
17 Q. And at some point today what I'd like to do is
18    make a photocopy of the contents of your file
19    folder regarding Mr. Bengston. Okay?
20 A. Okay.
21 Q. I'll stick this right here.
22     (Defendant's Exhibit 2 marked for
23         identification.)

Page 8

1  Q. Let me go through the rest of this list.
2      Any and all correspondence and
3     communications including e-mails between you
4     and any attorney for Kyle Bengston.
5      Are any of those correspondence and
6     communications listed in your file here marked
7     as Defendant's Exhibit 2?
8  A. Yes.
9  Q. Some are?
10 A. Some are.
11 Q. Are there some that are not in that file?
12 A. Yes.
13 Q. Why would they not be in that file?
14 A. They are e-mails that I did not make copies of.
15 Q. E-mails from whom?
16 A. From Dave. Mr. Adams.
17 Q. Do you have any e-mails regarding this case
18    from any other attorney other than Dave Adams?
19 A. No.
20 Q. How many such e-mails do you have?
21 A. Approximately ten.
22 Q. Are those saved on your computer back at your
23    office?

2 (Pages 5 to 8)

**Page 9**

1  A.  Yes.

2  Q.  When you get home, do you think you can print

3      those out and provide them to us?

4  A.  Yes.

5      MR. ADAMS:  We'll get them to you.

6  Q.  Number three is any and all notes and

7      memoranda produced by you in relation to this

8      matter.

9      Are there any such notes or memorandums in

10     your file that's marked as Defendant's Exhibit

11     2?

12 A.  Yes.

13 Q.  And do you have any other notes or memorandum

14     that are not included in Defendant's Exhibit 2?

15 A.  No.

16 Q.  Number four asks for any and all time records

17     and billing records regarding this matter.

18     Are those records included in Defendant's

19     Exhibit 2?

20 A.  Some are.

21 Q.  And some are not?

22 A.  Some are not.

23 Q.  Can you get us up-to-date time and billing

**Page 10**

1      records as soon as you return to the office?

2  A.  Yes.

3  Q.  Number five asks for any and all

4      correspondence and communications including

5      e-mails between you and any other person or

6      entity regarding Kyle Bengston.

7      The previous number two asked you for any

8      correspondence and communications including

9      e-mails between you and any attorney for Kyle

10     Bengston.  So the question I have is, are

11     there any e-mails or correspondence between

12     any person or entity other than the attorney

13     for Mr. Bengston?

14 A.  No.

15 Q.  So the answer to number five is there's no

16     document responsive to that request; is that

17     correct?

18 A.  Yes.

19 Q.  Number six, any and all textbooks, treatises,

20     articles, publications or other scholarly

21     materials relied upon -- it should say by

22     you -- in formulating your opinions in this

23     matter.

**Page 11**

1      Did you bring any such textbooks or

2      treatises or articles?

3  A.  Articles are in here.

4  Q.  Okay.

5  A.  I sent a textbook to Mr. Adams.

6      MR. ADAMS:  The exhibit I used in my

7         deposition of Dr. Bazemore is the

8         one we've listed in our expert

9         report or whatever, the

10        disclosure.  If you don't have a

11        copy of that --

12     MR. WHITE:  I've got a copy.

13     MR. ADAMS:  I think the pertinent

14        section --

15     MR. WHITE:  Clinical Ocular

16        Pharmacology?

17     MR. ADAMS:  Yeah.  I think the

18        pertinent sections, or at least

19        some of them, are photocopied in

20        his file.

21     (Off-the-record discussion.)

22 Q.  With regard to request number six, are there

23     any other textbooks or treatises or articles

**Page 12**

1      other than the textbook that we mentioned,

2      Clinical Ocular Pharmacology, and the articles

3      that you say are photocopied and included in

4      Defendant's Exhibit 2 that you intend to base

5      your opinions on in this matter?

6  A.  There was one other textbook, and I believe

7      the copies are in there for the information

8      from that textbook.  It was a Will's Eye

9      Manual on Emergency Room Diagnosis and

10     Treatment.  But I am not sure that the copy of

11     that article is in there.

12 Q.  But other than that, you feel confident that

13     everything that you're relying upon is

14     included?

15 A.  Yes.

16 Q.  Number seven is any and all documents,

17     photographs and materials received by you from

18     counsel for Kyle Bengston or any other source

19     regarding this matter.

20     Are all those materials included in

21     Defendant's Exhibit 2?

22 A.  There's one thing -- No.  There is one thing

23     in my office.  It is a big file on Wal-Mart

Deposition of Dr. Landgraf                                    June 15, 2007

Page 13

1   rules for the optometrist. It's a -- Dave
2   copied his agreement -- the doctor's agreement
3   between Wal-Mart and himself, and that is -- I
4   did not bring that with me.
5   Q.   Can you provide that to Mr. Adams to send to
6        us, please?
7   A.   Yes.
8   Q.   Is that the only thing responsive to number
9        seven that's not included in Defendant's
10       Exhibit 2?
11  A.   Yes.
12  Q.   Number eight is any and all diagrams, charts,
13       models of the eye or any other visual aid you
14       intend to use during your testimony at trial.
15       Have you given any thought to what
16       diagrams or charts or models you intend to use
17       at trial?
18  A.   I have.  The diagrams that are included with
19       the deposition of Dr. Bazemore are
20       appropriate.  I can use those.  As far as a
21       model, we have models of the eye and they
22       would be good to use, but I don't have that
23       with me.

Page 14

1        MR. WHITE:  Dave, we would just like
2              to see those at some point prior
3              to trial.  I don't know that he
4              needs to ship them down here.
5              But at some point if we could
6              just have an agreement before we
7              get in a courtroom we're going to
8              be allowed to see what it is he's
9              going to be using --
10       MR. ADAMS:  Yeah.  I will see if we
11             can -- if he can ship them to me,
12             and maybe I could bring them to
13             the deposition in about two
14             weeks.  I'll see if we can do
15             that.
16       MR. WHITE:  That will be fine.
17  Q.   Number nine, a list of all matters in which
18       you have given a professional opinion in the
19       last ten years including the names of the
20       parties involved, the attorneys or entity that
21       retained you, the attorney or entity
22       representing the other party, the location of
23       the dispute and the approximate date of your

Page 15

1        hire.
2   Q.   Do you have such a list?
3   A.   No.  I have for the past -- I've given you
4        information on the past two years.  I've given
5        it to Dave.  And that information is in this
6        file, but not for the past ten years.
7   Q.   Would you be able to go back to your files and
8        recreate a list of all of the matters for
9        which you've been retained as an expert
10       witness?
11  A.   I believe I have most of them, and I can
12       create the best list possible.
13  Q.   Does that include -- Would it include the
14       names of the parties involved in the case?
15  A.   Yes.
16  Q.   Would it include the attorney who retained
17       you?
18  A.   Yes.
19  Q.   And would it also include the name of the
20       opposing counsel?
21  A.   Yes.
22  Q.   Can you provide that to your attorney upon
23       your return to your office?

Page 16

1   A.   Yes.
2   Q.   Thank you.
3        Number ten is a list of all cases in which
4        you have given a deposition in the last ten
5        years including the names of the parties
6        involved, the jurisdiction where the lawsuit
7        was filed, the name of the attorney who
8        retained you, the name of the attorney for the
9        opposing party and the date the lawsuit was
10       filed.
11       Do you have a list of depositions that
12       you've given in the last ten years?
13  A.   I have the depositions.  I have documentation
14       that I've given those depositions.  I don't
15       have a list.  I have the information on those
16       depositions.
17  Q.   And from the information of those depositions,
18       can you create such a list?
19  A.   Yes.
20  Q.   Will you provide that to your attorney upon
21       returning to your office?
22  A.   Yes.
23  Q.   Thank you.

4 (Pages 13 to 16)

**Page 17**

1      Number eleven, physical copies -- it
2    should say of any and all depositions -- you
3    have given in the last ten years which you
4    have in your possession wherein you have
5    rendered a professional opinion in the area of
6    optometry.
7      Did you keep any actual copies of
8    depositions that you've given?
9  A.  I believe I have some copies.
10  Q.  How many such copies do you have?  Do you know?
11  A.  Approximately three.
12  Q.  Can you provide copies of those to Mr. Adams
13    so that he can provide those to us?
14  A.  Yes.
15  Q.  Number twelve is a list of all cases where you
16    have testified at trial within the last ten
17    years including the names of the parties
18    involved, the jurisdiction where the lawsuit
19    was filed, the name of the attorney who
20    retained you and the name of the attorney for
21    the opposing party and the date the lawsuit
22    was filed.
23      Have you testified at trial in the last

**Page 18**

1    ten years?
2  A.  No.
3  Q.  There's been no trial testimony?
4  A.  No.
5      MR. ADAMS:  Matt, I just want to say
6        again that I'm completely
7        responsible for the fact that we
8        don't have these things -- all of
9        these things here.  It's no
10        omission on the part of
11        Dr. Landgraf whatsoever.  It's
12        the fault of me and my office,
13        and we'll do what we can to
14        satisfy the request.
15      MR. WHITE:  That you.
16  Q.  I've just opened up Defendant's Exhibit 2, and
17    what I want to do is just flip through this
18    and let you help me identify what's in this
19    file.
20      The first thing I see is a pamphlet
21    entitled Commencement 2007.  What is that?
22  A.  That is the graduation commencement pamphlet
23    for this year's graduation at Southern College

**Page 19**

1    of Optometry where I teach.
2  Q.  What is the purpose of that being in
3    Mr. Bengston's file?
4  A.  I was selected by the fourth-year class to
5    read the optometric oath.  There's information
6    in the optometric oath that relates to keeping
7    yourself up-to-date in terms of taking care of
8    your patients as an optometrist.
9  Q.  And is that something -- is the optometric
10    oath something that's adopted by your school
11    or is it something that's adopted by some
12    board somewhere, or how is that -- What's the
13    effect of the optometric oath?
14  A.  It's read at every school's graduation.
15  Q.  Every school's graduation?
16  A.  Yes.  Every optometry school.
17  Q.  Is there some rule or law that requires it be
18    read at every school's graduation?
19  A.  I'm not aware of a rule or law.
20  Q.  Have you ever been to UAB's graduation?
21  A.  I have not.
22  Q.  Do you know whether or not it's read at UAB's
23    graduation?

**Page 20**

1  A.  I'm not a hundred percent sure.
2  Q.  The next thing I see is a photocopy of the
3    deposition of Dr. David Bazemore, which was
4    taken on May 15, 2007.  And we're here on June
5    15, 2007.  When was this provided to you?
6  A.  Yesterday.
7  Q.  Have you had a chance to read this deposition?
8  A.  Yes.
9  Q.  I see some handwritten notes on the front
10    page.  Are those your handwritten notes?
11  A.  Yes.
12  Q.  It's clipped to something else.  Are these the
13    exhibits to the deposition?
14  A.  Yes.
15  Q.  Then the next thing I see is a handwritten
16    note that says at the top of it Dr. Alabata.
17    Are those your handwritten notes?
18  A.  Those are my handwritten notes, yes.
19  Q.  When did you make these notes?
20  A.  Within the past several weeks.
21  Q.  What was the occasion for you making these
22    notes?
23  A.  It was per a conversation with Mr. Adams.

Deposition of Dr. Landgraf

Page 21

1    Q.  And then you've got several items listed below
2        the name Dr. Alabata, and it looks like they
3        have little stars beside them.  Let me ask you
4        about these.
5            It says, looks like, request gonioscopy -
6        can we see the history of what the angle has
7        been doing recently.
8            What are you talking about there?
9    A.  Dr. Alabata discussed with Mr. Adams that
10       gonioscopy can demonstrate what's been
11       happening with the angle in the eye recently.
12   Q.  When you say -- Am I reading that correctly?
13       It says R-E-Q period.  Does that mean request
14       gonioscopy?
15   A.  Regarding.  That's a "G," R-E-G.
16   Q.  Oh, regarding gonioscopy.  Can see the history
17       of what the angle has been doing recently.
18           So is that something -- This is a note
19       that you took regarding what Mr. Adams told
20       you about his conversation with Dr. Alabata?
21   A.  Yes.
22   Q.  And according to these notes, Dr. Alabata said
23       you can see the history of what the angle has

Page 22

1        been doing recently if you use a gonioscopy?
2    A.  Yes.
3    Q.  Is that your understanding of the -- Did you
4        have that knowledge on your own prior to
5        Mr. Adams telling you that's what Dr. Alabata
6        told him?
7    A.  Yes.
8    Q.  Your next starred item is, contact tonometry
9        should have been used, and that's what --
10       Again, that's what Mr. Adams told you that
11       Dr. Alabata told him?
12   A.  Yes.
13   Q.  Then you have a star by the item, Kyle
14       Bengston's deposition.  What's the
15       significance of that?
16   A.  I don't believe I had read Kyle Bengston's
17       deposition.
18   Q.  So have you read it yet?
19   A.  No.
20   Q.  Then you put a star by the item, amend initial
21       report.  What's the significance of that?
22   A.  Mr. Adams discussed with me that we may need
23       to amend the initial report that I wrote up at

Page 23

1        some point.
2    Q.  Why would you need to amend your initial
3        report?
4    A.  In case any -- At the end of the report, it
5        says, in case any new information comes up, we
6        can amend it at any time.
7    Q.  Do you have any new information right now that
8        you wish to amend the report?
9    A.  No.
10   Q.  What type of new information would require you
11       to amend your report?
12   A.  When I wrote up the initial report, I had not
13       reviewed -- I had not reviewed all the records
14       and depositions and such.
15   Q.  Tell me what you have reviewed.
16   A.  To this date I've reviewed everything that's
17       in that file in terms of information given to
18       me from Mr. Adams.  I've reviewed the records
19       of the eye care rendered to the patient by
20       Dr. Bazemore and the other eye doctors that
21       have seen him.  I have reviewed the deposition
22       of Dr. Bazemore, and I believe that's all.
23   Q.  Have you seen -- As far as medical records

Page 24

1        that you reviewed, you reviewed Dr. Bazemore's
2        records obviously, correct?
3    A.  Yes.
4    Q.  Have you reviewed Dr. Sepanski's records?
5    A.  Yes.
6    Q.  Have you reviewed Dr. Reed Cooper's records?
7    A.  Yes.
8    Q.  Have you reviewed Dr. Alabata's records?
9    A.  I reviewed the records through March of this
10       year.  I can't remember if it was
11       Dr. Alabata's records or not.
12   Q.  What about a Dr. Parma in Montgomery?  Have
13       you reviewed Dr. --
14   A.  I cannot recall reviewing his records.
15   Q.  The next item that I come to looks like a
16       printout from a web page relating to
17       Cogan-Reese Syndrome.  Am I reading that
18       correctly?
19   A.  Yes.
20   Q.  What is the significance of that?
21   A.  Iridocorneal Endothelial Syndrome is part of
22       the diagnosis of Cogan-Reese Syndrome, and the
23       patient was ultimately -- One of the diagnoses

6 (Pages 21 to 24)

Deposition of Dr. Landgraf
June 27, 2007

Page 25

1     that was considered ultimately was
2     Iridocorneal Endothelial Syndrome.
3     Q.  Otherwise known as ICE?
4     A.  Yes.
5     Q.  And that's been his ultimate diagnosis in this
6         case?
7     A.  It is the diagnosis that is currently the most
8         considered.
9     Q.  Do you agree or disagree with the diagnosis of
10        ICE?
11    A.  I would have to see the patient to agree or
12        disagree.  It seems -- appears correct to me.
13        But to be a hundred percent sure, I would have
14        to see the patient.
15    Q.  Have you seen the patient?
16    A.  No.
17    Q.  You've not performed any physical examination
18        of Mr. Bengston?
19    A.  No.
20    Q.  Were you familiar with the ICE Syndrome prior
21        to becoming involved in this case?
22    A.  Yes.
23    Q.  The next item I have also appears to be an

Page 26

1     article downloaded from the Internet also
2     pertaining to ICE; is that correct?
3     A.  Yes.
4     Q.  What was the reason for going on the Internet
5         and looking up these items pertaining to ICE
6         Syndrome?
7     A.  To make sure that I was completely familiar
8         with it beyond what I had learned in optometry
9         school and subsequent to optometry school.
10    Q.  The next item I come to is another article
11        that looks to be downloaded from the Internet
12        also pertaining to ICE, correct?
13    A.  Yes.
14    Q.  Have you been provided with Mr. Bengston's
15        deposition?
16    A.  I can't remember.  I went through all my
17        information in my office, and I pulled all
18        that to bring here and it wasn't in there.
19    Q.  If you had been provided with Mr. Bengston's
20        deposition, do you think you would have read
21        it prior to giving your deposition?
22    A.  Yes.
23    Q.  But as we sit here today, you've never read

Page 27

1     his deposition?
2     A.  No.
3          MR. ADAMS:  Matt, we will make sure
4         he has a copy of it, and I would
5         include that with the other
6         things, the items I mentioned, if
7         you wanted to do a telephone
8         deposition subsequent to this
9         just to ask him if he has any
10        changes of opinion or whatever
11        you wanted to ask him about --
12         MR. WHITE:  We will likely do that.
13         MR. ADAMS:  -- what he thought of
14        Bengston's deposition.
15    Q.  The next item I see is a letter dated May 9,
16        2007 from Dave Adams where he's simply
17        forwarding the expert disclosures to you along
18        with some other optical records of
19        Mr. Bengston; is that correct?
20    A.  Yes.
21    Q.  Let me show you this.  It's a letter dated
22        March 30, 2007 from Phil Alabata,
23        Dr. Alabata.  Do you recognize that?

Page 28

1     A.  I did read that.
2     Q.  Who provided you with that?
3     A.  Mr. Adams.
4     Q.  Have you at any point corresponded with
5         Dr. Alabata directly regarding his treatment
6         of Mr. Bengston?
7     A.  No.
8     Q.  Have you talked to Dr. Alabata on the
9         telephone?
10    A.  No.
11    Q.  The next item is our expert disclosures of
12        Dr. Richard Murphy and Dr. Brett Basden; is
13        that correct?
14    A.  Yes.
15    Q.  Have you read that report?
16    A.  Yes.
17    Q.  Do you know either Dr. Richard Murphy or
18        Dr. Brett Basden personally?
19    A.  No.
20    Q.  Let me show you what this next item is.  It
21        looks to be a compilation.  You tell me.  It's
22        a stapled document with a Medical Arts Eye
23        Clinic letter on the front from Dr. Sepanski

Deposition of Dr. Landgraf

June 15, 2007

---

Page 29

1    to Dr. Reed Cooper. Can you tell me what that
2    is?
3    A.  It is the records of mainly Dr. Sepanski after
4        he had begun to see Mr. Bengston.
5        Additionally, there are some records from
6        Mollega Eye Care in Destin, Florida.
7    Q.  Are those attached to each other for any
8        particular reason or are those just all
9        medical records you kept together in that
10       format?
11   A.  All medical records I've kept together in that
12       format, the way they were given to me.
13   Q.  This is how they arrived to you?
14   A.  Yes.
15   Q.  Stapled together in the corner over here?
16   A.  Yes.
17   Q.  The next two documents are fax transmittal
18       forms, it looks like, where you were faxing
19       something to Mr. Adams; is that correct?
20   A.  Yes.
21   Q.  Is that where you were faxing him the signed
22       version of your expert report?
23   A.  Yes.

---

Page 30

1    Q.  And the next item is, in fact, the signed
2        version of your expert report, correct?
3    A.  Yes.
4    Q.  And the next item appears to be an unsigned
5        version of your expert report; is that
6        correct?
7    A.  Yes.
8    Q.  Is that like a previous version of the report
9        that you had printed out, or what is that?
10   A.  I believe so.
11   Q.  A rough draft so to speak?
12   A.  The change we made was very minor and -- I
13       can't recall. It had less to do with what I
14       wrote and more to do with something else. I
15       think they are very similar.
16   Q.  Did you write your expert report?
17   A.  Yes.
18   Q.  Did you have any -- write all of it?
19   A.  Yes.
20   Q.  Are all of the words in your expert report
21       your words?
22   A.  Yes.
23   Q.  Did you receive any help in writing your

---

Page 31

1    report?
2    A.  I talked to Mr. Adams about what I was going
3        to write.
4    Q.  And did Mr. Adams give you any suggestions
5        about things you should write or shouldn't
6        write?
7    A.  I think he did.
8    Q.  Do you remember what some of those items would
9        have been?
10   A.  No.
11   Q.  You don't recall?
12   A.  No, I don't. For the most part, I wrote my
13       report, and it was -- I had some questions
14       regarding what I should include in terms of
15       what I had reviewed and such, and he answered
16       those questions. And then I included that in
17       my report.
18   Q.  Did you fax a version of your rough daft
19       report down to Mr. Adams prior to executing
20       the final version of the report?
21   A.  I believe I did.
22   Q.  And to your knowledge did Mr. Adams or anybody
23       in his office make any changes to your initial

---

Page 32

1    report that did not appear in your final
2    report?
3    A.  It would have to compare the initial and
4        the -- the first and the second ones that you
5        had there, but I think the changes were
6        more -- were minor. Grammatical some of them,
7        perhaps.
8    Q.  This unsigned report, let me just put that in
9        front of you. Is that the only prior version
10       of the report that you have?
11   A.  I believe there were -- there was one and then
12       I -- Yes.
13   Q.  Yes what?
14   A.  Yes, I believe that was the only prior report
15       that I had.
16   Q.  Okay. And is that saved on your computer back
17       at your office?
18   A.  I'm not sure.
19   Q.  Well, let me ask you this. When you create a
20       report, sometimes people will say, you know,
21       report number one and save it. And when they
22       change it, they'll say report two and save it
23       as a new document, where some people will just

---

8 (Pages 29 to 32)

Deposition of Dr. Landgraf

June 19, 2007

Page 33

1     hit "save" again and it changes the document.
2      Do you save previous versions of your reports?
3  A.  I didn't for this.
4  Q.  So your testimony is that this rough draft
5     version that we have here in front of us is
6     the only other prior version of your report
7     that we have?
8  A.  Yes.
9  Q.  The next thing I have is some more handwritten
10    notes.  Are those your handwritten notes?
11  A.  Yes.
12  Q.  Let me just read it to you.  It says, review
13    of new records on 5/6/07.  I'll tell you
14    what.  I'm going to let you read that to me,
15    what that is in the middle there.
16  A.  2/18/05 it's dated.  Blur OD times 5 months.
17    That's blur in the right eye times five
18    months.  Cleared by OD -- here I meant
19    optometrist -- several months ago.  On 2/25,
20    that was when he saw his physician.  His
21    physician -- I believe his name is Dr. Reed --
22    then referred the patient to Dr. Sepanski for
23    discomfort in the left eye.  And the other

Page 34

1    note there is the ICE Syndrome that we
2    previously discussed versus angle recession.
3    These were ultimately considered in the
4    diagnosis.
5  Q.  So when you say at the top, review of new
6    records, 5/6/07, would that have been the date
7    that you first received Dr. Reed Cooper's
8    records?
9  A.  Yes.
10  Q.  And you had not had a chance to review
11    Dr. Cooper's records prior to formulating your
12    opinions in this matter, your written opinion?
13  A.  I believe so.  I believe you're correct.
14  Q.  You believe I'm correct?
15  A.  Yes.
16  Q.  You signed your written opinions on February
17    28, 2007.  Does that refresh your
18    recollection?
19  A.  Yes.  That's when I signed that.
20  Q.  What is angle recession?
21  A.  That's a form of secondary glaucoma due to
22    trauma that one has had in one's life.
23  Q.  Is angle recession the same thing as angle

Page 35

1    closure?
2  A.  No.
3  Q.  Tell me about recession, then.  Is that a
4    diagnosis for somebody?
5  A.  It's a diagnosis of a type of glaucoma.  Due
6    to previous eye trauma, the angle or the
7    drainage part of the fluid from the eye --
8    that's what the angle is -- can be affected to
9    the point where the fluid doesn't drain out
10    correctly, and the pressure can go up and
11    cause glaucoma.
12  Q.  But does the angle itself close all the way or
13    close to some degree?
14  A.  Actually it's a completely different entity.
15    The angle on gonioscopy looks more open.
16    Actually the iris is pulled away from the
17    drainage area, but you have to do gonioscopy
18    to see that that has occurred.
19  Q.  Why is it called angle recession then?  What
20    does the word "recession" mean?
21  A.  The iris is receding from the angle, pulling
22    back from the angle.
23  Q.  Why do you use the term "ICE versus angle

Page 36

1    recession"?
2  A.  Mr. Adams and I were discussing ultimately
3    what was diagnosed, and angle recession was
4    considered by some of the ophthalmologists in
5    some of the records.
6  Q.  And was Mr. Bengston ever diagnosed with angle
7    recession?
8  A.  It was considered as part of the assessment.
9  Q.  Did he have angle recession to your knowledge?
10  A.  No.
11  Q.  I've got some blank sheets of paper in there.
12    Are those just sheets to make notes on?
13  A.  Yes.
14  Q.  Then I've got what looks to be Dr. Bazemore's
15    records, correct?
16  A.  Yes.
17  Q.  Is that part of Dr. Bazemore's records?
18  A.  Yes.
19  Q.  Then you've got Dr. Reed Cooper's records,
20    correct?
21  A.  Yes.
22  Q.  This next group of records looks to be a
23    combination of Dr. Sepanski and East Alabama

Deposition of Dr. Landgraf

Page 37

1    Medical Center. Will you just flip through
2    those to confirm that?
3    A.  I watched as you flipped through. Yes, they
4    are.
5    Q.  Thank you.
6         Next it looks like we have some
7    photographs from Mollega Eye Care -- two pages
8    of photographs from Mollega Eye Care, correct?
9    A.  Yes.
10   Q.  What is this? I'm showing you an e-mail from
11   somebody.
12   A.  To me this looks like an e-mail that Wal-Mart
13   generated in relation to the lawsuit.
14   Q.  This is not something from your office?
15   A.  No.
16   Q.  This is something Mr. Adams provided to you
17   that had been provided in discovery?
18        MR. ADAMS: Yeah. You produced
19        that.
20   Q.  The next item just appears to be some kind of
21   report generated from the court. Is there any
22   significance to that item that I need to know
23   about?

Page 38

1    A.  No.
2         MR. ADAMS: I think I produced this
3         to him in error actually.
4         MR. WHITE: Okay.
5    Q.  The next group of records appear to be medical
6    records from the Retina Specialists; is that
7    correct?
8    A.  Yes.
9    Q.  The next group of records appear to be records
10   from the Emerald Coast Eye Institute, correct?
11   A.  Correct.
12   Q.  The next group of records are from the Mollega
13   Eye Care and Optique, correct?
14   A.  Yes.
15   Q.  Looks like next is some fax cover sheet to
16   Blake Oliver here in our office, correct?
17   A.  Yes.
18   Q.  Next is an e-mail from Dave Adams to you
19   requesting a copy of Dr. Bartlett's book via
20   overnight delivery; is that correct?
21   A.  Yes.
22   Q.  Did you send him that book?
23   A.  Yes.

Page 39

1    Q.  And that's the book we talked about earlier,
2    Clinical Ocular Pharmacology?
3    A.  Yes.
4    Q.  Who are those two e-mail addresses at the
5    top? I see one is you. Who is this other
6    one?
7    A.  That's me also. This is my comcast address,
8    and this is my e-mail at the college where I
9    teach.
10   Q.  So he sent it to both of your e-mail
11   addresses?
12   A.  Yes.
13   Q.  Is this just the receipt for sending the book?
14   A.  Yes.
15   Q.  What is this?
16   A.  These are initial notes I took upon my -- one
17   of my first conversations with Mr. Adams.
18   These were in late February. I didn't date
19   it, but I do remember those were the initial
20   notes.
21   Q.  Did you take these notes prior to seeing any
22   medical records?
23   A.  I believe I did.

Page 40

1    Q.  Would these notes have been taken prior to you
2    being retained in this case, or do you know?
3    A.  I don't know.
4    Q.  When were you retained?
5    A.  February 28th about. The end of February.
6    Q.  End of February 2007?
7    A.  Yes, sir.
8    Q.  And so you think these notes -- handwritten
9    notes on this small 5-by-7 piece of paper
10   would have been taken prior to you being
11   retained?
12   A.  I do.
13   Q.  Let me just go through these with you. It
14   says "e-mail" at the top. What does that
15   mean? Do you remember?
16   A.  Yes. I believe it has to do with me sending
17   him my e-mail address.
18   Q.  And then it says, previous years, arrow, high
19   IOPs, and you've got a star by the year 2001
20   and you say 38/24. IOPs meaning intraocular
21   pressure, correct?
22   A.  Yes.
23   Q.  Is that what Mr. Adams told you over the

Deposition of Dr. Landgraf                                                                                June 15, 2007

Page 41

1      phone?
2   A.  Yes.
3   Q.  Have you ever dealt with any other lawyer
4       other than Mr. Adams on behalf of
5       Mr. Bengston?
6   A.  No.
7   Q.  And the 2001 reading of 38/24, after your
8       review of the records, do you still believe
9       that he had an intraocular pressure in 2001 of
10      38 and 24?
11  A.  That's what it said in his record.
12  Q.  It does say that in his record?
13  A.  Yes.
14  Q.  And do you believe he actually had pressures
15      that high in 2001?
16  A.  I have to believe what's in the record, yes.
17  Q.  In the record, isn't that scratched out and
18      another reading entered in its place?
19  A.  They did -- That was a reading via NCT or
20      noncontact tonometry, and his records are hard
21      to read.  I can't say for sure if it's
22      scratched out or not.  But if you've done a
23      test on a patient, you record it, and ...

Page 42

1   Q.  Did you read Dr. Bazemore's deposition in
2       regards to those readings?
3   A.  I read that somebody in the deposition said it
4       was 28 and 24, but it looked like 38 to me
5       when I read it.
6   Q.  Did you read that he went back and did the
7       pressure test via Goldmann's?
8   A.  I can see that in the record.
9   Q.  And the Goldmann test was much less?
10  A.  Yes.
11  Q.  So for purposes of formulating your opinions
12      in this matter, are you relying upon this
13      38/24 figure in 2001 as being accurate?
14  A.  I'm relying on that as one of the pressure
15      readings.
16  Q.  You are?
17  A.  Yes.
18  Q.  Even though Dr. Bazemore has testified that it
19      was inaccurate?
20  A.  I have to rely on what I see in the record.
21  Q.  Even though the doctor testified that it was
22      inaccurate and he later did Goldmann's test
23      that proved it to be inaccurate?

Page 43

1           MR. ADAMS:  Object to the form.  You
2       can answer.
3   A.  In Dr. Bazemore's deposition, he said that he
4       used one or the other interchangeably and they
5       both work.  They are both accurate as far as
6       he is concerned, the NCT and the Goldmann just
7       in general.
8   Q.  Just in general?
9   A.  Yes.
10  Q.  Did you also read that part of his testimony
11      where he says often people when they first
12      encounter the NCT will squint and that that
13      will often raise the pressure in their eyes
14      during that momentary point in time?
15          MR. ADAMS:  Object to the form.  You
16      can go ahead.
17  A.  I believe I read that in his deposition.  I
18      read the whole deposition last night, and --
19      It didn't take that long, but there was a lot
20      of information in there.  But it did say
21      "squint" in the record.
22  Q.  It did say that.  But you discounted that for
23      purposes of formulating your opinions in this

Page 44

1       matter?
2           MR. ADAMS:  Object to the form.  You
3       can answer.
4   A.  The only time that he did Goldmann tonometry
5       was at that visit, so I have to look at the
6       fact that he relied on NCT for all the
7       readings when he saw the patient except for
8       that visit.
9   Q.  You say you have to.  Why do you have to do
10      that?
11  A.  Because that's what he -- that's what he
12      utilized, the NCT.
13  Q.  He utilized the Goldmann's on this test,
14      didn't he?
15  A.  That's right.  But he didn't at any other
16      visit.
17  Q.  Next you say, ophthalmologist, six months
18      after visit, angle-closure glaucoma OD.  Does
19      that mean right eye?
20  A.  Yes.
21  Q.  What is the significance of that entry?
22  A.  That was just information given to me that he
23      was diagnosed with angle-closure glaucoma six

Deposition of Dr. Landgraf                                        June 15, 2007

Page 45

1    months after that visit with Dr. Bazemore.
2    Q.  And then you've got a star by the word
3        "paragraph," and it says, opinions in terms of
4        standard of care based upon the reviewed
5        records, dot dot dot dot.  Then you say all
6        opinions subject to further discovery,
7        deposition and receipt of -- I can't really
8        read that last word.
9    A.  Receipt of entire record.
10   Q.  Is there another piece of paper that goes with
11       that that we're missing?
12   A.  I don't believe so.
13   Q.  Is this something that you wrote down while
14       speaking with Mr. Adams?
15   A.  Yes.
16   Q.  And did you in this conversation with
17       Mr. Adams agree to become an expert -- give an
18       expert opinion in this matter?
19   A.  I don't remember if it was that particular
20       conversation.
21   Q.  Do you remember what particular conversation
22       it was when you agreed to become an expert in
23       this case?

Page 46

1    A.  We had -- I had information without any -- I
2        had information from Dr. Bazemore's records.
3        Mr. Adams relayed information from that to
4        me.  I had no other records or information
5        about ultimately what was diagnosed in the
6        patient.  All I had was, for example, history
7        of haloes.  There was a pressure reading that
8        at one point was higher in one eye than the
9        other.  The patient had a little bit of
10       reduced vision.  We discussed that on the
11       phone.  And then in a later conversation I
12       think even prior to writing this, I said to
13       Mr. Adams, this patient was diagnosed
14       ultimately with angle closure, right, just
15       based on knowing what he had told me without
16       having those records in front of me.  And I
17       said, I believe I need to look at the records
18       to make sure that all that was in there, but
19       then you could retain me at that point,
20       because I could figure out that the patient
21       had angle closure just based on that
22       information that he had given me.
23   Q.  Well, tell me what all information that was.

Page 47

1    Are you saying that based upon strictly your
2    conversations with Mr. Adams without ever
3    seeing any records that you were able to
4    determine that Mr. Bengston had angle-closure
5    glaucoma?  Am I hearing you correctly?
6    A.  That's what I supposed, but I said I would
7        have to see the records first to confirm what
8        he was telling me because he's not an
9        optometrist.
10   Q.  Tell me what information you based that on.
11       Before ever seeing any records and based upon
12       your conversations with Mr. Adams, how did you
13       come to the conclusion that Mr. Bengston had
14       angle-closure glaucoma?
15   A.  The complaint of haloes, the fact that the
16       patient had a problem with their vision in
17       that eye, and the fact that there was a
18       reading -- a difference in pressure in one eye
19       versus the other at a previous visit,
20       intraocular pressure reading.
21   Q.  Difference in pressure in one eye versus the
22       other at a previous visit?
23   A.  Yes.  So there was an asymmetry in the

Page 48

1    intraocular pressure.  I think the most
2    important thing was the haloes because the
3    most important thing to rule out if a patient
4    has haloes would be high pressure in that eye
5    to make sure they don't have some type of
6    glaucoma that causes high pressure.  It has to
7    be very high for them to see haloes.  So the
8    most common thing you would think of in the
9    type of glaucoma would be angle closure.
10   Q.  How high does the pressure need to be before
11       you see haloes?
12   A.  Probably about 50.
13   Q.  When you had that conversation with Mr. Adams,
14       you knew that something was wrong with this
15       patient's vision by the fact that an attorney
16       is calling you on the telephone about it,
17       correct?
18       MR. ADAMS:  Object to the form.
19   A.  I think -- I believe so.
20       THE WITNESS:  You didn't tell me to
21       answer.
22       MR. ADAMS:  That's fine.  I was
23       expecting you to answer.

Case 3:06-cv-00569-MEF-WC    Document 37-7    Filed 08/06/2007    Page 15 of 57
Deposition of Dr. Landgraf    June 13, 2007

**Page 49**

1  Q.  What is this next item?
2  A.  This was documentation that I sent the fax to
3      Mr. Adams, and that was the fax for that
4      report.
5  Q.  Faxed report on 7/28/07?
6  A.  I think it's 2/28.
7  Q.  I'm sorry.  2/28.
8      Did you tell me earlier that you were
9      retained on 2/28?
10 A.  If I wrote a report, I was retained before
11     then.
12 Q.  Do you recall in this case how long in advance
13     of writing the report that you were retained?
14 A.  I would say that it was in the week's period
15     of time.  If not, sooner than that, if not a
16     smaller time period.
17 Q.  I came across another set of notes here,
18     handwritten.  Is that your handwritten notes?
19 A.  Yes.
20 Q.  Let's just go through these real quick.  At
21     the top you say, standard of care, and then
22     what are you saying under that?  It looks like
23     CXS.

**Page 50**

1  A.  CXS stands for complaints and exam findings.
2      So the patient's part of -- his chief
3      complaint was haloes around lights.  Again,
4      like before, the intraocular pressure, there
5      was history of it being high and asymmetric.
6      And then I was jotting notes about the tests
7      that would be indicated based on this history
8      and based on this intraocular pressure and
9      then what options in terms of -- If the doctor
10     didn't want to manage the glaucoma, they
11     should have referred -- And actually no
12     optometrist can appropriately manage
13     angle-closure glaucoma because that usually
14     requires a laser, or in this case it was a
15     cutting procedure, trabeculectomy.
16 Q.  When were these notes made?  Do you have any
17     recollection?
18 A.  You know, that first week, I'm positive about
19     that.  In late February.
20 Q.  Were these notes taken during a telephone
21     conversation with Mr. Adams or some other
22     time?
23 A.  I don't recall.

**Page 51**

1  Q.  These look to be some more possibly
2      photocopies of Dr. Bazemore's records; is that
3      correct?
4  A.  Yes.
5  Q.  When you got these records, did you highlight
6      that?  Did you write on the records at all or
7      scribble or put any of your own writings on
8      these records?
9  A.  I don't believe I did.
10 Q.  So when it came to you, was it already
11     highlighted as it is now?
12 A.  I can't remember.
13 Q.  Do you remember writing on the records at all?
14 A.  No.
15 Q.  The next item is another letter -- copy of a
16     letter from Dr. Sepanski to Dr. Cooper dated
17     March 11, 2005, correct?
18 A.  Yes.
19 Q.  What is this?  This is a letter from a
20     Mr. Phillip A. Raley to a Ms. Patricia Harris
21     regarding Pearlie Mae Scott versus Dr. Robert
22     Hogan.  What is that?
23 A.  Mr. Adams had asked me to pull previous cases

**Page 52**

1      where I had done a deposition for the past two
2      years, and I pulled that information.  That is
3      one of those cases.
4  Q.  So that's why this is in your file?
5  A.  Yes.
6  Q.  The next letter is a letter from you to --
7      from you to Mr. Raley, Attorney at Law; is
8      that correct?
9  A.  Yes.
10 Q.  Is that in regards to the same case?
11 A.  Yes.
12 Q.  Is that just correspondence you had in your
13     file?
14 A.  Yes.
15 Q.  Any significance for this correspondence being
16     in this file?
17 A.  It allowed me to give Mr. Adams the
18     information that was requested regarding those
19     previous cases.
20 Q.  What information was requested?
21 A.  Information on the attorney that I worked with
22     where I had done a deposition for prior cases,
23     the other attorney that was involved with the

Deposition of Dr. Landgraf                                                    June 15, 2007

Page 53

1    case, the name of the patient, the name of the
2    doctor.
3    Q.   Then there's another letter from you to
4         Mr. Raley.  It looks to be some time records
5         that you sent to him or a bill perhaps; is
6         that correct?
7    A.   Yes.
8    Q.   And then there's some notes down here on the
9         bottom, sticky notes.  What is that?
10   A.   These were notes I made in regards to a phone
11        call from Mr. Adams.
12   Q.   Were those some of the things he was asking
13        for from you?
14   A.   Yes.
15   Q.   So he asked you for a list of exhibits.  Is
16        that a list of exhibits you used in that case?
17   A.   No.  This would be a list of exhibits I would
18        use in this case.
19   Q.   It says e-mail.  Did he want you to e-mail him
20        the list of exhibits?
21   A.   I believe so.
22   Q.   And then it says general.  What does "general"
23        mean?

Page 54

1    A.   In general what are the textbooks and articles
2         that I would be using in terms of this case.
3    Q.   It says, depositions over past four years.
4         Did you provide him with that?
5    A.   I did.
6    Q.   And then name of case in middle district, what
7         does that mean?
8    A.   The information that he wanted regarding each
9         of those cases, where I did the deposition.  I
10        think he wanted some information regarding to
11        a legal term called "middle district" or what
12        district the case was in.
13   Q.   Have you been an expert in a case in the
14        middle district of Alabama before?
15   A.   No.
16   Q.   Never have?
17   A.   No.
18   Q.   Well, you've never been an expert in any case
19        at a trial as far as you know --
20   A.   Yes.
21   Q.   -- regardless of where it was at trial.
22   A.   Yes.
23   Q.   What is this last entry, VS and case number?

Page 55

1    A.   VS stands for versus, like in this case it
2         would be Bazemore versus Bengston.  So this
3         would be for the previous cases, though, and
4         if there was a case number assigned.
5    Q.   And did you provide all that information?
6    A.   I did.
7    Q.   The next document is one entitled -- it says
8         "affidavit" at the top.  What is that?
9    A.   This is in relation to one of the cases that I
10        did that Mr. Adams required information on.
11        This is the case Mr. Raley was the attorney
12        that we discussed before.
13   Q.   Next you have, it looks to be, another
14        unsigned copy of your expert report in this
15        matter; is that correct?
16   A.   Yes.
17   Q.   And then that's followed by a fax report.  Is
18        that a report verifying that a fax went out?
19   A.   Yes.
20   Q.   What's the date of that fax?
21   A.   That one says April 10.  I'm looking for the
22        date -- Yeah.
23   Q.   The last thing that appears in here looks to

Page 56

1         be a fax cover sheet to David Adams from you,
2         and it says, here is the information from the
3         clinical text, Clinical Ocular Pharmacology,
4         referenced in the report.  I know this
5         information is not easy for the layman to
6         understand, but I will reference this text
7         passage in our discussion, Tom.  And you've
8         attached what looks to be an excerpt from that
9         textbook; is that correct?
10   A.   Yes.
11             MR. WHITE:  Let's take a break.
12             (Brief recess.)
13             (Defendant's Exhibit 3 marked for
14             identification.)
15   Q.   (Continuing by Mr. White) Doctor, I want to
16        ask you some questions about your educational
17        background, and I'm going to show you what's
18        marked as Defendant's Exhibit 3.  This is your
19        expert witness disclosure.  And attached to
20        that is your CV, and I just want you to
21        confirm that for me.
22   A.   Yes.
23   Q.   Is that your most recent version of your CV?

14 (Pages 53 to 56)

Deposition of Dr. Landgraf                                          June 25, 2007

---

Page 57

1   A.  As of March of this year.
2   Q.  As of March?
3   A.  Yes.
4   Q.  Has something changed since March that you
5       need to add to that?
6   A.  I was Teacher of the Year again and read the
7       optometric oath at graduation. Those are both
8       honors. I've done several continuing
9       education courses since March.
10  Q.  You say you've done. Have you taught them or
11      attended them?
12  A.  Taught them.
13  Q.  What courses have you taught since March?
14  A.  I taught a course on cases -- just general
15      optometric cases and a course on allergies in
16      Memphis in April. And I taught a course on
17      injections for the Illinois College of
18      Optometry in Chicago to their faculty and
19      students. It was an elective course.
20  Q.  Where are you from originally? Where did you
21      grow up?
22  A.  Chicago.
23  Q.  You graduated high school in Chicago?

---

Page 58

1   A.  A suburb, St. Charles High School.
2   Q.  Where did you go to undergrad?
3   A.  Ripon College, R-I-P-O-N, in Wisconsin.
4   Q.  What was your course of study in Ripon
5       College?
6   A.  Chemistry and biology.
7   Q.  Where is Ripon located?
8   A.  Ripon, Wisconsin.
9   Q.  And what was your degree in?
10  A.  It was a B. A. in biology with a minor in
11      chemistry.
12  Q.  Do you remember what your overall GPA was upon
13      graduating from Ripon?
14  A.  3.15.
15  Q.  Did you have any honors or anything that you
16      graduated with?
17  A.  I don't recall. I think I was in Beta Beta
18      Beta, which is the biologic honor society.
19  Q.  What year did you graduate from Ripon?
20  A.  1984.
21  Q.  What did you do upon leaving Ripon College?
22  A.  I started Illinois College of Optometry the
23      following fall.

---

Page 59

1   Q.  Where is that located?
2   A.  Chicago.
3   Q.  How long did you attend Illinois College of
4       Optometry?
5   A.  Four years.
6   Q.  Did you graduate with honors or anything of
7       that nature?
8   A.  Yes.
9   Q.  What is that?
10  A.  Magna Cum Laude. I think my GPA was 3.70.
11  Q.  You think it was 3.70?
12  A.  At least, yes.
13  Q.  What does Magna Cum Laude mean?
14  A.  I think you have to get above a 3.6 to get
15      that at Illinois College of Optometry.
16  Q.  Is it different for different schools?
17  A.  Yes.
18  Q.  I notice that your CV says Cum Laude. Is
19      there a difference between Cum Laude and Magna
20      Cum Laude?
21  A.  I guess I was Cum Laude. That's my mistake.
22  Q.  What's the difference between Cum Laude and
23      Magna Cum Laude?

---

Page 60

1   A.  At Illinois College of Optometry, I can't
2       recall. It has to do with your GPA. Maybe
3       Magna was 3.75. I can't recall.
4   Q.  What was your class rank? Do you know?
5   A.  I would say it was in the top 15 out of
6       approximately 120 students.
7   Q.  And you graduated from there in 1988?
8   A.  Yes.
9   Q.  And then you did a residency in primary care
10      at The Eye Institute at the Pennsylvania
11      College of Optometry; is that correct?
12  A.  Yes.
13  Q.  What is a residency in primary care?
14  A.  It is an optometric residency geared at all
15      types of optometry within a year. It's a
16      structured program to make sure that you are
17      tops in the field. Approximately 10 percent
18      of optometrists do residency. It would be
19      similar to a residency you would hear in other
20      fields except it's just for a year.
21  Q.  And you said not all optometrists do that?
22  A.  Approximately 10 to 15 percent.
23  Q.  How many optometry schools are there in the

---

Page 61

1     United States?
2     A.   There's about 20.
3     Q.   And do you have an opinion as to where your
4          school, the Illinois College of Optometry,
5          ranks as far as optometry schools in the
6          United States?
7     A.   No.
8     Q.   Do you have an opinion as to where the UAB
9          optometry school ranks as far as optometry
10         schools in the United States?
11    A.   No.  They are both accredited, and I've worked
12         with -- I have had experience at ICO.  I know
13         that it's a good school, and I know that UAB
14         is, too, based on my interactions when I've
15         been there for things.
16    Q.   You don't have an opinion as to one school
17         being better than the other?
18    A.   No.  I think they are both very good schools.
19    Q.   Where are you licensed to practice optometry?
20    A.   In Tennessee.
21    Q.   Are you licensed in any other states?
22    A.   Not currently.  I have -- I forgot the term.
23         I've had a license in Illinois and

Page 62

1          Pennsylvania, but they are inactive at this
2          time.
3     Q.   When did you -- First of all, when did you
4          first become licensed in Tennessee?
5     A.   1996.
6     Q.   When did you first become licensed in any
7          state to practice optometry?
8     A.   1988.
9     Q.   And where was that?
10    A.   Pennsylvania.
11    Q.   And then when did you become licensed in
12         Illinois?
13    A.   1989.
14    Q.   Is there any reason why you are no longer
15         active in or actively licensed in Pennsylvania
16         or Illinois?
17    A.   Because I don't live there.
18    Q.   Is that the only reason?
19    A.   Yeah.
20    Q.   Are you licensed in Alabama?
21    A.   No.
22    Q.   Have you ever been licensed in Alabama?
23    A.   No.

Page 63

1     Q.   Have you ever applied for a temporary license
2          to practice in Alabama?
3     A.   No.
4     Q.   How many times have you given a professional
5          opinion in a case arising out of Alabama?
6     A.   I can't recall any times so that would be
7          zero.
8     Q.   So this case would be the only time that
9          you've rendered a professional opinion in a
10         case arising out of Alabama?
11    A.   Yes.
12    Q.   Are you familiar with or friends with any
13         particular optometrist in Alabama?
14    A.   I know of optometrists in Alabama because I've
15         done -- I've served as an examiner for the
16         national boards in Birmingham at that college
17         on at least three or four occasions.  So I've
18         seen their graduates take their clinical exams
19         for national boards.
20    Q.   But are you close professional acquaintances
21         with any particular Alabama optometrist?
22    A.   I know Dr. Martha Greenburg.  She was a board
23         of trustee member at Southern College Of

Page 64

1          Optometry.
2     Q.   Who is she?
3     A.   She's an optometrist in Florence, Alabama.
4     Q.   Anybody else?
5     A.   No.
6     Q.   So after completing your residency, what did
7          you do?
8     A.   I taught in Chicago at Illinois College of
9          Optometry.
10    Q.   And it looks from your resume or CV that
11         you've been in -- been teaching pretty much
12         your whole career.  Is that fair to say?
13         MR. ADAMS:  Object to the form.  Go
14         ahead.
15    A.   I've worked in practices, too, throughout my
16         career.  It's always been one day a week when
17         I did that.
18    Q.   You say you've worked in practices.  Tell me
19         what practices you've worked in.
20    A.   Southern Eye Associates in Memphis, which is a
21         referral center.
22    Q.   First of all, I want you to tell me every
23         practice you've worked in.  You told me

Page 65

1       Southern Eye Associates.  Anywhere else?
2   A.  I'm trying to think.  Like if an optometrist,
3       for example, at a Wal-Mart or a -- needs
4       help -- I'm trying to think of the other
5       location.  If I know them and they need help
6       for a day, I have subbed for them probably
7       about ten times over the 15 years that I have
8       been in Memphis.  LensCrafters would be in
9       that ten times.
10  Q.  You're talking about LensCrafters and
11      Wal-Marts and places like that?
12  A.  For a day when an optometrist was in a bind
13      and they needed help that day and I knew them.
14          MR. ADAMS:  I'm going to object to
15          the form.  I don't think he's
16          ever testified that he ever
17          worked at a Wal-Mart, but if he
18          has -- I was just objecting to
19          the form.
20  Q.  I'm sorry.  I didn't mean to put words in your
21      mouth.  Have you ever worked at a Wal-Mart
22      store?
23  A.  I worked for the optometrist that worked

Page 66

1       there.  I subbed for her one day.
2   Q.  How many times have you done that?
3   A.  Probably about three or four times in the 15
4       years that I've been in Memphis.
5   Q.  What's that lady's name that works at
6       Wal-Mart?
7   A.  Rhonda Baltier.
8   Q.  Could you spell her last name, please?
9   A.  Sure.  B-A-L-T-I-E-R.
10  Q.  What Wal-Mart location is that in Memphis?
11  A.  I believe it's in Cordova, C-O-R-D-O-V-A.
12  Q.  Is that in Tennessee or Mississippi?
13  A.  Tennessee.
14  Q.  So you said something about Southern Eye
15      Associates being a referral center.  What did
16      you mean by that?
17  A.  Optometrists would send patients there for
18      second opinions.  There's an ophthalmologist
19      there and an optometrist.
20  Q.  And why would optometrists send patients there
21      for second opinions?
22  A.  If they needed, for example, a consult on a
23      patient that they were having difficulties

Page 67

1       managing for consultation, they would send
2       patients -- Since there was an ophthalmologist
3       there, they would send them for cataract
4       surgery also.
5   Q.  And how often did you work at Southern Eye
6       Associates?
7   A.  I worked there for six months one day a week.
8   Q.  What years did you work there?
9   A.  I don't remember the year.  It was around
10      2000, I believe.
11  Q.  Is that place still in business?
12  A.  Yes, sir.
13  Q.  And what part of Memphis is it located in?
14  A.  It's in east Memphis.
15  Q.  And did they see patients just off the street
16      who need glasses or think they may need
17      glasses?
18  A.  Southern Eye Associates?
19  Q.  Yes.
20  A.  They see patients that are referred in to them
21      more likely from the community.
22  Q.  So it's not just like an optometry shop where
23      people make appointments to get their eyes

Page 68

1       examined?
2   A.  No.
3   Q.  Other than the work at Southern Eye Associates
4       and the filling in for people for
5       approximately ten times in 15 years, have you
6       ever worked at any private optometry practice?
7   A.  No.
8   Q.  Tell me what you do on a daily basis where you
9       work.
10  A.  I see patients in the ocular disease service
11      with students.  I do that four days a week.  I
12      provide complete eye care to the patients.
13      For example, I see patients with glaucoma on a
14      regular basis.  They are seen every three
15      months, but I also do all their other eye
16      care.  If they need glasses, then I do that,
17      if they need -- whatever they need related to
18      their eyes.  Even though I see patients with
19      eye disease, I take care of the patient.
20  Q.  What is the name of the facility where you
21      work at?
22  A.  The Eye Center at Southern College of
23      Optometry.

17 (Pages 65 to 68)

Deposition of Dr. Landgraf
June 15, 2007

---

Page 69

1  Q. How do patients come to see or come to be at
2     The Eye Center at Southern College of
3     Optometry?
4  A. Through word of mouth.
5  Q. Is it open to the public?
6  A. Yes.
7  Q. Is it a referral center such as Southern Eye
8     Associates?
9  A. No.
10 Q. Do y'all see people who come in off the street
11    who may need glasses or think they may need
12    glasses?
13 A. Yes.
14 Q. Do you do that type of work also?
15 A. Yes.
16 Q. How long have y'all been -- have you been
17    working at The Eye Center at the Southern
18    College of Optometry?
19 A. For 15 years.
20 Q. How are you paid?
21 A. Every two weeks.
22 Q. Are you paid a salary?
23 A. Yes.

---

Page 70

1  Q. How much do you make at The Eye Center?
2  A. I think it's about $96,000 a year currently.
3  Q. And is your pay in any way based upon the
4     profits or the income made by The Eye Center?
5  A. No.
6  Q. What is your title at The Eye Center at
7     Southern College of Optometry?
8  A. I'm a professor.
9  Q. Did you say you worked there four days a week?
10 A. I work there five days a week. I see patients
11    four days a week.
12 Q. On the days that you see patients, how many
13    hours a day are you seeing patients?
14 A. Six.
15 Q. Six hours a day?
16 A. Yes.
17 Q. What do you do on the fifth day?
18 A. That is my development time as a faculty
19    member to prepare lectures, for example.
20 Q. Do you --
21 A. Keep up-to-date on journals and such.
22 Q. Do you teach courses?
23 A. At the college?

---

Page 71

1  Q. Yes.
2  A. Not currently. I'm going to teach a course in
3     the fall.
4  Q. When you're teaching courses, do you still
5     maintain the same schedule at the eye clinic?
6  A. Give or take a few hours.
7  Q. When you're working at the eye clinic, are you
8     working along with students? Do you have
9     students there by your side who you are
10    teaching in that process?
11 A. Yes.
12 Q. Is that always the case or is it sometimes
13    it's just you and the patient or are you
14    always meeting with the patient along with the
15    student?
16 A. I'm always meeting with the patient along with
17    the student.
18 Q. How many students will you -- When you're
19    meeting with the patient, how many students
20    will also be there with you?
21 A. Per patient?
22 Q. Yes.
23 A. Two at the most. One or two.

---

Page 72

1  Q. Not more than two?
2  A. No. If there's something really interesting
3     on a patient and I want the students to see
4     that, then I would ask the patient if that's
5     okay and bring the students in to see that
6     additional.
7  Q. And how do the patients pay at the eye
8     clinic? Do y'all charge just like any other
9     eye clinic would?
10 A. I believe so. We see a lot of PEN Care
11    patients so that's insurance based. We see a
12    lot of Medicare patients, and we see self-pay
13    patients.
14 Q. Do y'all have any particular missi on there
15    that you're designed to care for certain types
16    of income brackets as opposed to ot hers or
17    anything of that nature?
18 A. The mission of the college is to educate
19    students on the art and science of optometry.
20 Q. But as far as your clin ic goes, you're not
21    catering to one particular clientele or the
22    other?
23 A. No.

---

Deposition of Dr. Landgraf                                                                              June 15, 2007

Page 73

1  Q.  You're not trying to get in a certain sector
2      of the population?
3  A.  No.  We're trying to get in as many patients
4      as possible from a variety of sectors.
5  Q.  Does your clinic advertise in the local Yellow
6      Pages?
7  A.  Yes.
8  Q.  Do you advertise on radio and TV?
9  A.  Yes.
10 Q.  Do other optometrists also work there at the
11     clinic?
12 A.  Yes.
13 Q.  How many other optometrists are there at the
14     clinic?
15 A.  Approximately 45.
16     (Brief interruption.)
17     MR. ADAMS:  Can you break that
18         question down about radio and
19         TV?
20 Q.  The eye clinic where you work at, do you
21     advertise on the radio?
22 A.  Yes.
23 Q.  And do you also advertise on TV?

Page 74

1  A.  Yes.
2  Q.  And we got interrupted there, but how many
3      other optometrists work there at the clinic?
4  A.  Approximately 45.
5  Q.  How many patients does the clinic see on a
6      daily basis on average?
7  A.  That's hard for me to answer.  The clinic that
8      I work in, which is the ocular disease
9      service, we see approximately 35 patients per
10     day.  The entire clinic, several hundred.
11 Q.  When you say you work at the ocular disease --
12     What did you call it?  Ocular disease portion
13     or section?  What is that?
14 A.  There are different sections of the clinic.
15     The advanced care ocular disease service sees
16     patients with ocular disease.
17 Q.  How do you know that they have ocular
18     disease?  How are they routed to you?
19 A.  From the primary care service traditionally.
20     We have a regular eye service for routine eye
21     exams.  Then if they have glaucoma or diabetic
22     retinopathy or macular degeneration or an eye
23     disease problem, they are sent to the ocular

Page 75

1      disease clinic, and then we'll see them on a
2      chronic basis.  I've accumulated patients over
3      years because I've been there 15 years, and
4      I've been seeing patients from 14 or 15 years
5      ago for glaucoma.  And you accumulate patients
6      that way just like a practice.
7  Q.  But when they are sent to you, they already
8      have some chronic problem that you're treating
9      them for; is that fair?
10 A.  Most of the patients.  I mean, we see walk-ins
11     and emergencies, like if somebody has a red
12     eye or decreased vision.
13 Q.  Would you see them in the ocular disease
14     section?
15 A.  For walk-ins and emergencies, we would.
16 Q.  What is the primary care section?
17 A.  If you would call and say I want a regular eye
18     exam for glasses.
19 Q.  And did you work in the primary care section
20     of that clinic?
21 A.  Yes.
22 Q.  How long did you work in the primary care
23     section?

Page 76

1  A.  Approximately ten years.
2  Q.  And then how long have you been in the ocular
3      disease section?
4  A.  I would say 15 years.  You can work in the
5      primary care service and the ocular disease
6      service on a different day.  But I work only
7      in the ocular disease service currently.
8  Q.  How long has it been that you've worked only
9      in the ocular disease section?
10 A.  Approximately five years.
11 Q.  So is it fair to say, then, in the last five
12     years you don't do routine eye exams on a
13     daily basis?
14 A.  Remember I told you that my patients don't go
15     back to the primary care clinic, the patients
16     that I see chronically for their routine eye
17     care, because once I'm their doctor, I'm their
18     doctor.  Don't -- Patients don't want to see
19     another doctor to be sent back to primary care
20     to figure out their glasses.  So I do that
21     with all my chronic care patients.
22 Q.  But any patient that you see for glasses is
23     already under your treatment for chronic care;

Deposition of Dr. Landgraf

June 15, 2007

Page 77

1    is that correct?
2    A.  For the most part, yes.
3    Q.  Is it fair to say, then, that over the last
4        five years you have not seen patients for a
5        routine eye exam who are not already under
6        your care for chronic problems?
7    A.  Not really, because if a patient comes to the
8        clinic and they are complaining about blurry
9        vision and it was sudden and they get up to my
10       clinic and it really wasn't sudden and they
11       really want a regular eye exam, I do it.  I
12       don't send it to somebody else.
13   Q.  How often does that happen?
14   A.  Maybe about 10 percent of the time at most.
15   Q.  Let me ask you about your expert services.
16       How long have you been in the business, so to
17       speak, of providing expert services?  How long
18       have you been doing that?
19   A.  About ten years.
20   Q.  And currently what percentage of your income
21       is derived from expert services?
22   A.  Three to five percent.
23   Q.  Does your employment with the college allow

Page 78

1        you to serve as an expert in outside matters?
2    A.  Yes.
3    Q.  Does the money that you make in your expert
4        services go to you individually or does that
5        go to the university or the college?
6    A.  It goes to me.  For example, I took two
7        vacation days off to come here.  That's not
8        something that I'm given time for from the
9        college.
10   Q.  Do you advertise your expert services in any
11       way?
12   A.  No.
13   Q.  How do people learn of you?  Do you know?
14   A.  Word of mouth.
15   Q.  Are you listed in any professional journals or
16       expert listing services that you know of?
17   A.  No.
18   Q.  Do you pay any fees to be listed in any expert
19       witness listing services or anything of that
20       nature?
21   A.  No.
22   Q.  Do you know as we sit here today how many
23       times that you have been retained as an expert

Page 79

1    witness?
2    A.  Approximately 15.
3    Q.  And of those 15 times, do you know what
4        percentage of those times you were retained on
5        behalf of the plaintiff and what percentage
6        you were retained on behalf of a defendant?
7    A.  I would say it's 60 percent for the plaintiff
8        and 40 percent for the defendant.  I want to
9        make sure that I get that correct.
10            MR. ADAMS:  Plaintiff is the one
11            bringing the lawsuit and the
12            defendant is the one being sued.
13            THE WITNESS:  What I'm doing in this
14            case is on behalf of the
15            plaintiff?
16            MR. ADAMS:  Yes.
17   A.  Then I am correct.  Sixty percent.
18   Q.  Of the 15 times you've been retained as an
19       expert witness, do you recall on how many of
20       those occasions the issue has been a
21       misdiagnosis of glaucoma or a failure to
22       diagnose glaucoma?
23   A.  Two.

Page 80

1    Q.  Two?
2    A.  (Witness nods head positively.)
3    Q.  Do you recall the names of those cases?
4    A.  I've been asked this before.  One was for a
5        case in Arkansas, and it was a long time ago
6        and I could not find the documents for it
7        before.  It wasn't for that other case that we
8        talked about.
9    Q.  So one you can't remember?
10   A.  One I really can't remember, and I would have
11       to look through my files to figure out the
12       other one.
13   Q.  Do you think you could figure that out after
14       looking through your files?
15   A.  Yes.
16   Q.  And do you remember generally what the issues
17       were in those two cases?
18   A.  The one from northeast Arkansas involved an
19       optometrist that did not diagnose glaucoma.
20   Q.  Did not diagnose it?
21   A.  Yes.
22   Q.  And did you testify on behalf of the doctor or
23       the patient in that case?

Page 81

1   A.   I testified on behalf of the doctor.
2   Q.   And what did you say on behalf of the doctor
3        in that case?  What was your opinion on behalf
4        of the doctor?
5   A.   That it was open-angle glaucoma and that it
6        was difficult to predict how quickly the
7        damage occurred in this type of glaucoma for
8        the patient.
9   Q.   Is that the case where you can't remember the
10       names of the parties?
11  A.   Yes.
12  Q.   Is that something that you would be able to go
13       back and determine from looking at your notes
14       and records?
15  A.   I really looked hard the last time, but I
16       could look again.
17  Q.   You said it was in northeast Arkansas?
18  A.   Yes.
19  Q.   Do you remember what county in northeast
20       Arkansas it was in?
21  A.   It might have been Mississippi County.
22  Q.   Do you remember -- I may have already asked
23       you this.  Do you remember either of the

Page 82

1        parties' names?
2   A.   I don't.
3   Q.   Parties meaning -- Like you don't remember the
4        doctor's name who you testified on his behalf?
5   A.   No.  It was at least eight years ago, if not
6        longer.
7   Q.   And you don't remember the person's name who
8        was suing the doctor?
9   A.   No.
10  Q.   Do you remember either of the attorneys' names
11       who were on either side?
12  A.   No.  And I did not do a deposition for that
13       case.  I do remember that.
14  Q.   And you can't find your opinion that you
15       rendered in that matter?
16  A.   No.
17  Q.   What was the other case that you testified
18       regarding glaucoma?
19  A.   I can't recall.  I'm estimating one or two
20       cases.  I really can't -- I'm almost doing
21       that just to make sure just in case I had
22       another one, but I can't remember one.  That's
23       the only one I can really remember regarding

Page 83

1        glaucoma.
2   Q.   How many times total have you given a
3        deposition?
4   A.   About six times.
5   Q.   When you go back and review your records and
6        notes, are you going to be able to determine
7        how many -- in what cases you gave those
8        depositions?
9   A.   Yes.
10  Q.   So if I have an opportunity to speak with you
11       again, you can provide me with the names of
12       those cases?
13  A.   I will look for every case that I've done in
14       the past, yes.
15  Q.   Let me just go back and make sure I understand
16       what you just told me about cases involving
17       glaucoma.  You told me about one case in
18       northeast Arkansas where you testified on
19       behalf of a doctor, and in that case the issue
20       was open-angle glaucoma; is that correct?
21  A.   Yes.
22  Q.   And then you said you think there was at least
23       one other occasion where you testified in a

Page 84

1        case involving glaucoma, but you can't recall
2        what that is at this time?
3   A.   Right.
4            MR. ADAMS:  I'm going to object to
5            the form.  I may have missed the
6            question, but if you asked him
7            did he testify for that doctor, I
8            believe his prior testimony was
9            that he never testified.
10           MR. WHITE:  You're correct.  I'm
11           sorry.  I didn't mean to misstate
12           that.
13  Q.   You told me you were retained on behalf of the
14       doctor but you never testified in the
15       northeast Arkansas case.
16  A.   Yes.
17  Q.   I'm sorry.  I didn't mean to misstate that.
18       And then there was one other case you
19       believe involving glaucoma, but you don't
20       remember the name of the case?
21  A.   I don't, and I don't do these enough to
22       know -- Some years I don't do one, and one
23       year I'll do two.  I don't do them enough that

21 (Pages 81 to 84)

Deposition of Dr. Landgraf
June 15, 2007

Page 85

1    I can remember.
2    Q.  Do you remember in that other case whether you
3        represented the doctor or whether you
4        represented the individual suing the doctor?
5    A.  I don't remember.
6    Q.  Have you ever offered an opinion or testified
7        in any other case regarding the use of
8        noncontact tonometry?
9    A.  No.
10   Q.  Have you ever testified or given an opinion in
11       another case regarding the use or failure to
12       use Goldmann's tonometry?
13   A.  No.
14   Q.  Have you ever testified in another case or
15       rendered an opinion in another case regarding
16       the use of or failure to use gonioscopy?
17   A.  No.
18       (Brief off-the-record discussion
19        followed by a brief recess.)
20   Q.  (Continuing by Mr. White) I asked you earlier
21       about -- when we were going through your notes
22       here in Defendant's Exhibit 2 about first
23       being retained.  Just so I'm clear, is it your

Page 86

1    testimony that you were first retained in this
2    case within the two or three weeks immediately
3    proceeding your giving an opinion in this
4    case?
5    A.  Yes.
6    Q.  And that contact would have been through
7        Mr. David Adams; is that correct?
8    A.  Yes.
9    Q.  You were not contacted by anyone else on
10       behalf of the plaintiff, correct?
11   A.  No.
12   Q.  And during the course of our going through
13       your notes in Exhibit 2, did we talk about all
14       the conversations you had with Mr. Adams prior
15       to rendering your opinion in this matter?
16   A.  Yes.
17   Q.  Did you ever have a letter of engagement -- an
18       official letter of engagement from Mr. Adams
19       to you where he retained you?
20   A.  No, not that I'm aware of.
21   Q.  How did you make him aware of your fees and
22       expenses and things of that nature?
23   A.  I verbally told him.

Page 87

1    Q.  You didn't send him any kind of contract for
2        him to sign or anything of that nature?
3    A.  No.  I may have sent him an e-mail regarding
4        my fees, but it wasn't a contract.  I believe
5        I verbally told him.
6    Q.  I believe I asked you earlier whether you ever
7        treated the plaintiff or saw the plaintiff.
8        Have you ever met the plaintiff --
9    A.  No.
10   Q.  -- Mr. Bengston?
11   A.  No.
12   Q.  And other than reviewing his medical records,
13       have you ever seen any other photographs of
14       him?
15   A.  No.
16   Q.  Have you corresponded with him in any way?
17   A.  No.
18   Q.  Have you ever talked to Mr. Bengston on the
19       telephone?
20   A.  No.
21       (Brief lunch recess.)
22   Q.  (Continuing by Mr. White) I want to ask you
23       specifically about glaucoma.  First of all,

Page 88

1    can you just tell me in your own words what is
2    glaucoma?
3    A.  It's an eye disease where it's believed that
4        high pressure damages the eye nerve, which
5        results in visual field loss and can result
6        ultimately in blindness.
7    Q.  What causes the high pressure?
8    A.  For the most common type of glaucoma, it's
9        probably genetic.  That has something to do
10       with it.
11   Q.  What's the most common type of glaucoma?
12   A.  Open angle.  With open angle there's a genetic
13       component to that.  But there could be
14       anatomical problems with other types of
15       glaucoma that cause the pressure to be high.
16   Q.  What causes narrow-angle or closed-angle
17       glaucoma?
18   A.  There's a structure in the eye that can only
19       be observed like with a gonioscopy lens that's
20       called the angle.  It's basically where the
21       fluid drains out.  There's a fluid in the eye,
22       and it drains out of the eye compartment
23       through the angle.  It's a filtering

Page 89

1    mechanism.
2    Q.  What causes that angle to close?
3    A.  People are predisposed to it.  Some of us are
4        born with narrow angles.
5    Q.  What else?
6    A.  You could have secondary types of closed
7        angle.  You could have new blood vessels form
8        there in patients that have diabetes, for
9        example.
10   Q.  What else can cause secondary?
11   A.  You can have a lot of inflammation present in
12       that angle.
13   Q.  Anything else?
14   A.  There's lots of causes.  Those are probably
15       the main ones.
16   Q.  Trauma?  Can trauma be a cause of secondary
17       angle-closure glaucoma?
18   A.  Not angle disclosure but a secondary type of
19       glaucoma.
20   Q.  What type of glaucoma would trauma --
21   A.  Angle recession.  But the angle is not
22       closed.  It's just not functioning correctly
23       to drain out the fluid.

Page 90

1    Q.  Tell me, what are some of the risk factors for
2        glaucoma?
3    A.  Being African-American, age, cardiovascular
4        disease, thinner than normal corneas,
5        increased intraocular pressure.  Those are all
6        for -- We're thinking of open-angle glaucoma
7        with those.
8    Q.  What about for secondary angle-closure
9        glaucoma?  What are --
10   A.  Diabetes.
11   Q.  -- the risk factors?
12           MR. ADAMS:  Make sure he finishes
13               his question because she's got to
14               get everything down.  And if
15               y'all talk at the same time, it
16               makes her job harder.
17   Q.  Do you remember the question?
18   A.  Retinal vascular disease.
19   Q.  Anything else?
20   A.  You asked about secondary --
21   Q.  Secondary --
22   A.  -- angle-closure glaucoma?
23   Q.  Yes, sir.

Page 91

1    A.  Inflammation.
2    Q.  Due to what?
3    A.  Well, one example would be ICE.
4    Q.  Anything else?
5    A.  That sums up the main causes.  There's primary
6        angle-closure glaucoma too.
7    Q.  Did Mr. Bengston have primary angle-closure
8        glaucoma?
9    A.  It looks like he had secondary angle-closure
10       glaucoma.
11   Q.  Secondary, doesn't that mean due to something
12       else?
13   A.  Right.  In this case it was due to an
14       anatomical problem with his angle.
15       Inflammation was present.
16   Q.  Are you referring to the ICE Syndrome?
17   A.  Yes.
18   Q.  Let me go back to some of these risk factors
19       you just talked about.  African-Americans are
20       more disposed to develop glaucoma; is that
21       correct?
22   A.  All the risk factors -- Yes.  Open-angle
23       glaucoma.  All the -- You asked risk factors

Page 92

1    for glaucoma and open angle -- those are all
2    the risk factors for open-angle glaucoma.
3    Q.  When you say age, I presume you mean the older
4        you are, the more inclined you are to develop
5        glaucoma.
6    A.  Yes.
7    Q.  And is there some magic age where it
8        becomes -- you become much more at risk to
9        develop glaucoma?
10   A.  For open-angle glaucoma, we're concerned about
11       anyone over the age of 55 and really concerned
12       about patients over the age of 75.
13   Q.  Does that change with closed-angle glaucoma?
14       Is there a certain risk factor for age as far
15       as closed-angle glaucoma?
16   A.  The primary closed-angle glaucoma, the risk is
17       with age.  It has to do with your prescription
18       in your glasses.  If you're hyperopic, it puts
19       you more at risk for primary angle-closure
20       glaucoma.
21   Q.  What is hyperopic?
22   A.  It means you're farsighted.
23   Q.  Do you know if Mr. Bengston was farsighted?

Deposition of Dr. Landgraf

Page 93

1  A.  No, he wasn't.  But he had secondary
2      angle-closure glaucoma.
3  Q.  That's what I was asking you.
4  A.  Okay.
5  Q.  You were differentiating, it seems to me,
6      between the risk factors for open-angle
7      glaucoma and closed-angle glaucoma; am I
8      correct?
9  A.  Yes.  And there are different types of
10     closed-angle glaucoma, and most of those types
11     have specific age groups and risk factors
12     associated with them.  For example, ICE tends
13     to occur in younger individuals under the age
14     of 40.  It tends to occur in only one eye.
15 Q.  What causes ICE?
16 A.  The biggest problem is a genetic problem that
17     predisposes them to inflammation in the angle.
18 Q.  Genetic meaning you're born with it?
19 A.  Yes.
20 Q.  And occurs --
21 A.  Tends to show up in patients young adults and
22     onward.
23 Q.  Did you say earlier 40 years old and less?

Page 94

1  A.  Yes.  That's when it tends to show up.
2  Q.  But the fact of the matter is if you have it,
3      you have it from the time you're born?
4  A.  I think you're predisposed to it, and the
5      manifestations of it don't show up until later
6      in life.
7  Q.  What are the symptoms of ICE?
8  A.  The symptoms of angle closed are going to be
9      the same for all those types that I
10     mentioned.  So the symptoms for ICE would be
11     seeing haloes around lights, eye pain, eye
12     redness, blurry vision, nausea, vomiting.
13 Q.  Would the nausea and vomiting be related to
14     the increased IOP, intraocular pressure?
15 A.  Yes.
16 Q.  Any other symptoms for ICE?
17 A.  Eventually if it's not treated, then they are
18     going to lose their side vision and they are
19     going to go blind.
20 Q.  Tell me again what the acronym ICE stands
21     for.
22 A.  Iridocorneal Endothelial Syndrome.
23 Q.  Is ICE a rare syndrome?

Page 95

1  A.  Yes.
2  Q.  How rare is it?
3  A.  Very rare.
4  Q.  How rare is very rare?  Do you have any
5      statistics to tell us how rare it is?
6  A.  No.
7  Q.  Have you ever had the occasion in your career
8      as an optometrist to treat a patient with ICE
9      Syndrome?
10 A.  No.
11     MR. ADAMS:  Let me just kind of
12        issue a blanket objection to
13        questions related to the ICE
14        Syndrome.  That is something that
15        as an eye disease I think the
16        treating ophthalmologist will be
17        presenting evidence on.  Just a
18        blanket objection.  Go ahead.
19 Q.  How do you diagnose ICE Syndrome?  Do you
20     know?
21 A.  You would base it on looking at the cornea,
22     base it on measuring the intraocular pressure,
23     base it on the gonioscopic view of the angle,

Page 96

1  and then that accompanied by the risk factors
2  that the patient has if they fall into that
3  risk factor group.
4  Q.  How would you differentiate glaucoma from ICE
5      Syndrome?  What's the difference?
6  A.  What kind of glaucoma, open angle?
7  Q.  Closed-angle glaucoma.
8  A.  The symptoms would be the same.  The
9      gonioscopic view would help you make that
10     diagnosis.
11 Q.  What would you see in the gonioscopic view
12     that would determine it was ICE Syndrome as
13     opposed to closed-angle glaucoma?
14 A.  One of the things you would see would be
15     peripheral anterior synechia.
16 Q.  What is that?
17 A.  They are little adhesions between the iris and
18     the angle, and they are indicative of
19     inflammation in the angle.
20 Q.  How do you treat ICE Syndrome?
21 A.  You need to lower the pressure.  You can do
22     that with medications.  If that doesn't work,
23     then a glaucoma surgery would be done.

Deposition of Dr. Landgraf

Page 97

1   Q.  So is ICE Syndrome caused by glaucoma?
2   A.  I would say ICE Syndrome causes glaucoma.
3   Q.  So you have ICE Syndrome first and it, in
4       turn, causes the glaucoma?
5   A.  Yes.
6   Q.  As far as the ICE Syndrome is concerned, does
7       it cause any other problems with the eye other
8       than what's known as glaucoma?
9   A.  Because the pressure goes up and there's a
10      problem with the cornea, the cornea can become
11      swollen.
12  Q.  Call it corneal edema?
13  A.  Yes.  Part of the syndrome is irido -- this
14      stands for iris -- so they end up with
15      problems with their iris too.
16  Q.  What kind of problems do they have with their
17      iris?
18  A.  There may be lack of pigment in the iris that
19      can actually develop into a hole in the iris,
20      and I think one of the photos has an iris
21      defect on it.
22  Q.  What causes the hole in the iris?
23  A.  Now you're getting -- I haven't seen -- I

Page 98

1       think it's a congenital problem that
2       contributes to that.  There's a genetic
3       propensity to lose pigment.  And so if you
4       lose enough -- your iris is mainly composed of
5       pigment -- you're eventually going to have a
6       hole through it.
7   Q.  When you say congenital component, what do you
8       mean by that?
9   A.  When I say congenital, I mean genetic.
10  Q.  Is it common for a 20-year-old white male to
11      have glaucoma?
12          MR. ADAMS:  Object to the form.
13  A.  It's not common.
14  Q.  What percentage of the population in
15      general -- Let's just say the population of
16      the United States.  What percentage of that
17      population has glaucoma?
18  A.  For every age?  I would say about 2 percent.
19  Q.  And if you take the -- Let me just, for
20      purposes of this next question, take the
21      universe of people in the United States who
22      have glaucoma.  That's who I'm talking about
23      here.  Let me ask you a question about that

Page 99

1       subset of people.
2           What percentage of those people are young
3       white males -- young meaning 20 to 25
4       years old -- with no family history of
5       glaucoma and no trauma to the eye and no
6       health issues, meaning they are not diabetic?
7       Could you give me an idea of what percentage
8       of the glaucoma population that would
9       encompass?
10  A.  Less than 1 percent.
11  Q.  Meaning less than 1 percent of that entire
12      population of glaucoma patients; am I
13      correct?
14  A.  I'm not sure if I understand.
15  Q.  The population -- If you had the entire
16      population of glaucoma patients being a new
17      100 percent of patients, then is it your
18      testimony that that subset of young white
19      males with no family history of glaucoma, no
20      trauma to the eye and no health issues would
21      be less than 1 percent of that 100 percent
22      figure?
23  A.  Yes.

Page 100

1   Q.  Is angle-closure glaucoma an acute condition?
2   A.  It can be.
3   Q.  Are you familiar with the term "acute
4       angle-closure glaucoma"?
5   A.  Yes.
6   Q.  And when used in that context, what does the
7       word "acute" mean?
8   A.  The patient is suffering an angle closure
9       attack at that time.
10  Q.  And how quickly can an acute-angle closure
11      glaucoma develop?
12  A.  Within hours.
13  Q.  So, for instance, if you had a person who had
14      an eye pressure of 13, for instance, and later
15      had an angle closure attack and his pressure
16      elevated, how quickly could you go from 13 to
17      a much higher pressure?
18  A.  Within hours.
19  Q.  To your knowledge did Mr. Bengston suffer from
20      acute angle-closure glaucoma?
21  A.  Not at the -- No.
22  Q.  Do you recall whether he was ever diagnosed
23      with acute angle-closure glaucoma?

Deposition of Dr. Landgraf                                                          June 15, 2007

Page 101

1    A.  I think he was diagnosed with intermittent
2         angle-closure glaucoma.
3    Q.  Who diagnosed that?  Do you recall?
4    A.  I believe they wrote angle-closure glaucoma,
5         Dr. Sepanski.  But based on the records and
6         based on -- it looks like it was -- it was
7         acute at the time that he saw the patient.
8    Q.  It was acute at the time he saw Sepanski?
9    A.  Yes.  The pressure was 52.
10   Q.  It was acute at the time Bengston first saw
11        Sepanski.  Is that what you're saying?
12   A.  Yes.
13   Q.  And the pressure was 52 on that occasion?
14   A.  Yes.
15   Q.  If a patient presented to you with acute
16        angle-closure glaucoma, what would you expect
17        to see in that patient's eye?
18   A.  I would expect via gonioscopy that the angle
19        was narrow or closed.  I would expect the
20        pressure to be elevated.  Those would be the
21        main signs that I would see.  The cornea may
22        be cloudy or swollen.
23   Q.  Would you expect any other symptoms in the

Page 102

1         patient?
2    A.  I would expect the patient to say that they
3         had problems with their vision, that they were
4         seeing haloes, that they may have pain in
5         their eye.
6    Q.  Would they complain of -- In a situation of
7         acute angle-closure glaucoma, would they
8         complain of nausea or vomiting?
9    A.  They may.  That's listed as symptoms of it in
10        textbooks.  Most patients that I've seen with
11        angle-closure glaucoma that was acute did not
12        have nausea or vomiting.
13   Q.  Would they have severe pain in their eye?
14   A.  No, not severe.  Their symptomatology varies
15        so it's important that -- the signs I see are
16        just as important as the symptoms.  There are
17        certain symptoms that are indicative of a
18        serious -- possible serious problem with
19        glaucoma that don't occur with a lot of other
20        things.
21   Q.  Such as what?
22   A.  The haloes.
23   Q.  Tell me what you mean by that.

Page 103

1    A.  I rarely see patients that report to me that
2         they see haloes around lights.  That means
3         there is a problem with their cornea, and I
4         would say it's from the pressure being
5         elevated 99 percent of the time.
6    Q.  So you rarely see patients who complain of
7         haloes around lights?
8    A.  Right.  But I know it's a serious complaint
9         because it usually or almost always indicates
10        that there's a problem with the cornea, and
11        usually that comes from the cornea being
12        swollen secondary to increased intraocular
13        pressure.  So it's a red flag for me that
14        something serious may be going on.
15   Q.  What are some of the causes of haloes around
16        lights?
17   A.  Anything that can cause the cornea to be
18        swollen.
19   Q.  Isn't that what it is a symptom of, the cornea
20        being swollen?
21   A.  The haloes come --
22             (Brief interruption.)
23   Q.  Do you remember my question?

Page 104

1    A.  Symptoms -- Can you repeat it, please?
2    Q.  Isn't the complaint of seeing haloes around
3         lights really a symptom of the cornea being
4         swollen?
5    A.  Yes.
6    Q.  And there are various different things that
7         cause the cornea to become swollen, correct?
8    A.  Yes.
9    Q.  Tell me what some of those various different
10        things are.
11   A.  Mild corneal swelling can come from problems
12        with the endothelium in the cornea, which is
13        the back part of the cornea.  That would cause
14        mild swelling.  They might complain about a
15        little bit of blur, but I doubt they would see
16        haloes.  Severe corneal swelling, again, the
17        most common reason for that would be high
18        intraocular pressure, because the fluid
19        presses so hard on the back of the cornea that
20        it can damage the endothelium and affect it
21        from working.  The back of the cornea works to
22        pump fluid out or water out of it.  And if
23        you've got pressure that's pushing on the

Page 105

1  endothelium, it can't get the fluid out of the
2  cornea. So then the patient gets severe
3  edema, and they start to see haloes around
4  lights.
5  Q.  Do you treat many patients who wear contact
6  lenses?
7  A.  Yes.
8  Q.  Do patients who wear contact lenses and who
9  suffer from dry eyes often complain of seeing
10  haloes around lights, especially at the end of
11  the day?
12      MR. ADAMS: Object to the form, but
13      go ahead.
14  A.  Not -- Rarely.
15  Q.  Rarely?
16  A.  I can't remember a patient that wore contact
17  lenses that's said they saw haloes.
18  Q.  Do people who have allergy eyes experience
19  haloes around lights?
20  A.  Not any of my patients that I can recall.
21  Q.  Can people who have a scratch on their cornea
22  experience haloes around lights?
23  A.  They usually complain of eye pain and feeling

Page 106

1  like there's a foreign body sensation in their
2  eye. They don't complain about haloes.
3  Q.  What about somebody who is suffering from
4  conjunctivitis? Would they experience haloes
5  around lights?
6  A.  No.
7  Q.  No?
8  A.  It would be very atypical.
9  Q.  So your testimony is that just about every
10  time somebody complains about haloes around
11  lights it has to do with increased intraocular
12  pressure?
13  A.  Causing the cornea to swell. And I'd also
14  like to say that the most important reason
15  that an optometrist needs to look at that's
16  causing haloes around lights is angle-closure
17  glaucoma. That's a red flag that that's --
18  It's a red flag that this may be happening and
19  I've got to do everything to make sure that
20  it's not. So I'm testifying also that it's
21  very important to rule out angle closure since
22  it can be so devastating visually to the
23  patient.

Page 107

1  Q.  Can cataracts also cause haloes around lights?
2  A.  Usually causes patients to see colors, such
3  as -- Sometimes it causes them to see
4  yellows. I mean, a lot of the -- or they see
5  colors differently. That's why a lot of older
6  ladies have -- their hair is an unusual color
7  sometimes.
8  Q.  But cataracts in your opinion would not cause
9  a complaint of haloes around lights?
10  A.  It would be pretty rare to cause that
11  complaint.
12  Q.  What is Corneal Endothelial Dystrophy?
13  A.  That's what I talked about before about
14  there's some mild swelling. The endothelium
15  is the layer on the back of the cornea. It's
16  actually called Fuch's, F-U-C-H-'S, Corneal
17  Dystrophy. Occurs in older patients, and
18  their endothelium is not working correctly so
19  they get mild edema.
20  Q.  Would that cause a complaint of seeing haloes
21  around lights?
22  A.  My patients with Endothelial Dystrophy
23  complain about blurry vision.

Page 108

1  Q.  What if someone had a mucousy eye for whatever
2  reason? Would that cause haloes around
3  lights?
4  A.  That's usually a sign of allergic
5  conjunctivitis. I can't recall a patient ever
6  with that common entity saying they had haloes
7  around lights.
8  Q.  Would any type of drugs to your knowledge
9  cause a complaint of seeing haloes around
10  lights?
11  A.  Again, very atypical. I haven't had a patient
12  that was on a drug systemically or topical
13  that caused them to see haloes around lights.
14  Q.  What is Digitalis?
15  A.  That's a cardiac glycoside.
16  Q.  Have you ever had a patient on Digitalis --
17  A.  I have --
18  Q.  -- complain of seeing haloes around lights?
19  A.  I have had a patient on Digitalis but never
20  one that complained about seeing haloes around
21  lights.
22  Q.  What is Chloroquine?
23  A.  That's an anti-malarial, and you're worried

Deposition of Dr. Landgraf
June 15, 2007

Page 109

1  about a toxic maculopathy. That would be the
2  number one reason you're worried about
3  Chloroquine. Actually one of my legal cases
4  before was about Chloroquine maculopathy, and
5  it causes corneal problems. It causes a
6  vortex keratopathy, but that does not have
7  anything to do with swelling.
8  Q. Chloroquine would not cause an effect of
9  seeing haloes around lights?
10  A. It would be very atypical, rare, unusual.
11  Q. What is Psuedophakic Bullous Keratopathy? I'm
12  sure I murdered that.
13  A. You did fine.
14  Q. What is that?
15  A. Pseudophakic means you've had cataract surgery
16  so it means you have a fake lens in the eye.
17  And rarely patients can develop problems with
18  their endothelium after cataract surgery, and
19  it can be severe and it can cause the
20  endothelium to swell and to bubble up. Again,
21  my patients with that -- That's a really rare
22  entity because the cataract surgery is so good
23  nowadays. I've had one patient with that in

Page 110

1  the past ten years, and they complained about
2  blurry vision.
3  Q. Have you ever had a patient who suffered from
4  that disease, Pseudophakic Bullous
5  Keratopathy, who complained of seeing haloes
6  around lights?
7  A. I have not.
8  Q. Is it important as an optometrist to take an
9  accurate history from a patient?
10  A. Yes.
11  Q. Why is it important?
12  A. Because the symptoms -- you want to know why
13  they are there in terms of their chief
14  complaint so you can address that in your
15  assessment. You want to know what's happening
16  in terms of their eyes or what's happened in
17  the past in terms of their ocular history.
18  You want to know about their medical history,
19  too, because that relates directly to how your
20  exam -- what may result in your exam and what
21  you need to look for.
22  Q. If a patient had a history of trauma to the
23  eye or trauma to the region immediately

Page 111

1  surrounding the eye -- Is there a word that
2  y'all use for this area immediately around
3  your eyes and nose?
4  A. Adnexa.
5  Q. I'm sorry?
6  A. A-D-N-E-X-A.
7  Q. Would it be important if a patient had
8  suffered trauma to the adnexa for him to
9  report that to his optometrist?
10  A. Yes.
11  Q. Why is that important?
12  A. Just because we need to know about that.
13  Sometimes -- Most of the time what happens is
14  I see something in the patient that may
15  indicate that they've had a past trauma. And
16  then they go, oh, yeah, like 25 years ago I
17  got hit with a fist. Often they don't -- We
18  ask about trauma in our history, but often
19  they don't realize what kind -- we mean any
20  type of trauma. But if they report it, then
21  we rule out all the things that might have
22  been hurt in the eye that cause trauma.
23  Q. I think you may have said this earlier, but

Page 112

1  trauma can -- trauma to the eye can lead to
2  angle-closure glaucoma, can it not?
3  A. Angle-recession glaucoma, not angle-closure
4  glaucoma.
5  Q. Trauma would lead to angle-recession glaucoma?
6  A. Yes.
7  Q. Why would it not lead to angle-closure
8  glaucoma?
9  A. Because usually what happens with trauma, that
10  angle kind of doesn't drain correctly but it
11  pulls the iris away. So when you do
12  gonioscopy, you see a wider open angle. It's
13  just not working correctly. And generally the
14  pressure works like in regular glaucoma or
15  open angle. It's going to gradually become
16  elevated over time as opposed to being an
17  acute kind of condition.
18  MR. WHITE: I need to take a break
19  real quick.
20  (Brief recess.)
21  Q. (Continuing by Mr. White) Mr. Bengston also at
22  some point complained of a film over his eye.
23  What is that a symptom of in your opinion?

28 (Pages 109 to 112)

Page 113

```
1    A.  Usually a dry eye.
2         MR. ADAMS:  I'm going to issue a
3         late objection on that.  Object
4         to the form of the question.
5    Q.  And your answer was what?
6    A.  Usually a dry eye, but it has a lot of other
7         causes too.
8    Q.  What are some of those other causes?
9    A.  Film could mean blur so it could be refractive
10        error.  Could be a problem with their eye
11        health, their cornea or any other part of the
12        eye, including the back of the eye.
13   Q.  When you use the term "elevated intraocular
14        pressure," at what number is a person's
15        intraocular pressure elevated?
16   A.  Greater than 21.
17   Q.  So anything greater than 21 is elevated; is
18        that right?
19   A.  Yes.
20   Q.  Is that commonly accepted among optometrists,
21        that that number is where it becomes elevated?
22   A.  Yes.
23   Q.  And then the term "asymmetric intraocular
```

Page 114

```
1         pressure," what does that mean?
2    A.  Greater than 5 millimeters difference between
3         the eyes of the intraocular pressure.
4    Q.  And that's at a single visit --
5    A.  Yes.
6    Q.  -- at a single point in time?
7    A.  Yes.
8    Q.  Is that also generally accepted in the
9         optometric community as being the number to
10        use, that 5 milliliter --
11   A.  Five millimeters, yes.
12   Q.  I'm sorry.  You're talking about millimeters
13        of Mercury?
14   A.  Yes.
15   Q.  Let me ask you about the noncontact tonometer,
16        and that's also known as the air puff test; is
17        that correct?
18   A.  Yes.
19   Q.  And oftentimes we see it abbreviated as NCT;
20        is that correct also?
21   A.  Yes.
22   Q.  Is the noncontact tonometer still used in
23        optometrists' offices?
```

Page 115

```
1    A.  Rarely.
2    Q.  Rarely?
3    A.  Rarely.
4    Q.  Do you have one in your office?
5    A.  There may be one at the college.
6    Q.  May be one at the college?
7    A.  Yeah.
8    Q.  Do y'all use it to evaluate intraocular
9         pressure?
10   A.  I don't.
11   Q.  Does anyone at your college use it to evaluate
12        intraocular pressure?
13   A.  Rarely.
14   Q.  What do you mean by rarely?
15   A.  If there's no way we can get a Goldmann
16        applanation tonometry reading, then there are
17        other measures to try tonometry.  One of them
18        would be NCT.
19   Q.  What is the basis for you saying that the NCT
20        is rarely used in optometrists' offices?
21   A.  It's not the standard of care to measure
22        tonometry.
23   Q.  What's your basis for making that statement
```

Page 116

```
1         that the NCT is not the standard of care?
2    A.  It's not as accurate.  When I administered the
3         boards for the profession of optometry, the
4         clinical national board of examiners in
5         optometry, the graduating exam that students
6         take during the fourth year -- and they take
7         it at all the optometry schools in the
8         country; most states utilize that for their
9         way for students to get licensed -- noncontact
10        tonometry has never been on that board.  In
11        the past 15 years, Goldmann tonometry is the
12        only thing that's been on that board for a way
13        to measure tonometry.
14   Q.  Isn't it true that many, many optometrists
15        still use the noncontact tonometer to measure
16        intraocular pressure?
17        MR. ADAMS:  Object to the form.  Go
18        ahead.
19   A.  The only three that I'm aware of are the three
20        that the -- Dr. Bazemore, and then the other
21        two that you got to speak on his -- to be his
22        expert.
23   Q.  So your testimony is the only three
```

29 (Pages 113 to 116)

Deposition of Dr. Landgraf                                                                    June 15, 2007

Page 117

1  optometrists in the universe that you know of
2  who still use NCT are Dr. Bazemore,
3  Dr. Murphy, who is our expert, and Dr. Basden,
4  who is also our expert?
5        MR. ADAMS: Object to the form. Go
6  ahead.
7  A. Who would use that as their primary means to
8  measure intraocular pressure. If for some
9  reason, again, you don't have a patient that
10  can be measured with the Goldmann, then there
11  perhaps are some optometrists that have an NCT
12  in their office. The reason the NCT was
13  around was so that optometrists could measure
14  pressure in the 1970s before topical drugs
15  were allowed to be used by optometrists to
16  measure intraocular pressure. So that was a
17  way for us to do that. But as soon as topical
18  drugs were allowed to do that, since Goldmann
19  has been proven over and over again to be so
20  much more accurate than -- It has been taught
21  for the past 20 years that that's the standard
22  of care.
23  Q. Been taught by who?

Page 118

1  A. The optometry schools at continuing education
2  conferences.
3  Q. What writings are you aware of or what peer
4  review articles are you aware of that state
5  explicitly that the noncontact tonometer is
6  not to be used for primary -- for diagnosing
7  primary intraocular pressure?
8  A. I would have to go back to the mid-'80s when I
9  went to optometry school because that's when
10  the literature came out on that, and it was
11  pretty much settled then. But I'm not
12  aware -- I'd have to look up those articles.
13  Since I've been in optometry, no one has ever
14  advocated utilizing that if you don't have to
15  as a means to measure intraocular pressure in
16  all the educational institutions I've been at.
17  Q. Let me make sure I understand you. Is it your
18  testimony that most optometrists -- practicing
19  optometrists simply do not have these devices
20  in their office?
21        MR. ADAMS: Object to the form. You
22  can answer.
23  A. They are taught -- I don't know. They are

Page 119

1  taught that that's not an accurate -- there
2  are much more -- there's a much more accurate
3  way to measure tonometry. To best take care
4  of your patient -- this is all about the
5  patient -- they expect the doctor to use the
6  best method to check for intraocular pressure
7  to make sure they don't have glaucoma. This
8  is about the patient. They have been taught
9  that that is the standard of care for
10  tonometry.
11  Q. In your opinion, how inaccurate is the
12  noncontact tonometer?
13  A. It's inaccurate. I don't know what percent of
14  the time it's inaccurate. If the accuracy of
15  the Goldmann is 100 percent, that one is 50
16  percent.
17  Q. Is the accuracy of the Goldmann a hundred
18  percent?
19  A. I said if the accuracy --
20  Q. That's what I'm asking you. Is that true?
21  A. I think it's the best way we have now to
22  measure intraocular pressure.
23  Q. Are there not better ways than Goldmann to

Page 120

1  pressure the pressure?
2  A. You can measure it with pachymetry, and then
3  you can adjust the Goldmann based on that if
4  you want to do that.
5  Q. Isn't the Goldmann also subjective?
6  A. No, it's not subjective at all.
7  Q. It's not?
8  A. No. The patient sits there, and you put a
9  drop in and they open up their eye. And you
10  put the probe on the front of the cornea, and
11  you turn it until you get the mires lined up
12  correctly.
13  Q. Where the mires line up is where the pressure
14  reading is?
15  A. Yes.
16  Q. And --
17  A. The inside mires.
18  Q. And isn't it subjective from one optometrist
19  to the other as to where those line up?
20  A. The inside mires are supposed to line up.
21  When you're testing on Goldmann tonometry on a
22  national board, we watch through a teaching
23  tube to make sure the optometrist is lining up

Page 121

1     the inside mires. It's not a hard procedure

2     to do. Everyone that graduates from optometry

3     school can do Goldmann tonometry.

4  Q.  If a Goldmann -- Let me ask this. If a

5     noncontact tonometer read 13 and you did a

6     Goldmann's, where would the Goldmann's read?

7  A.  I don't know. It would read what I believe

8     the pressure to be in the patient's eye. I

9     can't compare one to the other. If the

10    patient's pressure was 28, then I believe the

11    Goldmann would read 28.

12  Q.  The question I'm asking you is, are you aware

13    of any studies or papers that talk about the

14    difference between the Goldmann's tonometer

15    and the noncontact tonometer?

16  A.  I'm sure there are studies on that. Again,

17    they would be from the 1980s because this has

18    been established a long time ago that it's

19    much more accurate.

20  Q.  Now, I understand that you say it's been

21    established that the Goldmann's is much more

22    accurate, but has it been established in your

23    opinion that optometrists should not use the

Page 122

1     noncontact tonometer to evaluate intraocular

2     pressure?

3  A.  Yes. If we're testing students when they

4    graduate for the past 10 or 15 years on 20

5    skills that we think are most important to

6    them in terms of the national boards and if

7    one of those skills is Goldmann tonometry,

8    then that's what we expect the graduate to do

9    on the patient.

10  Q.  Do you test them -- ask them a question about

11    whether or not they should use the noncontact

12    tonometer?

13  A.  No.

14  Q.  That question is not asked?

15  A.  No.

16  Q.  Do you ever have an opportunity to go around

17    and visit optometry clinics? I'm talking

18    about private optometry clinics.

19  A.  Not a lot. The only way I would know about

20    private optometry clinics would be from

21    students e-mailing me and asking me questions

22    and such. Everywhere I've worked, including

23    when I -- That wouldn't be a private optometry

Page 123

1     clinic, I guess, substituting at those stores

2     like I mentioned. Those all had Goldmann

3     tonometers.

4  Q.  What is your basis, then, for testifying that

5    the noncontact tonometers are not used by

6    optometrists anymore?

7  A.  Because they are not accurate to measure

8    intraocular pressure.

9  Q.  I understand -- I appreciate you telling me

10    that they are not accurate. What is your

11    basis for concluding that practicing

12    optometrists do not use them anymore?

13        MR. ADAMS: Object to the form.

14        Hasn't that been asked and

15        answered?

16        MR. WHITE: No, I don't think

17        he's -- I've asked it and he

18        hasn't --

19  A.  Because I don't know anyone in practice that

20    utilizes noncontact tonometry on a regular

21    basis to measure pressure on their patients.

22  Q.  So that's based upon the universe of people

23    that you know in private practice?

Page 124

1        MR. ADAMS: Object to the form.

2  A.  It would be based on every student that I've

3    taught, the 120 per year for the past 10 or 15

4    years that I've taught to use Goldmann

5    tonometry.

6  Q.  And they always do what you teach them to?

7        MR. ADAMS: Object to the form.

8  A.  This is not -- Goldmann -- It's not a

9    difficult thing to do. It's the minimum

10    standard of care to measure tonometry, to make

11    sure you're getting an accurate reading on the

12    patient. If you were worried about glaucoma

13    and your optometrist was measuring it with an

14    NCT, then the optometrist, he or she might

15    miss glaucoma and the patient ultimately would

16    suffer because you're not using the most

17    accurate means to do it. I can't force anyone

18    to do anything they want, but if they are

19    not -- if a patient suffers because I don't

20    believe someone is doing the standard --

21    minimum standard of care, then my opinion

22    would be that that would be a reason why the

23    patient suffered in terms of Goldmann

Deposition of Dr. Landgraf                                                                                    June 15, 2007

Page 125

1    tonometry.
2    Q.  I didn't catch that. Say that again. I don't
3        know that I followed that answer.
4    A.  It's about the patient.
5    Q.  Right.
6    A.  I believe that Mr. Bengston did not at every
7        visit when he saw Dr. Bazemore have his
8        pressure measured by Goldmann tonometry. So
9        since Dr. Bazemore was not using the current
10       measure, the current manner to measure
11       intraocular pressure, then the patient's
12       intraocular pressure measurement was not as
13       accurate as it could be.
14   Q.  Do you know how inaccurate it was?
15   A.  No. Because it wasn't a Goldmann tonometry
16       reading. There was lots of -- The patient had
17       already lost tons of visual field by the time
18       he ended up in Dr. Sepanski's office. He had
19       a small island of vision, so I'm concerned
20       that the pressure in the past had been
21       elevated.
22   Q.  Do different other medical schools, other
23       optometry schools, teach their students how to

Page 126

1    use the noncontact tonometer?
2    A.  I don't know. I know that everyone teaches
3        them how to do Goldmann tonometry, and I know
4        they are tested on Goldmann tonometry for all
5        their practicals as they go through the
6        optometry school.
7    Q.  Do you at your school teach how to operate the
8        noncontact tonometer device?
9    A.  They may have -- There may be one in the
10       central testing part of the clinic, and they
11       may briefly get that once during their
12       four-year tenure. And I'm not even sure if
13       there's a noncontact tonometer there.
14   Q.  Why not just throw it out if it's such an
15       antiquated device?
16   A.  The old ones that we have are sitting in our
17       storeroom. This may be -- I'm not familiar
18       with what's in central testing. It's not a
19       traditional NCT. There are other ways to
20       measure tonometry if you can't get Goldmann
21       tonometry. They are not as accurate, but if
22       we can't, we have to have another measure.
23   Q.  So you would use -- would there ever be a

Page 127

1    situation where you would use the NCT as a
2    fallback to measure intraocular pressure?
3    A.  I would use a Perkins tonometer, which is a
4        handheld tonometer. It's a lot less
5        threatening to the patient, and it can get a
6        reading for you too.
7    Q.  Would there be any situation where you would
8        use a noncontact tonometer?
9    A.  On a 6-year-old or younger that I couldn't get
10       a Goldmann tonometry on after I attempted it.
11   Q.  Do you have an understanding of the degree of
12       inaccuracy there is with a noncontact
13       tonometry?
14   A.  I know it's very inaccurate.
15   Q.  But to what degree? In other words, if an NCT
16       said 13, are you going to do a Goldmann's and
17       it's going to be 32 or is it going to be 15?
18   A.  I just would never do an NCT. I would do
19       something else besides the Goldmann, but I
20       wouldn't do an NCT.
21   Q.  So is the truth of the matter you don't know
22       how inaccurate they are? You just believe
23       them to be inaccurate?

Page 128

1        MR. ADAMS: I'm going to object to
2        the form because you're asking
3        him if -- I mean, if there was a
4        standard set inaccuracy -- I
5        mean, if it was always 10 points
6        differential, then it would be
7        accurate. If you could rely on
8        it to be this much different than
9        Goldmann's tonometry --
10       MR. WHITE: That's what I'm asking
11       him.
12       MR. ADAMS: -- then you'd know what
13       the pressure was. But he's
14       saying it is inaccurate. It's
15       inconsistent. He's said that for
16       a while now.
17   A.  At one time it could read 33, and the pressure
18       was 10 and next -- the Goldmann pressure was
19       10. And the next time the Goldmann pressure
20       on a different patient could be 20, and it
21       could read 12.
22   Q.  Are you just making that up or is that --
23   A.  No. I can think of --

Page 129

1    MR. ADAMS: Object to the form.
2    A.  I can think of times when that's happened
3        years and years ago.
4    Q.  Really?
5    A.  Yeah.
6    Q.  What patient was that?
7    A.  I don't remember.
8    Q.  But you remember about a 33 and a 12, but you
9        don't remember the patient?
10   A.  I remember that during optometry school when I
11       went from 1984 to 1988, I learned how to do
12       Goldmann tonometry because I was taught over
13       and over that noncontact was inaccurate, and
14       this is a much more accurate way to do
15       tonometry. And that's why it's the standard
16       of care in our profession.
17   Q.  Are you aware of any articles or any writings
18       that say, in essence, that the noncontact
19       tonometer should not be used?
20   A.  I'd have to look that stuff up.
21   Q.  As you sit here today, you're not aware of any
22       such articles?
23   A.  I would say that there's a hundred percent

Page 130

1    chance that there would be an article that
2    said that Goldmann's should always be used if
3    possible versus noncontact tonometry because
4    it's so inaccurate.
5    Q.  Are there any -- Are you aware of any
6        statistics regarding the usage of the
7        noncontact tonometer by optometrists
8        currently?
9    A.  I'm not currently aware of any.
10   Q.  What is the slit lamp exam?
11   A.  That looks at the health on the front of your
12       eye so you would be looking at the lids and
13       the lashes. You would be looking at the
14       cornea, the lens, the iris, the conjunctiva.
15       Everything you can basically see, only it
16       would be a magnified view. The patient sits
17       behind an instrument that gives you a
18       magnified view of all those structures.
19   Q.  Is that also known as the Von Herrick's test?
20   A.  That is part of it.
21   Q.  What is that?
22   A.  That's a screening to check to make sure it's
23       okay to dilate your patients.

Page 131

1    Q.  What are they screening for?
2    A.  They are screened to make sure that the angle
3        is open enough to dilate the patient.
4    Q.  Okay.
5    A.  So there's a beam of light with the slit lamp,
6        and you put that beam of light at the edge of
7        your iris. And you'll see a shadow there, and
8        the shadow, if it's a certain width, it's
9        going to be okay to dilate your patient
10       without closing the angle.
11   Q.  Do optometrists use the Von Herrick exam to
12       determine whether an angle is open or closed?
13   A.  They utilize it to determine whether it's okay
14       to dilate the patient or not.
15   Q.  Is it your opinion that you would not use the
16       slit lamp exam to evaluate the open or closed
17       nature of the angle?
18   A.  No. Because for glaucoma, the standard of
19       care is you put a gonioscopy lens on to
20       determine the type of glaucoma the patient
21       has. That's initially when you make your
22       diagnosis. That is a gross screening, the Von
23       Herrick, very gross.

Page 132

1    Q.  That's a what screening?
2    A.  Gross, meaning that it's -- it basically tells
3        you that the angle looks kind of normal so
4        it's okay. You're not going to have any
5        problems dilating the patient. Sometimes when
6        we dilate patients, the dilating drops can
7        actually narrow up the angle a little bit.
8    Q.  Is it your testimony, then, that you would do
9        gonioscopy on every patient?
10   A.  No.
11   Q.  Under what --
12   A.  I would do it on any patients that I suspect
13       of having glaucoma.
14   Q.  You would do it on every patient you suspected
15       of having glaucoma?
16   A.  Right.
17   Q.  And I believe you testified earlier that
18       complaining of haloes around lights is a red
19       flag, and you would do a full examination for
20       glaucoma; is that right?
21   A.  Yes.
22   Q.  If you can grade with the slit lamp exam
23       whether the angle is open, why do the

Page 133

1  gonioscopy? What does the gonioscopy show
2  you?
3  MR. ADAMS: Object to the form, but
4  go ahead. You can answer.
5  A. It shows you the actual structures in the
6  angle. You're viewing the structures directly
7  so you can see the trabecular mesh, ciliary
8  body, Schwalbe's line and other structures.
9  So there are structures that you can view with
10  gonioscopy that you are not seeing with the
11  Von Herrick estimation. It's called a Von
12  Herrick Angle Estimation Test.
13  (Defendant's Exhibit 4 marked for
14  identification.)
15  Q. I'm going to hand you what I've marked as
16  Defendant's Exhibit 4, which is the four
17  office visit notes from where Mr. Bengston
18  visited Dr. Bazemore. And I'm going to ask
19  you a few questions about that. They are
20  dated -- The last visit of August 20, 2004 is
21  on top.
22  A. Yes.
23  Q. I want to ask you a few questions about that.

Page 134

1  The pressure on this visit, as I
2  understand it and what Dr. Bazemore has
3  testified to, is 13 and 12. Do you see that
4  on there?
5  A. Yes.
6  Q. And he's testified that that was done via the
7  noncontact tonometer. Do you agree that that
8  was Mr. Bengston's pressure on August 20,
9  2004?
10  A. By NCT, yes.
11  Q. Do you disagree that that was his actual eye
12  intraocular pressure on that date?
13  A. I'm not sure. I'd have to know what the
14  Goldmann tonometry was. The chance of
15  accuracy with that is going to be much less
16  than if you would have done Goldmann
17  tonometry.
18  Q. So as we sit here today, can you tell me what
19  Mr. Bengston's actual intraocular pressure was
20  on 8/20/04?
21  A. No.
22  Q. If Goldmann's had been done on that date, what
23  would it have shown?

Page 135

1  A. It could have shown any pressure because he
2  could have had intermittent angle closure,
3  meaning that the pressure could have been high
4  on this date or it could have been normal. I
5  don't know here if he was seeing haloes at
6  this -- He said seeing haloes around lights is
7  worse at night. If he was seeing haloes at
8  this time when he actually came in, then I
9  would expect the Goldmann to be much higher
10  than this. But you can have intermittent
11  angle closure where the angle is narrow, and
12  it can close and open on its own and the
13  pressure can go up temporarily.
14  Q. So if the Goldmann's -- Bottom line is that if
15  the Goldmann's had been done, you don't know
16  what it would have shown on that date; is that
17  correct?
18  A. No, I don't.
19  Q. Could it have been 13 and 12 on the Goldmann's
20  as well?
21  A. I guess.
22  Q. The angle on that date -- Dr. Bazemore graded
23  his angle as being open on that date. Do you

Page 136

1  agree? Is that reflected in the notes under
2  the slit lamp exam?
3  A. See, I had trouble reading this. I need to
4  know what this says. This is hard to read, a
5  lot of the writing here. This says lid, I
6  think, OD. This says -- There's a slash and
7  then it says -- I can't tell if that's a 13/4
8  and maybe there's a GR 40U. But 1 3/4, I
9  don't know what that means.
10  Q. Well, Dr. Bazemore testified to that in his
11  deposition, and I believe he said that the 4
12  indicated that the angle was wide open.
13  A. By estimation.
14  Q. Yes.
15  A. By the Von Herrick.
16  Q. Right. Do you have any reason to disagree
17  with that?
18  A. The estimation of the angle, if he wrote that
19  down and he knows how to do that technique,
20  then, sure, I agree.
21  Q. Do you have any basis to disagree that
22  Mr. Bengston's angle was wide open on that
23  date? Is 4 wide open? Isn't that -- I use

Page 137

1    the term "wide open". Is 4 a number for
2    grading openness in an angle?
3    A.  It's an estimate that it's open.  Considering
4        the patient didn't have open angles when he
5        came to Dr. Sepanski's later on in that he had
6        a complaint that was indicative of a narrow
7        angle, haloes, I don't -- I wish I would have
8        the gonioscopy readings here to really tell me
9        what was the angle -- really tell me what was
10       going on with the angle.
11   Q.  Let me back up.  You said given that he didn't
12       have open angles later on.  What do you mean
13       by that?
14   A.  When he went to see Dr. Sepanski six months
15       later.
16   Q.  What did Dr. Sepanski say?
17   A.  He had some form of angle-closure glaucoma.
18   Q.  Isn't it true that Dr. Sepanski also graded
19       his angles as being wide open?
20   A.  His angles were closed or they were narrow
21       because they had peripheral anterior synechia
22       in them.  So that was preventing the fluid
23       from draining out.  You can't see the

Page 138

1        peripheral anterior synechia and that
2        inflammation without doing gonioscopy.
3    Q.  I'm talking about the openness of the angle
4        itself, regardless of something clogging up
5        the mesh work in there.  I'm talking about the
6        degree of openness of the angle.
7    A.  As screening for the angle being open, he said
8        the 4 indicates that it's open as a screener.
9    Q.  You're saying "he".  Are you talking about
10       Dr. Bazemore?
11   A.  Yes.
12   Q.  And isn't it true that Dr. Sepanski also
13       graded the angle at 4 six months later as
14       being open?
15   A.  You can grade it -- Did he grade it via the
16       slit lamp exam or did he grade it via
17       gonioscopy as a 4?
18   Q.  I don't know.  Do you know that?
19   A.  I'm not sure, but I know in his assessment it
20       said angle closure at that first visit.
21   Q.  And you disagree with that assessment by
22       Dr. Sepanski of angle closure?
23   A.  No, I don't.

Page 139

1    Q.  I thought you told me it was angle-recession
2        glaucoma.
3    A.  No, I never said that.
4    Q.  So you agree that it's angle-closure glaucoma?
5    A.  That it's some type of angle closure, yes.
6    Q.  Going back to this doctor's -- Dr. Bazemore's
7        notes of 8/20, what reason do you have to
8        disagree that the angle was open on that date?
9    A.  Because there's no definitive way to look at
10       the angle here besides the screening test,
11       which is a very gross test.  No one has looked
12       at the angle structures so I don't know what
13       they are.
14   Q.  You don't know what they are?
15   A.  Right.
16   Q.  Is that correct?
17   A.  Right.  Because he didn't do the test that's
18       required to know what the angle really looked
19       like.
20   Q.  And if you had done the gonioscopy on that
21       date, you don't know what you would have found
22       on that date, do you?
23   A.  Based on the fact that the patient was

Page 140

1        reporting haloes around lights and he ended up
2        losing most of his vision except for a small
3        island of vision, I bet the angle would have
4        looked unusual to Dr. Bazemore.
5    Q.  You bet it would?
6    A.  Yeah.  It would have to me.
7    Q.  And you know that based upon looking at his
8        medical records from later on, correct?
9    A.  And the fact that patients don't complain
10       about -- For a patient to actually come in and
11       say, I have haloes around lights -- You know,
12       we talked about the film, and that could be an
13       indication.  Just based on this, without
14       having Dr. Sepanski's records, that's what I
15       was telling you earlier today, that I said I
16       bet this patient ended up with an angle
17       closure.
18   Q.  How quickly can an angle closure develop?
19   A.  Within hours.  But then it can go away on its
20       own spontaneously.  It can be intermittent.
21       So you really need to know what the angle
22       looks like.
23   Q.  Isn't it true that when Mr. Bengston went to

Deposition of Dr. Landgraf

Page 141

1   see Dr. Sepanski six months later, his angle
2   closure could have developed within hours of
3   seeing Dr. Sepanski?
4   A.   That one, yes.  But if it had developed --
5   you've got -- His visual field indicates end
6   stage glaucoma.  He has hardly any vision left
7   except for a central island.  That doesn't
8   occur within hours.  That takes longer to
9   occur.
10  Q.   His visual field has depleted to that level
11  currently, correct?
12  A.   No.  It was already that way when he saw
13  Dr. Sepanski.
14  Q.   What was his vision when he saw Dr. Sepanski?
15  A.   It was about 20/30.
16  Q.   And you're telling me you think the 20/30 is a
17  result of glaucoma?
18  A.   I believe so, yes.
19  Q.   What is your basis for believing that the
20  20/30 is from glaucoma?
21  A.   Because there was no other indication in the
22  record.  There's a lot of reasons why you can
23  lose your vision.  You could have a cataract.

Page 142

1   You could have a problem with the macula in
2   the back of your eye which is part of the
3   retina that allows you to see very well.
4   There's a lot of reasons why patients can't
5   see 20/20 vision.  The only thing that showed
6   up in the record was the extensive visual
7   field loss.  You have to have a lot of visual
8   field loss in order to actually lose lines of
9   visual acuity, and the normal would be 20/20.
10  So that would be two lines of visual acuity.
11  There was nothing else in that record at that
12  time that would have been an etiology for the
13  vision loss.
14  Q.   The record in front of you of 8/20/04 also
15  talks about examining his pupils.
16  Dr. Bazemore testified that on that date, his
17  pupils were equal in appearance and equally
18  reactive to light.  Do you have any reason to
19  disagree with that finding?
20  A.   In Dr. Bazemore's deposition, he said that
21  there's no difference between using a pen
22  light and a transilluminator to do pupils.
23  Transilluminator is the standard of care and

Page 143

1   not a pen light to do pupils.
2   Q.   So you think he should have used a
3   transilluminator?
4   A.   And I don't know if he did or not.  It doesn't
5   say here, and I didn't -- The only reason that
6   that concerns me is in his deposition, he said
7   that the transilluminator is the same as using
8   a pen light; it doesn't make a difference
9   which one you use.  And that's not -- The
10  patient did end up with an afferent pupillary
11  defect when he showed up at Dr. Sepanski's
12  office.  And that's a lot harder to see with a
13  transilluminator versus a -- Excuse me.
14  That's wrong.  They are a lot harder to see
15  with a light versus a transilluminator.
16  Q.   So tell me what evidence you have to say that
17  Dr. Bazemore's findings on August 20, 2004
18  that Mr. Bengston's pupils were equal and
19  equally reactive to light was inaccurate.
20  A.   It says that here.  The only concern I have is
21  in his deposition, I don't know whether he
22  used a pen light or a transilluminator.
23  Q.   If he had used a transilluminator, in your

Page 144

1   opinion what would he have seen differently?
2   A.   It will be easier to see an afferent pupillary
3   defect.
4   Q.   Do you know as we sit here today whether
5   Mr. Bengston had an affery pupillary defect --
6   A.   Afferent.
7   Q.   -- afferent pupillary defect on August 20,
8   2004?
9   A.   He wrote down no.
10  Q.   And you don't have any evidence to suggest
11  otherwise, do you?
12  A.   It just concerned me, again, because of his
13  deposition, what he said about that.
14  Q.   Mr. -- I'm sorry.  Go ahead.
15  A.   Because he did end up with an afferent
16  pupillary defect.
17  Q.   Dr. Bazemore also testified that he looked at
18  Mr. Bengston's optic nerve on that date and
19  that it appeared normal.  Do you have any
20  reason to disagree with Dr. Bazemore's
21  findings in that regard?
22  A.   He put .4 and .35 here for CDs.  Those are
23  normal cup to disc ratios.  I don't see any

36 (Pages 141 to 144)

Page 145

1    comment regarding the neuroretinal rim, which
2    is the -- The optic nerve is like a doughnut,
3    and the hole in the center is the cup. And
4    that's the cup size, .4 and .35. That's
5    normal. But what is just as important in
6    glaucoma is that you evaluate the neuroretinal
7    rim, and there's no comment here on that. But
8    the CDs look normal.
9    Q.  Do you have any evidence to suggest that the
10   optic nerve did not appear normal on
11   Mr. Bengston's visit of August 20, 2004 to
12   Dr. Bazemore?
13   A.  All you can say is that the CD was normal, cup
14   to disc ratio, .4 and .35. There's no other
15   comments here about other parts of the optic
16   nerve that are evaluated typically on
17   patients.
18   Q.  Let me hand you back Defendant's Exhibit 3. I
19   want to ask you some questions about that.
20   A.  Of course.
21   Q.  In paragraph 2 on Defendant's Exhibit 3, you
22   talk about the medical records you've
23   reviewed, and you talk about reviewing

Page 146

1    Dr. Bazemore's notes and Dr. Bengston's
2    notes -- I'm sorry -- Dr. Sepanski's notes,
3    correct?
4    A.  Yes.
5    Q.  So are those the only two doctors' notes you
6    had reviewed at the time of formulating your
7    written report in this matter?
8    A.  Yes.
9    Q.  And you begin at the bottom of page 2 by
10   saying, the optometrist, Dr. Bazemore, failed
11   to meet the standard of care in regards to the
12   history and exam findings in this patient.
13        What is the standard of care in this
14   situation?
15   A.  If a patient has haloes around lights, you
16   have to make sure that they don't have angle
17   closure.
18   Q.  And where would I find that written down
19   somewhere, what you just said, as being the --
20   A.  In the Clinical Ocular Pharmacology book by
21   Bartlett and Jaanus.
22   Q.  You say if a patient complains of haloes
23   around lights, you have to make sure they

Page 147

1    don't have angle closure; is that correct?
2    A.  That would be the most important condition to
3    rule out because it's the most devastating
4    condition to the patient's vision that causes
5    haloes around lights as a symptom.
6    Q.  How would you go about making sure that they
7    don't have angle closure?
8    A.  Measure Goldmann tonometry and do gonioscopy.
9    Q.  Could you imagine a scenario where a patient
10   came in and complained of haloes around lights
11   and then when you did Goldmann's had normal
12   pressure and when you did gonioscopy found
13   that he had no blockages of any kind or
14   closures?
15   A.  Yes.
16   Q.  Tell me what kind of scenario that would be.
17   A.  Anything that causes a severe corneal edema,
18   maybe the Pseudophakic Bullous K. But I would
19   write down in my assessment the reason for
20   that, and my plan would include the treatment
21   and then have the patient come back to make
22   sure that they were better.
23   Q.  Any other scenario you can imagine where

Page 148

1    somebody complained of haloes around lights
2    but tested normal on Goldmann's and normal on
3    gonioscopy? There would be a lot of different
4    scenarios, wouldn't there?
5    A.  They would be really rare in that you'd have
6    to write them down in your assessment that
7    that was the reason why and then have them
8    back and make sure that is the reason why.
9    Q.  The next sentence in your report reads, on
10   August 20, 2004, Mr. Bengston complained of
11   haloes around lights in the right eye. The
12   next sentence is, this, combined with an exam
13   history finding of asymmetric and elevated
14   intraocular pressure in the right eye is
15   highly indicative of narrow-angle or
16   angle-closure glaucoma.
17        Tell me where in his history there was
18   asymmetric intraocular pressure.
19   A.  When I said exam history, I was referring to
20   the reading from the exam on 10/2/01.
21   Q.  And so that's a visit by Mr. Bengston almost
22   three years prior; is that correct?
23   A.  Yes.

Page 149

1    Q.   And on that date, there was a noncontact
2         tonometer performed at 3:50 p.m., which says
3         38 and 24; is that correct?
4    A.   Yes.
5    Q.   38 being the right eye and 24 being the left
6         eye?
7    A.   Yes.
8    Q.   Do you remember if I asked you earlier if that
9         had been scratched out?
10   A.   You did.
11   Q.   Does that appear to be scratched out?
12   A.   There's a scratch through it. I wasn't sure
13        when I went through the records that that was
14        scratched out, because when you -- the
15        standard of care for scratching out things in
16        the records is to cross it out, initial and
17        date it, especially for a tonometry reading.
18   Q.   And what does this say over here on the side?
19        Can you read that?
20   A.   Lids and then -- This is tough for me to read.
21   Q.   You've indicated today that you've read the
22        deposition of Dr. Bazemore. Do you remember
23        what he said about that in his deposition?

Page 150

1    A.   He said that the patient was squeezing his
2         lids.
3    Q.   In your experience, is that one of the issues
4         with the noncontact tonometer that can give a
5         false high reading if somebody is squinting
6         their eyes at the time the test is given?
7    A.   From what I remember is that it won't give you
8         a reading if it's not accurate, if it's not
9         considered within the accuracy of the NCT.
10   Q.   That's what you remember about it from back in
11        the '80s?
12   A.   Yes.
13   Q.   And did you remember Dr. Bazemore's testimony
14        that he then did a Goldmann's tonometry on
15        this visit of 10/2/01?
16   A.   Right. I can see that there, too.
17   Q.   Isn't that what's circled out here to the
18        side, the 20 and the 19?
19   A.   Right.
20   Q.   Do you remember also that he testified that he
21        did not rely upon the 38 and the 24?
22   A.   He said 28 and 24 in his deposition.
23   Q.   Did he testify that he did not rely upon that?

Page 151

1    A.   I think so. I don't ...
2    Q.   Under the Goldmann's standard of 20 and 19
3         that's listed here on 10/2/01, is that
4         considered elevated pressure?
5    A.   21 is high. The 20 is on the high side of
6         normal.
7    Q.   The 20 and 19, are those considered asymmetric
8         pressures?
9    A.   No. But the reason for this in the record was
10        because of this, and the right eye ultimately
11        was the one that was affected with angle
12        closure. And a 14 difference, you know, I was
13        concerned about this reading, and that's why I
14        put it in here.
15   Q.   The reference in your report, Exhibit 3 -- In
16        Exhibit 3, the reference to asymmetric and
17        elevated intraocular pressure in the right
18        eye, is that reference only to this entry on
19        the 10/2/01 visit where it looks to say 38 and
20        24?
21   A.   Yes.
22   Q.   There's no other evidence in Mr. Bengston's
23        records that you're aware of that show either

Page 152

1         elevated intraocular pressure or asymmetric
2         intraocular pressure; is that correct?
3    A.   Not in these four records, no.
4    Q.   Are there some other records that would
5         indicate that that you know of?
6    A.   Just the ones when he saw Dr. Sepanski, but
7         not in these four.
8    Q.   And on the visit of 10/2/01, Mr. Bengston was
9         not complaining of haloes around lights on
10        that occasion, was he?
11        MR. ADAMS:   Object to the form. He
12        can't ...
13   A.   Again, I'm having trouble reading the chief
14        complaint. Last check, check new glasses. I
15        don't know what this says. Chief complaint,
16        wants contact lens, never worn. There's
17        nothing that I can see about haloes here.
18   Q.   Have you since had an opportunity to review
19        the records from Dr. Reed Cooper?
20   A.   Yes.
21   Q.   Do you have any opinions about his treatment
22        of Mr. Bazemore?
23   A.   He is the patient's primary care physician.

Page 153

1    He saw him twice?
2  Q.  Yeah.
3  A.  I think the patient had a different problem in
4      the other eye like a conjunctivitis that he
5      was working on, but he --
6          MR. ADAMS: I'm going to object.
7  A.  If I can remember --
8          MR. ADAMS: Hold on just a second.
9          I'm going to object to the form
10         of the question to the extent
11         you're asking him to critique
12         care provided by a medical
13         doctor, a family practitioner.
14         He is being presented as an
15         expert professor of optometry,
16         and he's not purported to be a
17         medical doctor. And so to ask
18         him to testify as to a medical
19         doctor's -- to critique a medical
20         doctor is not appropriate.
21  Q.  Let me ask you this way. Are you familiar or
22      do you know what is the standard for medical
23      doctors in dealing with patients who present

Page 154

1      with eye problems?
2  A.  No. I see a lot of patients that have seen
3      medical doctors that had eye problems and then
4      end up in my clinic. That's all. I was glad
5      to Dr. -- I keep getting -- Dr. Cooper. I was
6      glad that he got him to Dr. Sepanski. That's
7      the only thing that I was ...
8  Q.  So going back to your report on Exhibit 3, the
9      sentence that reads -- Well, starting up here,
10     on August 20, 2004, Mr. Bengston complained of
11     haloes around lights in the right eye. And
12     then you say, this, combined with an exam
13     history finding of asymmetric and elevated
14     intraocular pressure in the right eye, is
15     highly indicative of narrow-angle or
16     angle-closure glaucoma.
17         We just talked about the asymmetric and
18     the intraocular pressure. If you were to
19     assume for purposes of this question that
20     there was no asymmetric or elevated
21     intraocular pressure, would the single
22     complaint of haloes around lights be highly
23     indicative of narrow-angle or angle-closure

Page 155

1      glaucoma?
2  A.  It would be the most important thing to rule
3      out.
4  Q.  The most important thing to rule out.
5  A.  Because it's so devastating to the patient's
6      vision.
7  Q.  Would it be the most common cause of haloes
8      around lights?
9  A.  I don't know.
10  Q.  You don't know?
11  A.  (Witness nods head negatively.)
12  Q.  What --
13  A.  It could be a cause. It's the most important
14     cause of a patient complaining about haloes
15     around lights. Patients don't come into my
16     office that often and complain about haloes
17     around lights. For all the other conditions
18     that we talked about, they complain about
19     blurry vision or eye discomfort, but that
20     actual term "haloes" is unusual to hear from a
21     patient.
22  Q.  The next sentence of the minimum workup per
23      the optometric standard of care for this

Page 156

1      complaint includes an assessment of the
2      anterior chamber angle via gonioscopy and
3      Goldmann tonometry on each visit.
4          And that minimum standard of care that
5      you've just described, is that what you are
6      saying is in writing in the Clinical
7      Pharmacology book?
8  A.  Gonioscopy and Goldmann tonometry are
9      indicated to check for angle-closure glaucoma,
10     or that possibility.
11  Q.  And the source for that, again, just to make
12      sure I'm clear, is -- your source for that
13      standard of care is Clinical Ocular
14      Pharmacology, the textbook?
15         MR. ADAMS: Object to the form. Go
16         ahead.
17  A.  Because it talks about haloes as a symptom,
18      and then it goes through the tests that need
19      to be done in that text.
20  Q.  In that text?
21  A.  Yes.
22  Q.  Are you aware of any other texts or any other
23      writings or treatises that say, in effect,

Deposition of Dr. Landgraf

Page 157

1    that if a patient complains of haloes around
2    lights, the minimum standard workup would
3    include gonioscopy and Goldmann tonometry at
4    each visit?
5    A.  Any text that talks about angle-closure
6        glaucoma or narrow-angle glaucoma is going to
7        have that in there.  So the Will's Eye Text
8        that I talked about earlier -- There are tons
9        of textbooks on eye disease.  Any textbook on
10       glaucoma, you would look in the section on
11       neuro angle or angle-closure glaucoma, and
12       it's going to talk about haloes around lights
13       as a symptom of that and what tests need to be
14       done to evaluate that.
15   Q.  Did Mr. Bengston have angle-closure glaucoma
16       on 8/20/2004?
17            MR. ADAMS:  Object to the form.  Go
18       ahead.
19   A.  I don't know.
20   Q.  Have you had a chance to read Dr. Bazemore's
21       deposition?
22   A.  I did last night for the first time.
23   Q.  Is there anything in there that you disagree

Page 158

1    with -- that stuck out to you immediately that
2    you disagree with?
3    A.  There were three things.
4    Q.  Tell me what those were.
5    A.  The first was he used Goldmann and NCT
6        interchangeably and said one was as good as
7        the other.
8    Q.  And you disagree with that?
9    A.  I disagree with that.
10   Q.  For reasons we've discussed here today?
11   A.  Yes.
12   Q.  Okay.
13   A.  The other, he said that patients complain
14       about haloes all the time to him, and that's
15       not been my experience at all as an
16       optometrist.
17   Q.  Do you have any reason to disagree with his
18       statement that patients complain to him all
19       the time about haloes around lights other than
20       the fact you haven't experienced the same
21       thing?
22   A.  The fact that if you would ask anyone, I don't
23       think on a daily basis -- If you were to ask

Page 159

1    any optometrist, they are not going to say
2    that there's always several patients per day
3    that complain about haloes around lights.
4    Q.  So you think he's lying about that?
5            MR. ADAMS:  Object to the form.
6    A.  I don't know.
7    Q.  But your testimony is you have a different
8        experience in that you don't have many
9        complaints of people complaining of haloes
10       around lights?
11   A.  Right.  Because -- I don't.  That's all I'm
12       saying.
13   Q.  That was number two.  What's number three?
14   A.  The issue with -- he thought that the
15       transilluminator and the pen light were
16       interchangeable to measure pupils.  If you use
17       a pen light to do the pupil test on the
18       national boards, you don't pass the test.
19   Q.  Is a transilluminator a new device?
20   A.  No.
21   Q.  How long has it been around?
22   A.  I would imagine 30 years at least.  It's a
23       much brighter light source.  He has one, I'm

Page 160

1    sure.
2    Q.  You've given me those three things where you
3        disagree with Dr. Bazemore's deposition.  Any
4        other things that stuck out to you regarding
5        Dr. Bazemore's deposition?
6    A.  Those were the three biggest issues upon going
7        through it one time last night.
8            MR. WHITE:  I'm going to take a
9        break.
10           (Brief recess.)
11           MR. WHITE:  I don't have any further
12       questions.
13           EXAMINATION
14   BY MR. ADAMS:
15   Q.  What's been admitted, Dr. Landgraf, as
16       Defendant's Exhibit 3, you have had an
17       opportunity to read over that, correct?
18   A.  Yes.
19   Q.  And you agree that that is your report -- your
20       expert report regarding Kyle Bengston and
21       Dr. Bazemore's treatment of him and the events
22       that give rise to this case?
23   A.  Yes.

40 (Pages 157 to 160)

## Page 161

1   Q.   And further, that is your signature just above
2        the date under paragraph 6 on that report?
3   A.   Yes.
4            MR. ADAMS:  That's all.
5            MR. WHITE:  No follow-up.
6            (Deposition concluded at
7             approximately 3:00 p.m.)
8
     * * * * * * * * * * * *
9
         FURTHER DEPONENT SAITH NOT
10
     * * * * * * * * * * * * *
11
12       REPORTER'S CERTIFICATE
13   STATE OF ALABAMA:
14   MONTGOMERY COUNTY:
15       I, Pamela A. Wilbanks, Registered
16   Professional Reporter and Commissioner for the State
17   of Alabama at Large, do hereby certify that I
18   reported the deposition of:
19       DR. THOMAS J. LANDGRAF, O.D.
20   who was first duly sworn by me to speak the truth,
21   the whole truth and nothing but the truth, in the
22   matter of:
23       KYLE BENGSTON,

## Page 162

1        Plaintiff,
2        Vs.
3    DAVID BAZEMORE, O.D., and
4    WAL-MART STORES, INC.,
5    Defendants.
6        In The U.S. District Court
7        For the Middle District of Alabama
8        Eastern Division
9        3:06-CV-0059-MEF
10   on Friday, June 15, 2007.
11       The foregoing 161 computer printed pages
12   contain a true and correct transcript of the
13   examination of said witness by counsel for the
14   parties set out herein.  The reading and signing of
15   same is hereby waived.
16       I further certify that I am neither of kin
17   nor of counsel to the parties to said cause nor in
18   any manner interested in the results thereof.
19       This 20th day of June 2007.
20
21
22
23

## Page 163

1
2
3
4
5
6
7
                    _____
8    Pamela A. Wilbanks, Registered
     Professional Reporter and
     Commissioner for the State
9    of Alabama at Large.
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**A**

abbreviated 114:19
able 15:7 47:3 81:12
83:6
about 6:16,21 14:13
21:4,8,20 24:12
27:11 31:2,5 35:3
37:23 39:1 40:5 46:5
48:12,16 50:6,18
56:16 61:2 65:7,10
66:3,14 70:2 73:18
77:8,14,15,19 80:8
83:4,16,17 85:21,22
86:13 87:23 90:8,20
91:19 92:10,12 98:18
98:22,23 104:14
106:2,3,9,10 107:13
107:13,23 108:20
109:1,2,4 110:1,18
111:12,18 114:12,15
119:4,8 121:13
122:10,18,19 124:12
125:4 129:8 133:19
133:23 138:3,5,9
140:10,12 141:15
142:15 144:13
145:15,19,22,23
147:6 149:23 150:10
151:13 152:17,21
154:17 155:14,16,18
155:18 156:17 157:5
157:8,12 158:14,19
159:3,4
above 59:14 161:1
accepted 113:20 114:8
access 5:18
accompanied 96:1
according 21:22
accredited 61:11
accumulate 75:5
accumulated 75:2
accuracy 119:14,17,19
134:15 150:9
accurate 42:13 43:5
110:9 116:2 117:20
119:1,2 121:19,22
123:7,10 124:11,17
125:13 126:21 128:7
129:14 150:8
acquaintances 63:20
acronym 94:20
across 49:17
ACTION 1:7
active 62:15
actively 62:15
actual 17:7 133:5
134:11,19 155:20
actually 35:14,16 38:3
41:14 50:11 97:19
107:16 109:3 132:7

135:8 140:10 142:8
acuity 142:9,10
acute 100:1,3,7,20,23
101:7,8,10,15 102:7
102:11 112:17
acute-angle 100:10
Adams 1:18 2:3,8,14
5:13 6:21 8:16,18 9:5
11:5,6,13,17 13:5
14:10 17:12 18:5
20:23 21:9,19 22:5
22:10,22 23:18 27:3
27:13,16 28:3 29:19
31:2,4,19,22 36:2
37:16,18 38:2,18
39:17 40:23 41:4
43:1,15 44:2 45:14
45:17 46:3,13 47:2
47:12 48:13,18,22
49:3 50:21 51:23
52:17 53:11 55:10
56:1 64:13 65:14
73:17 79:10,16 84:4
86:7,14,18 90:12
95:11 98:12 105:12
113:2 116:17 117:5
118:21 123:13 124:1
124:7 128:1,12 129:1
133:3 152:11 153:6,8
156:15 157:17 159:5
160:14 161:4
add 57:5
additional 72:6
Additionally 29:5
address 5:13 6:20 39:7
40:17 110:14
addresses 39:4,11
adhesions 96:17
adjust 120:3
administered 116:2
admitted 160:15
adnexa 111:4,8
adopted 19:10,11
adults 93:21
advance 49:12
advanced 74:15
advertise 73:5,8,21,23
78:10
advocated 118:14
affect 104:20
affected 35:8 151:11
afferent 143:10 144:2,6
144:7,15
affery 144:5
affidavit 55:8
African-American
90:3
African-Americans
91:19
after 4:7 6:14 29:3 41:7

44:18 45:1 64:6
80:13 109:18 127:10
again 18:6 22:10 33:1
50:3 57:6 81:16
83:11 94:20 104:16
108:11 109:20 117:9
117:19 121:16 125:2
144:12 152:13
156:11
age 90:3 92:3,7,11,12
92:14,17 93:11,13
98:18
ago 33:19 75:5 80:5
82:5 111:16 121:18
129:3
agree 25:9,11 45:17
134:7 136:1,20 139:4
160:19
agreed 3:2,16,23 45:22
agreement 1:15 13:2,2
14:6
ahead 43:16 64:14
95:18 105:13 116:18
117:6 133:4 144:14
156:16 157:18
aid 13:13
air 114:16
Alabama 1:2,17,19
2:10 3:8 36:23 54:14
62:20,22 63:2,5,10
63:13,14,21 64:3
161:13,17 162:7
163:9
Alabata 20:16 21:2,9
21:20,22 22:5,11
27:22,23 28:5,8
Alabata's 24:8,11
allergic 108:4
allergies 57:15
allergy 105:18
allow 77:23
allowed 14:8 52:17
117:15,18
allows 142:3
almost 82:20 103:9
148:21
along 27:17 71:8,14,16
Alpharetta 2:5
already 51:10 75:7
76:23 77:5 81:22
125:17 141:12
always 64:16 71:12,14
71:16 103:9 124:6
128:5 130:2 159:2
amend 22:20,23 23:2,6
23:8,11
among 113:20
anatomical 88:14
91:14
angle 21:6,11,17,23

34:2,20,23,23 35:6,8
35:12,15,19,21,22,23
36:3,6,9 46:14,21
48:9 88:12,12,20,23
89:2,7,12,18,21,21
91:14 92:1 93:17
94:8 95:23 96:6,18
96:19 100:8,15
101:18 106:21
112:10,12,15 131:2
131:10,12,17 132:3,7
132:23 133:6,12
135:2,11,11,22,23
136:12,18,22 137:2,7
137:9,10 138:3,6,7
138:13,20,22 139:5,8
139:10,12,18 140:3
140:16,18,21 141:1
146:16 147:1,7
151:11 156:2 157:11
angles 89:4 137:4,12,19
137:20
angle-closure 44:18,23
47:4,14 50:13 89:17
90:8,22 91:6,7,9
92:19 93:2 100:1,4
100:20,23 101:2,4,16
102:7,11 106:16
112:2,3,7 137:17
139:4 148:16 154:16
154:23 156:9 157:5
157:11,15
angle-recession 112:3
112:5 139:1
another 26:10 41:18
45:10 49:17 51:15
53:3 55:13 76:19
82:22 85:11,14,15
126:22
answer 10:15 43:2 44:3
48:21,23 74:7 113:5
118:22 125:3 133:4
answered 31:15 123:15
anterior 96:15 137:21
138:1 156:2
antiquated 126:15
anti-malarial 108:23
anybody 31:22 64:4
anymore 123:6,12
anyone 86:9 92:11
115:11 123:19
124:17 158:22
anything 6:9,13 58:15
59:6 72:17 78:19
87:2 89:13 90:19
91:4 103:17 109:7
113:17 124:18
147:17 157:23
Anywhere 65:1
apologize 5:14

appear 32:1 38:5,9
145:10 149:11
appearance 142:17
APPEARANCES 2:1
appeared 144:19
appears 25:12,23 30:4
37:20 55:23
applanation 115:16
applied 63:1
apply 6:5
appointments 67:23
appreciate 123:9
appropriate 13:20
153:20
appropriately 50:12
approximate 14:23
approximately 1:20
8:21 17:11 60:6,17
60:22 68:5 73:15
74:4,9 76:1,10 79:2
161:7
April 55:21 57:16
area 17:5 35:17 111:2
arising 63:5,10
Arkansas 80:5,18
81:17,20 83:18 84:15
around 50:3 67:9 94:11
103:2,7,15 104:2
105:3,10,19,22 106:5
106:10,16 107:1,9,21
108:2,7,9,13,18,20
109:9 110:6 111:2
117:13 122:16
132:18 135:6 140:1
140:11 146:15,23
147:5,10 148:1,11
152:9 154:11,22
155:8,15,17 157:1,12
158:19 159:3,10,21
arrived 29:13
arrow 40:18
art 72:19
article 12:11 26:1,10
130:1
articles 10:20 11:2,3,23
12:2 54:1 118:4,12
129:17,22
Arts 28:22
asked 7:2 10:7 51:23
53:15 80:4 81:22
84:6 85:20 87:6
90:20 91:23 122:14
123:14,17 149:8
asking 5:1 53:12 93:3
119:20 121:12
122:21 128:2,10
153:11
asks 9:16 10:3
assessment 36:8 110:15
138:19,21 147:19

June 15, 2007

Deposition of Dr. Landgraf

Page 2

148:6 156:1
**assigned** 55:4
**associated** 93:12
**Associates** 64:20 65:1
66:15 67:6,18 68:3
69:8
**assume** 154:19
**asymmetric** 50:5
113:23 148:13,18
151:7,16 152:1
154:13,17,20
**asymmetry** 47:23
**attached** 2:20 29:7
56:8,19
**attachment** 2:17 5:11
**attack** 100:9,15
**attempted** 127:10
**attend** 59:3
**attended** 57:11
**attorney** 8:4,18 10:9,12
14:21 15:16,22 16:7
16:8,20 17:19,20
48:15 52:7,21,23
55:11
**attorneys** 2:4,9 14:20
82:10
**atypical** 106:8 108:11
109:10
**Auburn** 1:19
**August** 133:20 134:8
143:17 144:7 145:11
148:10 154:10
**average** 74:6
**aware** 19:19 86:20,21
116:19 118:3,4,12
121:12 129:17,21
130:5,9 151:23
156:22
**away** 35:16 112:11
140:19
**A-D-N-E-X-A** 111:6
**a.m** 1:21

**B**

**B** 58:10
**back** 8:22 15:7 32:16
35:22 42:6 76:15,19
81:13 83:5,15 91:18
104:13,19,21 107:15
113:12 118:8 137:11
139:6 142:2 145:18
147:21 148:8 150:10
154:8
**background** 56:17
**Baltier** 66:7
**Bartlett** 146:21
**Bartlett's** 38:19
**Basden** 28:12,18 117:3
**base** 12:4 95:21,22,23
**based** 45:4 46:15,21

47:1,10,11 50:7,8
61:14 70:3 72:11
101:5,6 120:3 123:22
124:2 139:23 140:7
140:13
**basically** 88:20 130:15
132:2
**basis** 68:8,14 74:6 75:2
76:13 115:19,23
123:4,11,21 136:21
141:19 158:23
**Bazemore** 1:8 2:21
11:7 13:19 20:3
23:20,22 42:18 45:1
55:2 116:20 117:2
125:7,9 133:18 134:2
135:22 136:10
138:10 140:4 142:16
144:17 145:12
146:10 149:22
152:22 162:3
**Bazemore's** 24:1 36:14
36:17 42:1 43:3 46:2
51:2 139:6 142:20
143:17 144:20 146:1
150:13 157:20 160:3
160:5,21
**beam** 131:5,6
**become** 45:17,22 62:4
62:6,11 92:8 97:10
104:7 112:15
**becomes** 92:8 113:21
**becoming** 25:21
**before** 1:15 3:6 4:21
14:6 47:11 48:10
49:10 50:4 54:14
55:12 80:4,7 107:13
109:4 117:14
**begin** 146:9
**begun** 29:4
**behalf** 41:4 79:5,6,14
80:22 81:1,2,3 82:4
83:19 84:13 86:10
**behind** 130:17
**being** 19:2 40:2,10
42:13 50:5 52:15
61:17 66:15 79:12
85:23 90:3 99:16
103:4,11,20 104:3
112:16 114:9 135:23
137:19 138:7,14
146:19 149:5,5
153:14
**believe** 12:6 15:11 17:9
22:16 23:22 30:10
31:21 32:11,14 33:21
34:13,13,14 39:23
40:16 41:8,14,16
43:17 45:12 46:17
48:19 51:9 53:21

66:11 67:10 72:10
84:8,19 87:4,6 101:4
121:7,10 124:20
125:6 127:22 132:17
136:11 141:18
**believed** 88:3
**believing** 141:19
**below** 21:1
**Bengston** 1:5 2:19 7:3
7:19 8:4 10:6,10,13
12:18 25:18 27:19
28:6 29:4 36:6 41:5
47:4,13 55:2 87:10
87:18 91:7 92:23
100:19 101:10
112:21 125:6 133:17
140:23 144:5 148:10
148:21 152:8 154:10
157:15 160:20
161:23
**Bengston's** 19:3 22:14
22:16 26:14,19 27:14
134:8,19 136:22
143:18 144:18
145:11 146:1 151:22
**beside** 21:3
**besides** 127:19 139:10
**best** 15:12 119:3,6,21
**bet** 140:3,5,16
**Beta** 58:17,17,18
**better** 61:17 119:23
147:22
**between** 3:3,17 4:1 8:3
10:5,9,11 13:3 59:19
59:22 93:6 96:17
114:2 121:14 142:21
**beyond** 26:8
**big** 12:23
**biggest** 93:16 160:6
**bill** 53:5
**billing** 9:17,23
**bind** 65:12
**biologic** 58:18
**biology** 58:6,10
**Birmingham** 63:16
**bit** 46:9 104:15 132:7
**Blake** 2:8 38:16
**blank** 36:11
**blanket** 95:12,18
**blind** 94:19
**blindness** 88:6
**blockages** 147:13
**blood** 89:7
**blur** 33:16,17 104:15
113:9
**blurry** 77:8 94:12
107:23 110:2 155:19
**board** 19:2 63:22
116:4,10,12 120:22
**boards** 63:16,19 116:3

122:6 159:18
**body** 106:1 133:8
**book** 38:19,22 39:1,13
146:20 156:7
**born** 89:4 93:18 94:3
**both** 39:10 43:5,5 57:7
61:11,18
**bottom** 53:9 135:14
146:9
**brackets** 72:16
**break** 56:11 73:17
112:18 160:9
**Brett** 28:12,18
**brief** 56:12 73:16 85:18
85:19 87:21 103:22
112:20 160:10
**briefly** 126:11
**brighter** 159:23
**bring** 5:17 7:2 11:1
13:4 14:12 26:18
72:5
**bringing** 79:11
**brought** 6:2,3,10
**bubble** 109:20
**Bullous** 109:11 110:4
147:18
**business** 67:11 77:16
**B-A-L-T-I-E-R** 66:9

**C**

**call** 53:11 74:12 75:17
97:12
**called** 35:19 54:11
88:20 107:16 133:11
**calling** 48:16
**came** 49:17 51:10
118:10 135:8 137:5
147:10
**cardiac** 108:15
**cardiovascular** 90:3
**care** 19:7 23:19 29:6
37:7,8 38:13 45:4
49:21 60:9,13 68:12
68:16,19 72:10,15
74:15,19 75:16,19,22
76:5,15,17,19,21,23
77:6 115:21 116:1
117:22 119:3,9
124:10,21 129:16
131:19 142:23
146:11,13 149:15
152:23 153:12
155:23 156:4,13
**career** 64:12,16 95:7
**case** 3:17,19 8:17 15:14
23:4,5 25:6,21 40:2
45:23 49:12 50:14
52:10 53:1,16,18
54:2,6,12,13,18,23
55:1,4,11 63:5,8,10

71:12 79:14 80:5,7
80:23 81:3,9 82:13
82:17,21 83:13,17,19
84:1,15,18,20 85:2,7
85:11,14,15 86:2,4
91:13 160:22
**cases** 16:3 17:15 51:23
52:3,19,22 54:9 55:3
55:9 57:14,15 80:3
80:17 82:20 83:7,12
83:16 109:3
**cataract** 67:3 109:15
109:18,22 141:23
**cataracts** 107:1,8
**catch** 125:2
**catering** 72:21
**cause** 35:11 88:15
89:10,16 97:7 103:17
104:7,13 107:1,8,10
107:20 108:2,9 109:8
109:19 111:22 155:7
155:13,14 162:17
**caused** 97:1 108:13
**causes** 48:6 88:7,16
89:2,14 91:5 93:15
97:2,4,22 103:15
107:2,3 109:5,5
113:7,8 147:4,17
**causing** 106:13,16
**CD** 145:13
**CDs** 144:22 145:8
**center** 37:1 64:21
66:15 68:22 69:2,7
69:17 70:1,4,6 145:3
**central** 126:10,18
141:7
**certain** 72:15 73:1
92:14 102:17 131:8
**CERTIFICATE**
161:12
**certify** 161:17 162:16
**chamber** 156:2
**chance** 20:7 34:10
130:1 134:14 157:20
**change** 30:12 32:22
92:13
**changed** 57:4
**changes** 27:10 31:23
32:5 33:1
**charge** 72:8
**Charles** 58:1
**charts** 13:12,16
**check** 119:6 130:22
152:14,14 156:9
**chemistry** 58:6,11
**Chicago** 57:18,22,23
59:2 64:8
**chief** 50:2 110:13
152:13,15
**Chloroquine** 108:22

109:3,4,8
chronic 75:2,8 76:21
    76:23 77:6
chronically 76:16
ciliary 133:7
circled 150:17
Civil 1:7 3:5
class 19:4 60:4
clear 85:23 156:12
Cleared 33:18
clientele 72:21
clinic 28:23 71:5,7 72:8
    72:9,20 73:5,11,14
    73:20 74:3,5,7,10,14
    75:1,20 76:15 77:8
    77:10 123:1 126:10
    154:4
clinical 11:15 12:2 39:2
    56:3,3 63:18 116:4
    146:20 156:6,13
clinics 122:17,18,20
clipped 20:12
clogging 138:4
close 35:12,13 63:20
    89:2 135:12
closed 89:6,22 94:8
    101:19 131:12,16
    137:20
closed-angle 88:16
    92:13,15,16 93:7,10
    96:7,13
closing 131:10
closure 35:1 46:14,21
    48:9 100:8,10,15
    106:21 135:2,11
    138:20,22 139:5
    140:17,18 141:2
    146:17 147:1,7
    151:12
closures 147:14
cloudy 101:22
Coast 38:10
Cogan-Reese 24:17,22
college 18:23 39:8
    57:17 58:3,5,21,22
    59:3,15 60:1,11 61:4
    63:16,23 64:8 68:22
    69:2,18 70:7,23
    72:18 77:23 78:5,9
    115:5,6,11
color 107:6
colors 107:2,5
combination 36:23
combined 148:12
    154:12
comcast 39:7
come 24:15 26:10
    47:13 69:1,1,10 78:7
    103:21 104:11
    140:10 147:21

155:15
comes 23:5 77:7 103:11
coming 5:16
commencement 18:21
    18:22
commencing 1:20
comment 145:1,7
comments 145:15
commission 3:9
Commissioner 1:17 3:8
    161:16 163:8
common 48:8 88:8,11
    98:10,13 104:17
    108:6 155:7
commonly 113:20
communications 8:3,6
    10:4,8
community 67:21
    114:9
compare 32:3 121:9
compartment 88:22
compilation 28:21
complain 102:6,8
    103:6 104:14 105:9
    105:23 106:2 107:23
    108:18 140:9 155:16
    155:18 158:13,18
    159:3
complained 108:20
    110:1,5 112:22
    147:10 148:1,10
    154:10
complaining 77:8
    132:18 152:9 155:14
    159:9
complains 106:10
    146:22 157:1
complaint 47:15 50:3
    103:8 104:2 107:9,11
    107:20 108:9 110:14
    137:6 152:14,15
    154:22 156:1
complaints 50:1 159:9
complete 68:12
completely 18:6 26:7
    35:14
completing 64:6
component 88:13 98:7
composed 98:4
computer 8:22 32:16
    162:11
concern 143:20
concerned 43:6 92:10
    92:11 97:6 125:19
    144:12 151:13
concerns 143:6
concluded 161:6
concluding 123:11
conclusion 47:13
condition 100:1 112:17

147:2,4
conditions 155:17
conferences 118:2
confident 12:12
confirm 37:2 47:7
    56:21
congenital 98:1,7,9
conjunctiva 130:14
conjunctivitis 106:4
    108:5 153:4
considered 25:1,8 34:3
    36:4,8 150:9 151:4,7
Considering 137:3
consult 66:22
consultation 67:1
contact 22:8 86:6 105:5
    105:8,16 152:16
contacted 86:9
contain 162:12
contents 7:18
context 100:6
continuing 56:15 57:8
    85:20 87:22 112:21
    118:1
contract 87:1,4
contributes 98:2
conversation 20:23
    21:20 45:16,20,21
    46:11 48:13 50:21
conversations 39:17
    47:2,12 86:14
Cooper 29:1 51:16
    152:19 154:5
Cooper's 24:6 34:7,11
    36:19
copied 13:2
copies 8:14 12:7 17:1,7
    17:9,10,12
copy 11:11,12 12:10
    27:4 38:19 51:15
    55:14
Cordova 66:11
cornea 95:21 97:10,10
    101:21 103:3,10,11
    103:17,19 104:3,7,12
    104:13,19,21 105:2
    105:21 106:13
    107:15 113:11
    120:10 130:14
corneal 97:12 104:11
    104:16 107:12,16
    109:5 147:17
corneas 90:4
corner 29:15
correct 4:21 10:17 24:2
    25:12 26:2,12 27:19
    28:13 29:19 30:2,6
    34:13,14 36:15,20
    37:8 38:7,10,11,13
    38:16,20 40:21 48:17

51:3,17 52:8 53:6
    55:15 56:9 60:11
    77:1 79:9,17 83:20
    84:10 86:7,10 91:21
    93:8 99:13 104:7
    114:17,20 135:17
    139:16 140:8 141:11
    146:3 147:1 148:22
    149:3 152:2 160:17
    162:12
correctly 21:12 24:18
    35:10 47:5 89:22
    107:18 112:10,13
    120:12
corresponded 28:4
    87:16
correspondence 8:2,5
    10:4,8,11 52:12,15
counsel 3:3,17 12:18
    15:20 162:13,17
country 116:8
county 81:19,21 161:14
course 57:14,15,16,19
    58:4 71:2 86:12
    145:20
courses 57:9,13 70:22
    71:4
court 1:1 37:21 162:6
courtroom 14:7
cover 38:15 56:1
create 15:12 16:18
    32:19
critique 153:11,19
cross 149:16
Cum 59:10,13,18,19,20
    59:21,22,23
cup 144:23 145:3,4,13
current 125:9,10
currently 25:7 61:22
    70:2 71:2 76:7 77:20
    130:8,9 141:11
cutting 50:15
CV 2:20 56:20,23
    59:18 64:10
CXS 49:23 50:1
C-O-R-D-O-V-A 66:11

D

daily 68:8 74:6 76:13
    158:23
damage 81:7 104:20
damages 88:4
date 14:23 16:9 17:21
    23:16 34:6 39:18
    55:20,22 134:12,22
    135:4,16,22,23
    136:23 139:8,21,22
    142:16 144:18 149:1
    149:17 161:2
dated 27:15,21 33:16

51:16 133:20
Dave 8:16,18 13:1 14:1
    15:5 27:16 38:18
David 1:18 2:3 20:3 56:1
    86:7 162:3
Davidson 1:18 2:8
day 64:16 65:6,12,13
    66:1 67:7 70:13,15
    70:17 74:10 76:6
    105:11 159:2 162:19
days 68:11 70:9,10,11
    70:12 78:7
dealing 153:23
dealt 41:3
decreased 75:12
defect 97:21 143:11
    144:3,5,7,16
defendant 79:6,8,12
Defendants 1:9 2:6
    162:5
Defendant's 2:16 5:8
    5:10 7:2,14,22 8:7
    9:10,14,18 12:4,21
    13:9 18:16 56:13,18
    85:22 133:13,16
    145:18,21 160:16
definitive 139:9
degeneration 74:22
degree 35:13 58:9
    127:11,15 138:6
delivery 38:20
demonstrate 21:10
depleted 141:10
DEPONENT 161:9
deposition 1:14 2:17
    3:4,6,13,18 4:2,21
    6:17 11:7 13:19
    14:13 16:4 20:3,7,13
    22:14,17 23:21 26:15
    26:20,21 27:1,8,14
    42:1,3 43:3,17,18
    45:7 52:1,22 54:9
    82:12 83:3 136:11
    142:20 143:6,21
    144:13 149:22,23
    150:22 157:21 160:3
    160:5 161:6,18
depositions 6:8 16:11
    16:13,14,16,17 17:2
    17:8 23:14 54:3 83:8
derived 77:21
described 156:5
designed 72:15
Destin 29:6
determine 47:4 81:13
    83:6 96:12 131:12,13
    131:20
devastating 106:22
    147:3 155:5
develop 91:20 92:4,9

97:19 100:11 109:17
  140:18
developed 141:2,4
development 70:18
device 126:8,15 159:19
devices 118:19
diabetes 89:8 90:10
diabetic 74:21 99:6
diagnose 79:22 80:19
  80:20 95:19
diagnosed 36:3,6 44:23
  46:5,13 100:22 101:1
  101:3
diagnoses 24:23
diagnosing 118:6
diagnosis 12:9 24:22
  25:5,7,9 34:4 35:4,5
  96:10 131:22
diagrams 13:12,16,18
difference 47:18,21
  59:19,22 96:5 114:2
  121:14 142:21 143:8
  151:12
different 35:14 59:16
  59:16 74:14 76:6
  93:9 104:6,9 125:22
  128:8,20 148:3 153:3
  159:7
differential 128:6
differentiate 96:4
differentiating 93:5
differently 107:5 144:1
difficult 81:6 124:9
difficulties 66:23
Digitalis 108:14,16,19
dilate 130:23 131:3,9
  131:14 132:6
dilating 132:5,6
directly 28:5 110:19
  133:6
disagree 25:9,12
  134:11 136:16,21
  138:21 139:8 142:19
  144:20 157:23 158:2
  158:8,9,17 160:3
disc 144:23 145:14
disclosure 11:10 56:19
  89:18
disclosures 27:17 28:11
discomfort 33:23
  155:19
discounted 43:22
discovery 37:17 45:6
discussed 21:9 22:22
  34:2 46:10 55:12
  158:10
discussing 36:2
discussion 11:21 56:7
  85:18
disease 68:10,19 74:8

74:11,12,15,16,18,23
  75:1,13 76:3,5,7,9
  88:3 90:4,18 95:15
  110:4 157:9
disposed 91:20
dispute 14:23
district 1:1,2 54:6,11
  54:12,14 162:6,7
Division 1:3 162:8
doctor 42:21 50:9 53:2
  56:15 76:17,18,19
  80:22 81:1,2,4 82:8
  83:19 84:7,14 85:3,4
  119:5 153:13,17,20
doctors 23:20 146:5
  153:23 154:3
doctor's 13:2 82:4
  139:6 153:19
document 10:16 28:22
  32:23 33:1 55:7
documentation 16:13
  49:2
documents 12:16 29:17
  80:6
doing 21:7,17 22:1
  77:18 79:13 82:20
  124:20 138:2
done 7:4 41:22 52:1,22
  57:8,10 63:15 66:2
  83:13 96:23 134:6,16
  134:22 135:15
  139:20 156:19
  157:14
dot 45:5,5,5,5
doubt 104:15
doughnut 145:2
down 14:4 31:19 45:13
  53:8 73:18 90:14
  136:19 144:9 146:18
  147:19 148:6
downloaded 26:1,11
Dr 1:14 2:18,21 3:4 4:6
  4:17,17,18,20 11:7
  13:19 18:11 20:3,16
  21:2,9,20,22 22:5,11
  23:20,22 24:1,4,6,8
  24:11,12,13 27:23
  28:5,8,12,12,17,18
  28:23 29:1,3 33:21
  33:22 34:7,11 36:14
  36:17,19,23 38:19
  42:1,18 43:3 45:1
  46:2 51:2,16,16,21
  63:22 101:5 116:20
  117:2,3,3 125:7,9,18
  133:18 134:2 135:22
  136:10 137:5,14,16
  137:18 138:10,12,22
  139:6 140:4,14 141:1
  141:3,13,14 142:16

142:20 143:11,17
  144:17,20 145:12
  146:1,1,2,10 149:22
  150:13 152:6,19
  154:5,5,6 157:20
  160:3,5,15,21 161:19
draft 30:11 31:18 33:4
drain 35:9 89:23
  112:10
drainage 35:7,17
draining 137:23
drains 88:21,22
drop 120:9
drops 132:6
drug 108:12
drugs 108:8 117:14,18
dry 105:9 113:1,6
due 34:21 35:5 91:2,11
  91:13
duly 4:7 161:20
during 13:14 43:14
  50:20 86:12 116:6
  126:11 129:10
Dystrophy 107:12,17
  107:22

──────── E ────────
each 29:7 54:8 156:3
  157:4
earlier 39:1 49:8 85:20
  87:6 93:23 111:23
  132:17 140:15 149:8
  157:8
easier 144:2
east 36:23 67:14
Eastern 1:3 162:8
easy 56:5
edema 97:12 105:3
  107:19 147:17
edge 131:6
educate 72:18
education 57:9 118:1
  118:16
effect 19:13 109:8
  156:23
eight 13:12 82:5
either 3:14,20 28:17
  81:23 82:10,11
  151:23
elective 57:19
elevated 100:16 101:20
  103:5 112:16 113:13
  113:15,17,21 125:21
  148:13 151:4,17
  152:1 154:13,20
eleven 17:1
Emerald 38:10
emergencies 75:11,15
Emergency 12:9

employment 77:23
encompass 99:9
encounter 43:12
end 23:4 40:5,6 97:14
  105:10 141:5 143:10
  144:15 154:4
ended 125:18 140:1,16
Endothelial 24:21 25:2
  94:22 107:12,22
endothelium 104:12,20
  105:1 107:14,18
  109:18,20
engagement 86:17,18
enough 84:21,23 98:4
  131:3
entered 41:18
entire 2:18 5:17 7:3
  45:9 74:10 99:11,15
entitled 18:21 55:7
entity 10:6,12 14:20,21
  35:14 108:6 109:22
entry 44:21 54:23
  151:18
equal 142:17 143:18
equally 142:17 143:19
error 38:3 113:10
especially 105:10
  149:17
essence 129:18
established 121:18,21
  121:22
estimate 137:3
estimating 82:19
estimation 133:11,12
  136:13,18
etiology 142:12
evaluate 115:8,11
  122:1 131:16 145:6
  157:14
evaluated 145:16
even 42:18,21 46:12
  68:18 126:12
event 6:9
events 160:21
eventually 94:17 98:5
ever 19:20 36:6 41:3
  47:2,11 62:22 63:1
  65:16,16,21 68:6
  85:6,10,14 86:17
  87:6,8,13,18 95:7
  100:22 108:5,16
  110:3 118:13 122:16
  126:23
every 19:14,15,16,18
  64:22 68:14 69:21
  83:13 98:18 106:9
  124:2 125:6 132:9,14
everyone 121:2 126:2
everything 12:13 23:16
  90:14 106:19 130:15

Everywhere 122:22
evidence 3:13 95:17
  143:16 144:10 145:9
  151:22
exam 50:1 75:18 77:5
  77:11 110:20,20
  116:5 130:10 131:11
  131:16 132:22 136:2
  138:16 146:12
  148:12,19,20 154:12
examination 2:1 4:10
  25:17 132:19 160:13
  162:13
examined 68:1
examiner 63:15
examiners 116:4
examining 142:15
example 46:6 65:3
  66:22 68:13 70:19
  78:6 89:9 91:3 93:12
exams 63:18 74:21
  76:12
except 44:7 60:20
  140:2 141:7
excerpt 56:8
Excuse 143:13
executing 31:19
exhibit 2:16,17 5:8,11
  5:12 7:1,2,14,22 8:7
  9:10,14,19 11:6 12:4
  12:21 13:10 18:16
  56:13,18 85:22 86:13
  133:13,16 145:18,21
  151:15,16 154:8
  160:16
exhibits 20:13 53:15,16
  53:17,20
expect 101:16,18,19,23
  102:2 119:5 122:8
  135:9
expecting 48:23
expenses 86:22
experience 61:12
  105:18,22 106:4
  150:3 158:15 159:8
experienced 158:20
expert 2:20 11:8 15:9
  27:17 28:11 29:22
  30:2,5,16,20 45:17
  45:18,22 54:13,18
  55:14 56:19 77:15,17
  77:21 78:1,3,10,16
  78:18,23 79:19
  116:22 117:3,4
  153:15 160:20
explicitly 118:5
extensive 142:6
extent 153:10
eye 12:8 13:13,21
  21:11 23:19,20 28:22

29:6 33:17,23 35:6,7
37:7,8 38:10,13
44:19 46:8 47:17,18
47:21 48:4 60:10
64:20 65:1 66:14
67:5,18 68:3,12,15
68:19,22 69:2,7,17
70:1,4,6 71:5,7 72:7
72:9 73:20 74:20,20
74:22 75:12,17 76:12
76:16 77:5,11 88:3,4
88:18,21,22 93:14
94:11,11 95:15 97:7
99:5,20 100:14
101:17 102:5,13
105:23 106:2 108:1
109:16 110:23 111:1
111:22 112:1,22
113:1,6,10,12,12
120:9 121:8 130:12
134:11 142:2 148:11
148:14 149:5,6
151:10,18 153:4
154:1,3,11,14 155:19
157:7,9
eyes 43:13 67:23 68:18
105:9,18 110:16
111:3 114:3 150:6
e-mail 37:10,12 38:18
39:4,8,10 40:14,17
53:19,19 87:3
e-mailing 122:21
e-mails 5:18 8:3,14,15
8:17,20 10:5,9,11

**F**

facility 68:20
fact 18:7 30:1 44:6
47:15,17 48:15 94:2
139:23 140:9 158:20
158:22
factor 92:14 96:3
factors 90:1,11 91:18
91:22,23 92:2 93:6
93:11 96:1
faculty 57:18 70:18
failed 146:10
failure 79:21 85:11,16
fair 64:12 75:9 76:11
77:3
fake 109:16
fall 58:23 71:3 96:2
fallback 127:2
false 150:5
familiar 25:20 26:7
63:12 100:3 126:17
153:21
family 99:4,19 153:13
far 13:20 23:23 43:5
54:19 61:5,9 72:20

92:14 97:6
farsighted 92:22,23
fault 18:12
fax 29:17 31:18 38:15
49:2,3 55:17,18,20
56:1
Faxed 49:5
faxing 29:18,21
February 34:16 39:18
40:5,5,6 50:19
Federal 3:5
feel 6:15 12:12
feeling 105:23
fees 78:18 86:21 87:4
few 6:8 71:6 133:19,23
field 60:17 88:5 125:17
141:5,10 142:7,8
fields 60:20
fifth 70:17
figure 42:13 46:20
76:20 80:11,13 99:22
file 2:18 5:18 7:3,14,18
8:6,11,13 9:10 11:20
12:23 15:6 18:19
19:3 23:17 52:4,13
52:16
filed 16:7,10 17:19,22
files 15:7 80:11,14
filing 3:18,22
filling 68:4
film 112:22 113:9
140:12
filtering 88:23
final 31:20 32:1
find 80:6 82:14 146:18
finding 142:19 148:13
154:13
findings 50:1 143:17
144:21 146:12
fine 4:18 6:23 14:16
48:22 109:13
finishes 90:12
FIRM 2:3
first 4:7 18:20 32:4
34:7 39:17 43:11
47:7 50:18 62:3,4,6
64:22 85:22 86:1
87:23 97:3 101:10
138:20 157:22 158:5
161:20
fist 111:17
five 10:3,15 33:17
70:10 76:10,11 77:4
77:22 114:11
flag 103:13 106:17,18
132:19
flip 7:8 16:17 37:1
flipped 37:3
Florence 64:3
Florida 29:6

fluid 35:7,9 88:21,21
89:23 104:18,22
105:1 137:22
folder 7:14,19
followed 55:17 85:19
125:3
following 58:23
follows 4:9
follow-up 161:5
force 124:17
foregoing 162:11
foreign 106:1
forgot 61:22
form 3:11 34:21 43:1
43:15 44:2 48:18
64:13 65:15,19 84:5
89:7 98:12 105:12
113:4 116:17 117:5
118:21 123:13 124:1
124:7 128:2 129:1
133:3 137:17 152:11
153:9 156:15 157:17
159:5
formality 3:9
format 29:10,12
forms 29:18
formulating 10:22
34:11 42:11 43:23
146:6
forwarding 27:17
found 139:21 147:12
four 2:21 9:16 54:3
59:5 63:17 66:3
68:11 70:9,11 133:16
152:3,7
fourth 116:6
fourth-year 19:4
four-year 126:12
Friday 1:20 162:10
friends 63:12
from 2:21 8:15,16,18
12:8,17 16:17 23:18
24:16 26:1,11 27:16
27:22 28:23 29:5
35:7,16,21,22 37:7,8
37:10,14,21 38:6,10
38:12,18 46:2,3
51:16,19 52:6,7 53:3
53:11,13 56:1,2,8
57:20 58:13,19 60:7
64:10 67:21 73:4
74:19 75:4 77:21
78:8 80:18 81:13
86:18 94:3 96:4
100:16,19 103:4,11
104:11,21 105:9
106:3 110:3,9 120:18
121:2,17 122:20
129:11 133:17
137:23 140:8 141:20

148:20 150:7,10
152:19 155:20
front 7:6 20:9 28:23
32:9 33:5 46:16
120:10 130:11
142:14
Fuch's 107:16
full 4:12 132:19
functioning 89:22
further 3:16,23 45:6
160:11 161:1,9
162:16
F-U-C-H 107:16

**G**

G 21:15
GA 2:5
gave 83:7
geared 60:14
general 43:7,8 53:22,22
54:1 57:14 98:15
generally 80:16 112:13
114:8
generated 37:13,21
genetic 88:9,12 93:16
93:18 98:2,9
gets 105:2
getting 97:23 124:11
154:5
give 31:4 45:17 52:17
71:6 99:7 150:4,7
160:22
given 4:21 13:15 14:18
15:3,4 16:4,12,14
17:3,8 23:17 29:12
44:22 46:22 63:4
78:8 83:2 85:10
137:11 150:6 160:2
gives 130:17
giving 26:21 86:3
glad 5:5 154:6,8
glasses 67:16,17 68:16
69:11,12 75:18 76:20
76:22 92:18 152:14
glaucoma 34:21 35:5
35:11 44:18,23 47:5
47:14 48:6,9 50:10
50:13 68:13 74:21
75:5 79:21,22 80:19
81:5,7 82:18 83:1,17
83:20 84:1,19 87:23
88:2,8,11,15,17
89:17,19,20 90:2,6,9
90:22 91:6,8,10,20
91:23 92:1,2,5,9,10
92:13,15,16,20 93:2
93:7,7,10 96:4,6,7,13
96:23 97:1,2,4,8
98:11,17,22 99:5,8
99:12,16,19 100:1,4

100:11,20,23 101:2,4
101:16 102:7,11,19
106:17 112:2,3,4,5,8
112:14 119:7 124:12
124:15 131:18,20
132:13,15,20 137:17
139:2,4 141:6,17,20
145:6 148:16 154:16
155:1 156:9 157:6,6
157:10,11,15
glycoside 108:15
go 4:17 6:19 7:12 8:1
15:7 35:10 40:13
43:16 49:20 58:2
64:13 76:14 78:4,5
81:12 83:5,15 91:18
94:19 95:18 100:16
105:13 111:16
116:17 117:5 118:8
122:16 126:5 133:4
135:13 140:19
144:14 147:6 156:15
157:17
goes 45:10 72:20 78:6
97:9 156:18
going 5:1,2,20 7:13
14:7,9 26:4 31:2
33:14 56:17 65:14
71:2 83:6 84:4 85:21
86:12 94:8,18,19
98:5 103:14 112:15
113:2 127:16,17,17
128:1 131:9 132:4
133:15,18 134:15
137:10 139:6 153:6,9
154:8 157:6,12 159:1
160:6,8
Goldmann 42:9 43:6
44:4 115:15 116:11
117:10,18 119:15,17
119:23 120:3,5,21
121:3,4,11 122:7
123:2 124:4,8,23
125:8,15 126:3,4,20
127:10,19 128:18,19
129:12 134:14,16
135:9 147:8 156:3,8
157:3 158:5
Goldmann's 42:7,22
44:13 85:12 121:6,6
121:14,21 127:16
128:9 130:2 134:22
135:14,15,19 147:11
148:2 150:14 151:2
gonioscopic 95:23 96:9
96:11
gonioscopy 21:5,10,14
21:16 22:1 35:15,17
85:16 88:19 101:18
112:12 131:19 132:9

133:1,1,10 137:8
138:2,17 139:20
147:8,12 148:3 156:2
156:8 157:3
good 13:22 61:13,18
109:22 158:6
GPA 58:12 59:10 60:2
GR 136:8
grade 132:22 138:15
138:15,16
graded 135:22 137:18
138:13
grading 137:2
gradually 112:15
graduate 58:19 59:6
122:4,8
graduated 57:23 58:16
60:7
graduates 63:18 121:2
graduating 58:13
116:5
graduation 18:22,23
19:14,15,18,20,23
57:7
Grammatical 32:6
greater 113:16,17
114:2
Greenburg 63:22
gross 131:22,23 132:2
139:11
group 36:22 38:5,9,12
96:3
groups 93:11
grow 57:21
guess 59:21 123:1
135:21

**H**
hair 107:6
haloes 46:7 47:15 48:2
48:4,7,11 50:3 94:11
102:4,22 103:2,7,15
103:21 104:2,16
105:3,10,17,19,22
106:2,4,10,16 107:1
107:9,20 108:2,6,9
108:13,18,20 109:9
110:5 132:18 135:5,6
135:7 137:7 140:1,11
146:15,22 147:5,10
148:1,11 152:9,17
154:11,22 155:7,14
155:16,20 156:17
157:1,12 158:14,19
159:3,9
hand 133:15 145:18
handheld 127:4
handwritten 20:9,10
20:15,17,18 33:9,10
40:8 49:18,18

happen 77:13
happened 110:16 129:2
happening 21:11
106:18 110:15
happens 111:13 112:9
hard 41:20 74:7 81:15
104:19 121:1 136:4
harder 90:16 143:12
143:14
hardly 141:6
Harris 51:20
having 4:7 46:16 66:23
132:13,15 140:14
152:13
head 80:2 155:11
health 99:6,20 113:11
130:11
hear 60:19 155:20
hearing 47:5
help 18:18 30:23 65:4,5
65:13 96:9
her 66:1,8 90:16
hereto 3:20 4:1
Herrick 131:11,23
133:11,12 136:15
Herrick's 130:19
high 40:18 41:15 48:4,6
48:7,10 50:5 57:23
58:1 88:4,7,15
104:17 135:3 150:5
151:5,5
higher 46:8 100:17
135:9
highlight 51:5
highlighted 51:11
highly 148:15 154:15
154:22
him 5:15,21 6:2,3,10,13
6:15 22:6,11 23:21
27:9,11 29:21 38:3
38:22 40:17 53:5,19
54:4 84:6 86:21,23
87:1,2,3,5,14,16
111:8 128:3,11 153:1
153:11,18 154:6
158:14,18 160:21
himself 13:3
hire 15:1
history 21:6,16,23 46:6
50:5,7 99:4,19 110:9
110:17,18,22 111:18
146:12 148:13,17,19
154:13
hit 33:1 111:17
Hogan 51:22
hold 7:11 153:8
hole 97:19,22 98:6
145:3
home 9:2
honor 58:18

honors 57:8 58:15 59:6
hours 70:13,15 71:6
100:12,18 140:19
141:2,8
hundred 20:1 25:13
74:10 119:17 129:23
hurt 111:22
hyperopic 92:18,21

**I**
ICE 25:3,10,20 26:2,5
26:12 34:1 35:23
91:3,16 93:12,15
94:7,10,16,20,23
95:8,13,19 96:4,12
96:20 97:1,2,3,6
ICO 61:12
idea 99:7
identification 5:9 7:23
56:14 133:14
identify 18:18
Illinois 57:17 58:22
59:3,15 60:1 61:4,23
62:12,16 64:8
imagine 147:9,23
159:22
immediately 86:2
110:23 111:2 158:1
important 48:2,3
102:15,16 106:14,21
110:8,11 111:7,11
122:5 145:5 147:2
155:2,4,13
inaccuracy 127:12
128:4
inaccurate 42:19,22,23
119:11,13,14 125:14
127:14,22,23 128:14
129:13 130:4 143:19
inactive 62:1
INC 1:8 162:4
inclined 92:4
include 15:13,13,16,19
27:5 31:14 147:20
157:3
included 9:14,18 12:3
12:14,20 13:9,18
31:16
includes 156:1
including 8:3 10:4,8
14:19 16:5 17:17
113:12 122:22
income 70:4 72:16
77:20
inconsistent 128:15
increased 90:5 94:14
103:12 106:11
INDEX 2:12,16
indicate 111:15 152:5
indicated 6:7 50:7

136:12 149:21 156:9
indicates 103:9 138:8
141:5
indication 140:13
141:21
indicative 96:18 102:17
137:6 148:15 154:15
154:23
individual 85:4
individually 78:4
individuals 93:13
inflammation 89:11
91:1,15 93:17 96:19
138:2
information 12:7 15:4
15:5 16:15,17 19:5
23:5,7,10,17 26:17
43:20 44:22 46:1,2,3
46:4,22,23 47:10
52:2,18,20,21 54:8
54:10 55:5,10 56:2,5
initial 22:20,23 23:2,12
31:23 32:3 39:16,19
149:16
initially 131:21
injections 57:17
inside 120:17,20 121:1
instance 100:13,14
Institute 38:10 60:10
institutions 118:16
instrument 130:17
insurance 72:11
intend 12:4 13:14,16
interactions 61:14
interchangeable
159:16
interchangeably 43:4
158:6
interested 162:18
interesting 72:2
intermittent 101:1
135:2,10 140:20
Internet 26:1,4,11
interrupted 74:2
interruption 73:16
103:22
intraocular 40:20 41:9
47:20 48:1 50:4,8
90:5 94:14 95:22
103:12 104:18
106:11 113:13,15,23
114:3 115:8,12
116:16 117:8,16
118:7,15 119:6,22
122:1 123:8 125:11
125:12 127:2 134:12
134:19 148:14,18
151:17 152:1,2
154:14,18,21
introduced 3:19

involved 14:20 15:14
16:6 17:18 25:21
52:23 80:18
involving 83:16 84:1
84:19
IOP 94:14
IOPs 40:19,20
irido 97:13
Iridocorneal 24:21
25:2 94:22
iris 35:16,21 96:17
97:14,15,17,18,19,20
97:22 98:4 112:11
130:14 131:7
island 125:19 140:3
141:7
issue 79:20 83:19 95:12
113:2 159:14
issues 80:16 99:6,20
150:3 160:6
item 22:8,13,20 24:15
25:23 26:10 27:15
28:11,20 30:1,4
37:20,22 49:1 51:15
items 21:1 26:5 27:6
31:8

**J**
J 1:14 3:4 4:6,14,15
161:19
Jaanus 146:21
job 90:16
Joseph 4:16
jotting 50:6
journals 70:21 78:15
June 1:20 20:4 162:10
162:19
jurisdiction 16:6 17:18
just 5:16,22 7:11 14:1,6
18:5,16,17 27:9 29:8
32:8,23 33:12 36:12
37:1,20 39:13 40:13
43:6,8 44:22 46:14
46:21 49:20 52:12
56:20 57:14 60:20
65:18 67:15,22 71:13
72:8 75:6 82:21,21
83:15,16 85:23 88:1
89:22 91:19 95:11,17
98:15,19 102:16
106:9 111:12 112:13
126:14 127:18,22
128:22 140:13
144:12 145:5 146:19
152:6 153:8 154:17
156:5,11 161:1

**K**
K 147:18
keep 17:7 70:21 154:5

keeping 19:6
kept 29:9,11
keratopathy 109:6,11 110:5
kin 162:16
kind 37:20 87:1 95:11 96:6 97:16 111:19 112:10,17 132:3 147:13,16
knew 48:14 65:13
know 5:23 14:3 17:10 19:22 28:17 32:20 37:22 40:2,3 50:18 54:19 56:4 60:4 61:12,13 63:14,22 65:5 74:17 78:13,16 78:22 79:3 84:22 92:23 95:20 103:8 110:12,15,18 111:12 117:1 118:23 119:13 121:7 122:19 123:19 123:23 125:3,14 126:2,2,3 127:14,21 128:12 134:13 135:5 135:15 136:4,9 138:18,18,19 139:12 139:14,18,21 140:7 140:11,21 143:4,21 144:4 151:12 152:5 152:15 153:22 155:9 155:10 157:19 159:6
knowing 46:15
knowledge 22:4 31:22 36:9 100:19 108:8
known 25:3 97:8 114:16 130:19
knows 136:19
Kyle 1:5 2:18 7:3 8:4 10:6,9 12:18 22:13 22:16 160:20 161:23

**L**

L 2:8
labeled 2:17
lack 97:18
ladies 107:6
lady's 66:5
lamp 130:10 131:5,16 132:22 136:2 138:16
Landgraf 1:14 3:4 4:6 4:14,17,17,18,20 18:11 160:15 161:19
Landgraf's 2:18
Large 1:17 3:8 161:17 163:9
laser 50:14
lashes 130:13
last 14:19 16:4,12 17:3 17:16,23 43:18 45:8 54:23 55:23 66:8

76:11 77:3 81:15 133:20 152:14 157:22 160:7
late 39:18 50:19 113:3
later 42:22 46:11 94:5 100:14 137:5,12,15 138:13 140:8 141:1
Laude 59:10,13,18,19 59:20,21,22,23
law 1:18 2:3,4,9 19:17 19:19 52:7
lawsuit 16:6,9 17:18,21 37:13 79:11
lawyer 41:3
layer 107:15
layman 56:5
lead 112:1,5,7
learn 78:13
learned 26:8 129:11
least 11:18 59:12 63:17 82:5 83:22 159:22
leaving 58:21
lectures 70:19
left 33:23 141:6 149:5
legal 54:11 109:3
lens 88:19 109:16 130:14 131:19 152:16
LensCrafters 65:8,10
lenses 105:6,8,17
less 30:13 42:9 93:23 99:10,11,21 127:4 134:15
let 5:10,13 6:19 7:11,12 7:13 8:1 18:18 21:3 27:21 28:20 32:8,19 33:12,14 40:13 77:15 83:15 91:18 95:11 98:19,23 114:15 118:17 121:4 137:11 145:18 153:21
letter 27:15,21 28:23 51:15,16,19 52:6,6 53:3 86:17,18
Let's 49:20 56:11 98:15
level 141:10
license 61:23 63:1
licensed 61:19,21 62:4 62:6,11,15,20,22 116:9
lid 136:5
lids 130:12 149:20 150:2
life 34:22 94:6
light 131:5,6 142:18,22 143:1,8,15,19,22 159:15,17,23
lights 50:3 94:11 103:2 103:7,16 104:3 105:4 105:10,19,22 106:5

106:11,16 107:1,9,21 108:3,7,10,13,18,21 109:9 110:6 132:18 135:6 140:1,11 146:15,23 147:5,10 148:1,11 152:9 154:11,22 155:8,15 155:17 157:2,12 158:19 159:3,10
like 6:6,15 7:11,17 14:1 21:2,5 24:15 29:18 30:8 37:6,12 38:15 42:4 49:22 50:4 55:1 65:2,11 67:22 72:8 75:6,11 82:3 88:19 91:9 101:6 106:1,14 111:16 112:14 123:2 139:19 140:22 145:2 153:4
likely 27:12 67:21
line 120:13,19,20 133:8 135:14
lined 120:11
lines 142:8,10
lining 120:23
list 6:20 7:12 8:1 14:17 15:2,8,12 16:3,11,15 16:18 17:15 53:15,16 53:17,20
listed 8:6 11:8 21:1 78:15,18 102:9 151:3
listing 78:16,19
literature 118:10
little 21:3 46:9 96:17 104:15 132:7
live 62:17
local 73:5
located 58:7 59:1 67:13
location 14:22 65:5 66:10
long 43:19 49:12 59:3 69:16 75:22 76:2,8 77:16,17 80:5 121:18 159:21
longer 62:14 82:6 141:8
look 44:5 46:17 51:1 80:11 81:16 83:13 106:15 110:21 118:12 129:20 139:9 145:8 157:10
looked 42:4 81:15 139:11,18 140:4 144:17
looking 26:5 55:21 80:14 81:13 95:21 130:12,13 140:7
looks 21:2,5 24:15 26:11 28:21 29:18 35:15 36:14,22 37:6

37:12 38:15 49:22 53:4 55:13,23 56:8 64:10 91:9 101:6 130:11 132:3 140:22 151:19
lose 94:18 98:3,4 141:23 142:8
losing 140:2
loss 88:5 142:7,8,13
lost 125:17
lot 6:1 43:19 72:10,12 89:11 102:19 107:4,5 113:6 122:19 127:4 136:5 141:22 142:4,7 143:12,14 148:3 154:2
lots 89:14 125:16
lower 96:21
lunch 87:21
lying 159:4

**M**

macula 142:1
macular 74:22
maculopathy 109:1,4
made 3:11 30:12 50:16 53:10 70:4
Mae 51:21
magic 92:7
Magna 59:10,13,19,23 60:3
magnified 130:16,18
main 2:5 89:15 91:5 101:21
mainly 29:3 98:4
maintain 71:5
make 7:18 8:14 20:19 26:7 27:3 31:23 36:12 46:18 48:5 60:16 67:23 70:1 78:3 79:9 82:21 83:15 86:21 90:12 96:9 106:19 118:17 119:7 120:23 124:10 130:22 131:2,21 143:8 146:16,23 147:21 148:8 156:11
makes 90:16
making 20:21 115:23 128:22 147:6
male 98:10
males 99:3,19
manage 50:10,12
managing 67:1
manifestations 94:5
manner 3:20 125:10 162:18
Manual 12:9
many 6:8 8:20 17:10 60:23 63:4 66:2

70:12 71:18,19 73:3 73:13 74:2,5 78:22 79:19 83:2,7 105:5 116:14,14 159:8
March 24:9 27:22 51:17 57:1,2,4,9,13
mark 7:13
marked 5:8,10 7:22 8:6 9:10 56:13,18 133:13 133:15
Martha 63:22
materials 10:21 12:17 12:20
Matt 18:5 27:3
matter 9:8,17 10:23 12:5,19 34:12 42:12 44:1 45:18 55:15 82:15 86:15 94:2 127:21 146:7 161:22
matters 14:17 15:8 78:1
Matthew 2:7
may 3:6,12,13,19 20:4 22:22 27:15 67:16 69:11,11 81:22 84:5 87:3 97:18 101:21 102:4,9 103:14 106:18 110:20 111:14,23 115:5,6 126:9,9,11,17
maybe 14:12 60:2 77:14 136:8 147:18
mean 21:13 35:20 40:15 44:19 53:23 54:7 59:13 65:20 66:16 75:10 84:11,17 91:11 92:3 98:8,9 100:7 102:23 107:4 111:19 113:9 114:1 115:14 128:3,5 137:12
meaning 40:20 82:3 93:18 99:3,6,11 132:2 135:3
means 92:22 103:2 109:15,16 117:7 118:15 124:17 136:9
meant 33:18
measure 115:21 116:13 116:15 117:8,13,16 118:15 119:3,22 120:2 123:7,21 124:10 125:10,10 126:20,22 127:2 147:8 159:16
measured 117:10 125:8
measurement 125:12
measures 115:17
measuring 95:22 124:13

Page 8

mechanism 89:1
medical 23:23 28:22
29:9,11 37:1 38:5
39:22 87:12 110:18
125:22 140:8 145:22
153:12,17,18,19,22
154:3
Medicare 72:12
medications 96:22
meet 146:11
meeting 71:14,16,19
member 63:23 70:19
memoranda 9:7
memorandum 9:13
memorandums 9:9
Memphis 57:16 64:20
65:8 66:4,10 67:13
67:14
mentioned 12:1 27:6
94:10 123:2
Mercury 114:13
mesh 133:7 138:5
met 87:8
method 119:6
mid 118:8
middle 1:2 33:15 54:6
54:11,14 162:7
might 6:7 81:21 104:14
111:21 124:14
mild 104:11,14 107:14
107:19
milliliter 114:10
millimeters 114:2,11
114:12
mind 7:8
minimum 124:9,21
155:22 156:4 157:2
minor 30:12 32:6 58:10
mires 120:11,13,17,20
121:1
misdiagnosis 79:21
miss 124:15
missed 84:5
missing 45:11
mission 72:14,18
Mississippi 66:12 81:21
misstate 84:11,17
mistake 5:17 59:21
model 13:21
models 13:13,16,21
Mollega 29:6 37:7,8
38:12
momentary 43:14
money 78:3
Montgomery 24:12
161:14
months 33:16,18,19
44:17 45:1 67:7
68:15 137:14 138:13
141:1

more 30:14 32:6 33:9
35:15 51:1 67:21
72:1 91:20 92:4,8,19
117:20 119:2,2
121:19,21 129:14
most 15:11 25:7 31:12
48:1,3,8 56:23 71:23
75:10 77:2,14 88:8
88:11 93:10 102:10
104:17 106:14
111:13 116:8 118:18
122:5 124:16 140:2
147:2,3 155:2,4,7,13
mouth 65:21 69:4
78:14
much 42:9 64:11 70:1
92:8 100:17 117:20
118:11 119:2,2
121:19,21 128:8
129:14 134:15 135:9
159:23
mucousy 108:1
murdered 109:12
Murphy 28:12,17
117:3

_____ N _____

name 4:12 15:19 16:7,8
17:19,20 21:2 33:21
53:1,1 54:6 66:5,8
68:20 82:4,7 84:20
names 14:19 15:14
16:5 17:17 80:3
81:10 82:1,10 83:11
narrow 89:4 101:19
132:7 135:11 137:6
137:20
narrow-angle 88:16
148:15 154:15,23
157:6
national 63:16,19
116:4 120:22 122:6
159:18
nature 59:7 72:17
78:20 86:22 87:2
131:17
nausea 94:12,13 102:8
102:12
NCT 41:19 43:6,12
44:6,12 114:19
115:18,19 116:1
117:2,11,12 124:14
126:19 127:1,15,18
127:20 134:10 150:9
158:5
necessary 5:19
need 3:11 6:12,15
22:22 23:2 37:22
46:17 48:10 57:5
65:5 67:16,16 68:16

68:17,17 69:11,11
96:21 110:21 111:12
112:18 136:3 140:21
156:18 157:13
needed 65:13 66:22
needs 14:4 65:3 106:15
negatively 155:11
neither 162:16
nerve 88:4 144:18
145:2,10,b6
neuro 157:11
neuroretinal 145:1,6
never 26:23 54:16,18
84:9,14 108:19
116:10 127:18 139:3
152:16
new 23:5,7,10 32:23
33:13 34:5 89:7
99:16 152:14 159:19
NEWMAN 2:3
next 20:2,15 22:8 24:15
25:23 26:10 27:15
28:11,20 29:17 30:1
30:4 33:9 36:22 37:6
37:20 38:5,9,12,15
38:18 44:17 49:1
51:15 52:6 55:7,13
98:20 128:18,19
148:9,12 155:22
night 43:18 135:7
157:22 160:7
nine 14:17
Ninth 1:19
nods 80:2 155:11
noncontact 41:20 85:8
114:15,22 116:9,15
118:5 119:12 121:5
121:15 122:1,11
123:5,20 126:1,8,13
127:8,12 129:13,18
130:3,7 134:7 149:1
150:4
normal 90:4 132:3
135:4 142:9 144:19
144:23 145:5,8,10,13
147:11 148:2,2 151:6
northeast 80:18 81:17
81:19 83:18 84:15
nose 111:3
note 20:16 21:18 34:1
notes 2:21 9:6,9,13
20:9,10,17,18,19,22
21:22 33:10,10 36:12
39:16,20,21 40:1,8,9
49:17,18 50:6,16,20
53:8,9,10 81:13 83:6
85:21 86:13 133:17
136:1 139:7 146:1,2
146:2,5
nothing 4:8 142:11

152:17 161:21
notice 2:17 59:18
nowadays 109:23
number 5:11 7:1 9:6,16
10:3,7,15,19 11:22
12:16 13:8,12 14:17
16:3 17:1,15 32:21
54:23 55:4 109:2
113:14,21 114:9
137:1 159:13,13

_____ O _____

oath 19:5,6,10,13 57:7
object 43:1,15 44:2
48:18 64:13 65:14
84:4 98:12 105:12
113:3 116:17 117:5
118:21 123:13 124:1
124:7 128:1 129:1
133:3 152:11 153:6,9
156:15 157:17 159:5
objecting 65:18
objection 95:12,18
113:3
objections 3:10,10
observed 88:19
obviously 24:2
occasion 20:21 83:23
95:7 101:13 152:10
occasions 63:17 79:20
occur 93:13,14 102:19
141:8,9
occurred 35:18 81:7
occurs 93:20 107:17
ocular 11:15 12:2 39:2
56:3 68:10 74:8,11
74:12,15,16,17,23
75:13 76:2,5,7,9
110:17 146:20
156:13
OD 33:16,18 44:18
136:6
off 7:11 67:15 69:10
78:7
offered 3:13 85:6
office 2:21 8:23 10:1
12:23 15:23 16:21
18:12 26:17 31:23
32:17 37:14 38:16
115:4 117:12 118:20
125:18 133:17
143:12 155:16
offices 1:18 114:23
115:20
official 86:18
off-the-record 11:21
85:18
often 43:11,13 67:5
77:13 105:9 111:17
111:18 155:16

oftentimes 114:19
oh 21:16 111:16
okay 5:6 6:19 7:15,19
7:20 11:4 32:16 38:4
72:5 93:4 130:23
131:4,9,13 132:4
158:12
old 93:23 99:4 126:16
older 92:3 107:5,17
Oliver 2:8 38:16
omission 18:10
once 76:17 126:11
one 7:1 11:8 12:6,22,22
24:23 32:11,21 34:22
39:5,6,16 42:14 43:4
46:8,8 47:18,21 52:3
55:7,9,21 61:16
64:16 66:1 67:7
71:23 72:21 79:10,12
80:4,9,10,12,18
82:19,22,22,23 83:17
83:23 84:18,22,22
91:3 93:14 96:14
97:20 108:20 109:2,3
109:23 115:4,5,6,17
118:13 119:15
120:18 121:9 122:7
126:9 128:17 139:11
141:4 143:9 150:3
151:11 158:6 159:23
160:7
ones 5:19 6:2 32:4
89:15 126:16 152:6
one's 34:22
only 13:8 32:9,14 33:6
44:4 62:18 63:8 76:6
76:8 82:23 88:18
93:14 116:12,19,23
122:19 130:15 142:5
143:5,20 146:5
151:18 154:7
onward 93:22
Opelika 2:10
open 35:15 69:5 88:12
88:12 92:1 96:6
112:12,15 120:9
131:3,12,16 132:23
135:12,23 136:12,22
136:23 137:1,3,4,12
137:19 138:7,8,14
139:8
opened 18:16
openness 137:2 138:3,6
open-angle 81:5 83:20
90:6 91:22 92:2,10
93:6
operate 126:7
ophthalmologist 44:17
66:18 67:2 95:16
ophthalmologists 36:4

opinion 14:18 17:5
   27:10 34:12 45:18
   61:3,8,16 63:5,9 81:3
   82:14 85:6,10,15
   86:3,15 107:8 112:23
   119:11 121:23
   124:21 131:15 144:1
opinions 10:22 12:5
   34:12,16 42:11 43:23
   45:3,6 66:18,21
   152:21
opportunity 83:10
   122:16 152:18
   160:17
opposed 72:16 96:13
   112:16
opposing 15:20 16:9
   17:21
optic 144:18 145:2,10
   145:15
optical 27:18
options 50:9
Optique 38:13
optometric 19:5,6,9,13
   57:7,15 60:14 114:9
   155:23
optometrist 13:1 19:8
   33:19 47:9 50:12
   63:13,21 64:3 65:2
   65:12,23 66:19 80:19
   95:8 106:15 110:8
   111:9 120:18,23
   124:13,14 146:10
   158:16 159:1
optometrists 60:18,21
   63:14 66:17,20 73:10
   73:13 74:3 113:20
   114:23 115:20
   116:14 117:1,11,13
   117:15 118:18,19
   121:23 123:6,12
   130:7 131:11
optometry 17:6 19:1
   19:16 26:8,9 57:18
   58:22 59:4,15 60:1
   60:11,15,23 61:4,5,9
   61:9,19 62:7 64:1,9
   67:22 68:6,23 69:3
   69:18 70:7 72:19
   116:3,5,7 118:1,9,13
   121:2 122:17,18,20
   122:23 125:23 126:6
   129:10 153:15
order 142:8
originally 57:20
other 3:10,14,20 8:18
   8:18 9:13 10:5,12,20
   11:23 12:1,6,12,18
   13:13 14:22 23:20
   27:5,18 29:7 33:6,23

39:5 41:3,4 43:4
   44:15 46:4,9 47:19
   47:22 50:21 52:23
   60:19 61:17,21 65:4
   68:3,15 72:8,22
   73:10,13 74:3 80:7
   80:12 82:17 83:23
   84:18 85:2,7 87:12
   87:13 88:14 94:16
   97:7,7 101:23 102:19
   113:6,8,11 115:17
   116:20 120:19 121:9
   125:22,22 126:19
   127:15 133:8 141:21
   145:14,15 147:23
   151:22 152:4 153:4
   155:17 156:22,22
   158:7,13,19 160:4
others 72:16
otherwise 25:3 144:11
out 9:3 30:9 35:9 41:17
   41:22 46:20 48:3
   55:18 60:5 63:5,10
   76:20 80:11,13 88:21
   88:22 89:23 104:22
   104:22 105:1 106:21
   111:21 118:10
   126:14 137:23 147:3
   149:9,11,14,15,16
   150:17 155:3,4 158:1
   160:4 162:14
outside 78:1
over 29:15 40:23 54:3
   65:7 75:2 77:3 92:11
   92:12 112:16,22
   117:19,19 129:12,13
   149:18 160:17
overall 58:12
overnight 38:20
own 22:4 51:7 88:1
   135:12 140:20
O.D 1:8,14 3:4 4:6
   161:19 162:3

P
pachymetry 120:2
page 20:10 24:16 146:9
pages 37:7 73:6 162:11
paid 69:20,22
pain 94:11 102:4,13
   105:23
Pamela 1:16 3:6
   161:15 163:7
pamphlet 18:20,22
paper 36:11 40:9 45:10
papers 121:13
paragraph 45:3 145:21
   161:2
Park 2:4
Parma 24:12

part 18:10 24:21 31:12
   35:7 36:8,17 43:10
   50:2 67:13 77:2
   97:13 104:13 113:11
   126:10 130:20 142:2
particular 29:8 45:19
   45:21 63:13,21 72:14
   72:21
parties 3:3,17 4:1
   14:20 15:14 16:5
   17:17 81:10 82:1,3
   162:14,17
parts 145:15
party 3:14,20 14:22
   16:9 17:21
pass 159:18
passage 56:7
past 15:3,4,6 20:20
   52:1 54:3 83:14
   110:1,17 111:15
   116:11 117:21 122:4
   124:3 125:20
patient 23:19 24:23
   25:11,14,15 33:22
   41:23 44:7 46:6,9,13
   46:20 47:16 48:3
   53:1 66:23 68:19
   71:13,14,16,19,21
   72:3,4 76:22 77:7
   80:23 81:8 95:8 96:2
   100:8 101:7,15 102:1
   102:2 105:2,16
   106:23 108:5,11,16
   108:19 109:23 110:3
   110:9,22 111:7,14
   117:9 119:4,5,8
   120:8 122:9 124:12
   124:15,19,23 125:4
   125:16 127:5 128:20
   129:6,9 130:16 131:3
   131:9,14,20 132:5,9
   132:14 137:4 139:23
   140:10,16 143:10
   146:12,15,22 147:9
   147:21 150:1 153:3
   155:14,21 157:1
patients 19:8 66:17,20
   67:2,15,20 68:10,12
   68:13,18 69:1 70:10
   70:12,13 72:7,11,12
   72:13 73:3 74:5,9,16
   75:2,4,5,10 76:14,15
   76:18,21 77:4 89:8
   92:12 93:21 99:12,16
   99:17 102:10 103:1,6
   105:5,8,20 107:2,17
   107:22 109:17,21
   123:21 130:23 132:6
   132:12 140:9 142:4
   145:17 153:23 154:2

155:15 158:13,18
   159:2
patient's 48:15 50:2
   101:17 121:8,10
   125:11 147:4 152:23
   155:5
Patricia 51:20
pay 70:3 72:7 78:18
Pearlie 51:21
peer 118:3
pen 72:10 142:21 143:1
   143:8,15,22 159:15
   159:17
Pennsylvania 60:10
   62:1,10,15
people 32:20,23 43:11
   67:23 68:4 69:10
   78:13 89:3 98:21
   99:1,2 105:18,21
   123:22 159:9
per 20:23 71:21 74:9
   124:3 155:22 159:2
percent 20:1 25:13
   60:17,22 77:14,22
   79:7,8,17 98:18
   99:10,11,17,21,21
   103:5 119:13,15,16
   119:18 129:23
percentage 77:20 79:4
   79:5 98:14,16 99:2,7
performed 25:17 149:2
perhaps 32:7 53:5
   117:11
period 21:13 49:14,16
peripheral 96:15
   137:21 138:1
Perkins 127:3
person 10:5,12 100:13
personally 28:18
person's 82:7 113:14
pertaining 26:2,5,12
pertinent 11:13,18
Pharmacology 11:16
   12:2 39:2 56:3
   146:20 156:7,14
Phil 27:22
Phillip 51:20
phone 6:18 41:1 46:11
   53:10
photocopied 11:19
   12:3
photocopies 51:2
photocopy 7:18 20:2
photographs 12:17
   37:7,8 87:13
photos 97:20
physical 17:1 25:17
physician 33:20,21
   152:23
piece 40:9 45:10

pigment 97:18 98:3,5
place 41:18 67:11
places 65:11
plaintiff 1:6 2:2 79:5,7
   79:10,15 86:10 87:7
   87:7,8 162:1
Plaintiff's 2:20
plan 147:20
Plaza 2:4
please 4:12 5:4 13:6
   66:8 104:1
point 7:11 14:2,5 23:1
   28:4 35:9 43:14 46:8
   46:19 112:22 114:6
points 128:5
population 73:2 98:14
   98:15,17 99:8,12,15
   99:16
portion 74:12
positive 50:18
positively 80:2
possession 17:4
possibility 156:10
possible 15:12 73:4
   102:18 130:3
possibly 51:1
practicals 126:5
practice 61:19 62:7
   63:2 64:23 68:6 75:6
   123:19,23
practices 64:15,18,19
practicing 118:18
   123:11
practitioner 153:13
predict 81:6
predisposed 89:3 94:4
predisposes 93:17
prepare 70:19
prescription 92:17
present 89:11 91:15
   153:23
presented 101:15
   153:14
presenting 95:17
presses 104:19
pressure 35:10 40:21
   41:9 42:7,14 43:13
   46:7 47:18,20,21
   48:1,4,6,10 50:4,8
   88:4,7,15 90:5 94:14
   95:22 96:21 97:9
   100:14,15,17 101:9
   101:13,20 103:4,13
   104:18,23 106:12
   112:14 113:14,15
   114:1,3 115:9,12
   116:16 117:8,14,16
   118:7,15 119:6,22
   120:1,1,13 121:8,10
   122:2 123:8,21 125:8

125:11,12,20 127:2
128:13,17,18,19
134:1,8,12,19 135:1
135:3,13 147:12
148:14,18 151:4,17
152:1,2 154:14,18,21
pressures 41:14 151:8
presume 92:3
pretty 64:11 107:10
118:11
preventing 137:22
previous 10:7 30:8
33:2 35:6 40:18
47:19,22 51:23 52:19
55:3
previously 34:2
primary 60:9,13 74:19
75:16,19,22 76:5,15
76:19 91:5,7 92:16
92:19 117:7 118:6,7
152:23
print 9:2
printed 30:9 162:11
printout 24:16
prior 5:15 14:2 22:4
25:20 26:21 31:19
32:9,14 33:6 34:11
39:21 40:1,10 46:12
52:22 84:8 86:14
148:22
private 68:6 122:18,20
122:23 123:23
probably 48:12 65:6
66:3 88:9 89:14
probe 120:10
problem 7:10 47:16
74:23 75:8 91:14
93:16,16 97:10 98:1
102:18 103:3,10
113:10 142:1 153:3
problems 77:6 88:14
97:7,15,16 102:3
104:11 109:5,17
132:5 154:1,23
procedure 3:5 50:15
121:1
proceeding 86:3
process 71:10
produce 6:12
produced 9:7 37:18
38:2
profession 116:3
129:16
professional 1:16 3:7
14:18 17:5 63:4,9,20
78:15 161:16 163:8
professor 70:8 153:15
profits 70:4
program 60:16
propensity 98:3

propose 6:4,11,16
proved 42:23
proven 117:19
provide 9:3 13:5 15:22
16:20 17:12,13 54:4
55:5 68:12 83:11
provided 3:14,21 20:5
26:14,19 28:2 37:16
37:17 153:12
providing 77:17
Pseudophakic 109:15
110:4 147:18
Psuedophakic 109:11
public 69:5
publications 10:20
puff 114:16
pull 51:23
pulled 26:17 35:16
52:2
pulling 35:21
pulls 112:11
pump 104:22
pupil 159:17
pupillary 143:10 144:2
144:5,7,16
pupils 142:15,17,22
143:1,18 159:16
purported 153:16
purpose 3:14 19:2
purposes 42:11 43:23
98:20 154:19
pursuant 1:15 3:5
pushing 104:23
put 22:20 32:8 51:7
65:20 120:8,10 131:6
131:19 144:22
151:14
puts 92:18
p.m 149:2 161:7

Q

question 3:11 5:3 10:10
73:18 84:6 90:13,17
98:20,23 103:23
113:4 121:12 122:10
122:14 153:10
154:19
questions 3:10 5:1,2
31:13,16 56:16 95:13
122:21 133:19,23
145:19 160:12
quick 5:14 49:20
112:19
quickly 81:6 100:10,16
140:18

R

radio 73:8,18,21
raise 43:13
Raley 51:20 52:7 53:4

55:11
rank 60:4
ranks 61:5,9
rare 94:23 95:2,3,4,4,5
107:10 109:10,21
148:5
rarely 103:1,6 105:14
105:15 109:17 115:1
115:2,3,13,14,20
ratio 145:14
ratios 144:23
reactive 142:18 143:19
read 19:5,14,18,22
20:7 22:16,18 26:20
26:23 28:1,15 33:12
33:14 41:21 42:1,3,5
42:6 43:10,17,18
45:8 57:6 121:5,6,7
121:11 128:17,21
136:4 149:19,20,21
157:20 160:17
reading 21:12 24:17
41:7,18,19 46:7
47:18,20 115:16
120:14 124:11
125:16 127:6 136:3
148:20 149:17 150:5
150:8 151:13 152:13
162:14
readings 42:2,15 44:7
137:8
reads 148:9 154:9
real 5:13 49:20 112:19
realize 111:19
really 45:7 72:2 77:7
77:10,11 80:10 81:15
82:20,23 92:11 104:3
109:21 129:4 137:8,9
139:18 140:21 148:5
reason 26:4 29:8 62:14
62:18 104:17 106:14
108:2 109:2 117:9,12
124:22 136:16 139:7
142:18 143:5 144:20
147:19 148:7,8 151:9
158:17
reasons 141:22 142:4
158:10
recall 24:14 30:13
31:11 49:12 50:23
58:17 60:2,3 63:6
79:19 80:3 82:19
84:1 100:22 101:3
105:20 108:5
receding 35:21
receipt 39:13 45:7,9
receive 6:14 30:23
received 12:17 34:7
recent 56:23
recently 21:7,11,17

22:1
recess 56:12 85:19
87:21 112:20 160:10
recession 34:2,20,23
35:3,19,20 36:1,3,7,9
89:21
recognize 27:23
recollection 34:18
50:17
record 4:13 41:11,12
41:16,17,23 42:8,20
43:21 45:9 141:22
142:6,11,14 151:19
records 9:16,17,18
10:1 23:13,18,23
24:2,4,6,8,9,11,14
27:18 29:3,5,9,11
33:13 34:6,8,11 36:5
36:15,17,19,22 38:5
38:6,9,9,12 39:22
41:8,20 45:5 46:2,4
46:16,17 47:3,7,11
51:2,5,6,8,13 53:4
81:14 83:5 87:12
101:5 140:8,14
145:22 149:13,16
151:23 152:3,4,19
recreate 15:8
red 75:11 103:13
106:17,18 132:18
redness 94:12
reduced 46:10
Reed 24:6 29:1 33:21
34:7 36:19 152:19
refer 4:19
reference 56:6 151:15
151:16,18
referenced 56:4
referral 64:21 66:15
69:7
referred 33:22 50:11
67:20
referring 7:1 91:16
148:19
reflected 136:1
refractive 113:9
refresh 34:17
regard 11:22 144:21
regarding 7:3,19 8:17
9:17 10:6 12:19
21:15,16,19 28:5
31:14 51:21 52:18
54:8,10 82:18,23
85:7,11,15 87:3
130:6 145:1 160:4,20
regardless 3:21 54:21
138:4
regards 42:2 52:10
53:10 146:11
region 110:23

Registered 1:16 3:7
161:15 163:7
regular 68:14 74:20
75:17 77:11 112:14
123:20
related 68:17 94:13
95:13
relates 19:6 110:19
relating 24:16
relation 9:7 37:13 55:9
relayed 46:3
relied 10:21 44:6
rely 42:20 128:7
150:21,23
relying 12:13 42:12,14
remember 24:10 26:16
31:8 39:19 40:15
45:19,21 51:12,13
58:12 67:9 76:14
80:9,10,16 81:9,19
81:22,23 82:3,7,10
82:13,22,23 84:20
85:1,2,5 90:17
103:23 105:16 129:7
129:8,9,10 149:8,22
150:7,10,13,20 153:7
rendered 17:5 23:19
63:9 82:15 85:15
rendering 86:15
repeat 104:1
rephrase 5:5
report 2:20 11:9 22:21
22:23 23:3,4,8,11,12
28:15 29:22 30:2,5,8
30:16,20 31:1,13,17
31:19,20 32:1,2,8,10
32:14,20,21,22 33:6
37:21 49:4,5,10,13
55:14,17,18 56:4
103:1 111:9,20 146:7
148:9 151:15 154:8
160:19,20 161:2
reported 161:18
Reporter 1:16 3:7
161:16 163:8
REPORTER'S 161:12
reporting 140:1
reports 33:2
represented 85:3,4
representing 3:3,17
14:22
request 10:16 11:22
18:14 21:5,13
requested 52:18,20
requesting 38:19
require 23:10
required 55:10 139:18
requires 19:17 50:14
reserved 3:12
residency 60:9,13,14

60:18,19 64:6
responding 5:2
responsible 18:7
responsive 10:16 13:8
rest 8:1
result 88:5 110:20
  141:17
results 88:5 162:18
resume 64:10
retain 46:19
retained 14:21 15:9,16
  16:8 17:20 40:2,4,11
  49:9,10,13 78:23
  79:4,6,18 84:13
  85:23 86:1,19
retina 38:6 142:3
Retinal 90:18
retinopathy 74:22
return 10:1 15:23
returning 16:21
review 33:12 34:5,10
  41:8 83:5 118:4
  152:18
reviewed 23:13,13,15
  23:16,18,21 24:1,1,4
  24:6,8,9,13 31:15
  45:4 145:23 146:6
reviewing 24:14 87:12
  145:23
Rhonda 66:7
Richard 28:12,17
right 7:12,21 23:7
  33:17 44:15,19 46:14
  84:3 91:13 103:8
  113:18 125:5 132:16
  132:20 136:16
  139:15,17 148:11,14
  149:5 150:16,19
  151:10,17 154:11,14
  159:11
rim 145:1,7
Ripon 58:3,4,7,8,13,19
  58:21
rise 160:22
risk 90:1,11 91:18,22
  91:23 92:2,8,14,16
  92:19 93:6,11 96:1,3
Robert 51:21
Room 12:9
rough 30:11 31:18 33:4
routed 74:18
routine 74:20 76:12,16
  77:5
rule 19:17,19 48:3
  106:21 111:21 147:3
  155:2,4
rules 3:5 13:1
ruling 3:12
R-E-G 21:15
R-E-Q 21:13

R-I-P-O-N 58:3

_____ S _____

S 107:16
SAITH 161:9
salary 69:22
same 3:22 34:23 52:10
  71:5 90:15 94:9 96:8
  143:7 158:20 162:15
satisfy 18:14
save 32:21,22 33:1,2
saved 5:20 6:6,7 8:22
  32:16
saw 33:20 44:7 87:7
  101:7,8,10 105:17
  125:7 141:12,14
  152:6 153:1
saying 47:1 49:22
  101:11 108:6 115:19
  128:14 138:9 146:10
  156:6 159:12
says 5:12 20:16 21:5,13
  23:5 33:12 40:14,18
  43:11 45:3 53:19,22
  54:3 55:7,21 56:2
  59:18 136:4,5,6,7
  143:20 149:2 152:15
scenario 147:9,16,23
scenarios 148:4
schedule 71:5
scholarly 10:20
school 19:10,16 26:9,9
  57:23 58:1 61:4,9,13
  61:16 118:9 121:3
  126:6,7 129:10
schools 59:16 60:23
  61:5,10,18 116:7
  118:1 125:22,23
school's 19:14,15,18
Schwalbe's 133:8
science 72:19
Scott 51:21
scratch 105:21 149:12
scratched 41:17,22
  149:9,11,14
scratching 149:15
screened 131:2
screener 138:8
screening 130:22 131:1
  131:22 132:1 138:7
  139:10
scribble 51:7
second 32:4 66:18,21
  153:8
secondary 34:21 89:6
  89:10,16,18 90:8,20
  90:21 91:9,11 93:1
  103:12
section 11:14 74:13
  75:14,16,19,23 76:3

76:9 157:10
sections 11:18 74:14
sector 73:1
sectors 73:4
see 7:8 14:2,8,10,14
  18:20 20:2,9,15 21:6
  21:16,23 25:11,14
  27:15 29:4 35:18
  39:5 42:8,20 47:7
  48:7,11 67:15,20
  68:10,13,18 69:1,10
  70:10,12 72:3,5,10
  72:11,12 74:5,9 75:1
  75:10,13 76:16,18,22
  96:11,14 101:17,21
  102:15 103:1,2,6
  104:15 105:3 107:2,3
  107:4 108:13 111:14
  112:12 114:19
  130:15 131:7 133:7
  134:3 136:3 137:14
  137:23 141:1 142:3,5
  143:12,14 144:2,23
  150:16 152:17 154:2
seeing 39:21 47:3,11
  70:13 75:4 94:11
  102:4 104:2 105:9
  107:20 108:9,18,20
  109:9 110:5 133:10
  135:5,6,7 141:3
seems 25:12 93:5
seen 23:21,23 25:15
  63:18 68:14 77:4
  87:13 97:23 102:10
  144:1 154:2
sees 74:15
selected 19:4
self-pay 72:12
send 13:5 38:22 66:17
  66:20 67:1,3 77:12
  87:1
sending 39:13 40:16
sensation 106:1
sent 11:5 39:10 49:2
  53:5 74:23 75:7
  76:19 87:3
sentence 148:9,12
  154:9 155:22
Sepanski 28:23 29:3
  33:22 36:23 51:16
  101:5,8,11 137:14,16
  137:18 138:12,22
  141:1,3,13,14 152:6
  154:6
Sepanski's 24:4 125:18
  137:5 140:14 143:11
  146:2
serious 102:18,18
  103:8,14
serve 78:1

served 63:15
service 68:10 74:9,15
  74:19,20 76:5,6,7
services 77:15,17,21
  78:4,10,16,19
set 49:17 128:4 162:14
settled 118:11
seven 12:16 13:9
several 20:20 21:1
  33:19 57:8 74:10
  159:2
severe 102:13,14
  104:16 105:2 109:19
  147:17
shadow 131:7,8
share 5:15
sheet 38:15 56:1
sheets 36:11,12
ship 14:4,11
shop 67:22
show 5:10 27:21 28:20
  56:17 93:21 94:1,5
  133:1 151:23
showed 142:5 143:11
showing 37:10
shown 134:23 135:1,16
shows 133:5
side 71:9 82:11 94:18
  149:18 150:18 151:5
sign 87:2 108:4
signature 4:2 161:1
signed 29:21 30:1
  34:16,19
significance 22:15,21
  24:20 37:22 44:21
  52:15
signing 162:14
signs 101:21 102:15
similar 30:15 60:19
simply 27:16 118:19
since 57:4,9,13 67:2
  106:21 117:18
  118:13 125:9 152:18
single 114:4,6 154:21
sir 4:13 40:7 67:12
  90:23
sit 26:23 78:22 129:21
  134:18 144:4
sits 120:8 130:16
sitting 126:16
situation 102:6 127:1,7
  146:14
six 10:19 11:22 44:17
  44:23 67:7 70:14,15
  83:4 137:14 138:13
  141:1
Sixty 79:17
size 145:4
skills 122:5,7
slash 136:6

slit 130:10 131:5,16
  132:22 136:2 138:16
small 40:9 125:19
  140:2
smaller 49:16
society 58:18
some 6:5 7:17 8:9,10
  8:11 9:20,21,22
  11:19 14:2,5 17:9
  19:11,17 20:9 23:1
  27:18 29:5 31:8,13
  32:6,23 33:9 35:13
  36:4,5,11 37:6,20
  38:15 48:5 50:21
  51:1 53:4,8,12 54:10
  56:16 75:8 84:22
  89:3 90:1 91:18 92:7
  103:15 104:9 107:14
  112:22 113:8 117:8
  117:11 137:17 139:5
  145:19 152:4
somebody 35:4 37:11
  42:3 75:11 77:12
  106:3,10 148:1 150:5
someone 108:1 124:20
something 19:9,10,11
  20:12 21:18 29:19
  30:14 37:14,16 45:13
  48:14 57:4 66:14
  72:2 78:8 81:12 88:9
  91:11 95:14 103:14
  111:14 127:19 138:4
sometimes 32:20 71:12
  107:3,7 111:13 132:5
somewhere 19:12
  146:19
soon 10:1 117:17
sooner 49:15
sorry 6:21 49:7 65:20
  84:11,17 111:5
  114:12 144:14 146:2
source 12:18 156:11,12
  159:23
South 1:19 2:5,9
Southern 18:23 63:23
  64:20 65:1 66:14
  67:5,18 68:3,22 69:2
  69:7,17 70:7
speak 4:8 30:11 77:17
  83:10 116:21 161:20
speaking 45:14
Specialists 38:6
specific 93:11
specifically 87:23
spell 66:8
spontaneously 140:20
squeezing 150:1
squint 43:12,21
squinting 150:5
St 58:1

stage 141:6
stand 4:15
standard 45:4 49:21
  115:21 116:1 117:21
  119:9 124:10,20,21
  128:4 129:15 131:18
  142:23 146:11,13
  149:15 151:2 153:22
  155:23 156:4,13
  157:2
stands 50:1 55:1 94:20
  97:14
stapled 28:22 29:15
star 22:13,20 40:19
  45:2
starred 22:8
stars 21:3
start 105:3
started 58:22
starting 154:9
state 1:17 3:8 4:12 62:7
  118:4 161:13,16
  163:8
statement 115:23
  158:18
states 1:1 61:1,6,10,21
  98:16,21 116:8
statistics 95:5 130:6
Statute 3:15,21
stick 7:21
sticky 53:9
still 41:8 67:11 71:4
  114:22 116:15 117:2
stipulated 3:2,16,23
stipulation 1:15 3:1
store 65:22
storeroom 126:17
stores 1:8 123:1 162:4
street 1:19 2:5,9 67:15
  69:10
strictly 47:1
structure 88:18
structured 60:16
structures 130:18
  133:5,6,8,9 139:12
stuck 158:1 160:4
student 71:15,17 124:2
students 57:19 60:6
  68:11 71:8,9,18,19
  72:3,5,19 116:5,9
  122:3,21 125:23
studies 121:13,16
study 58:4
stuff 129:20
subbed 65:6 66:1
subject 45:6
subjective 120:5,6,18
subsequent 26:9 27:8
subset 99:1,18
substituting 123:1

suburb 58:1
sudden 77:9,10
sued 79:12
suffer 100:19 105:9
  124:16
suffered 110:3 111:8
  124:23
suffering 100:8 106:3
suffers 124:19
suggest 144:10 145:9
suggestions 31:4
suing 82:8 85:4
Suite 2:4
sums 91:5
supposed 47:6 120:20
sure 4:18 12:10 20:1
  25:13 26:7 27:3
  32:18 41:21 46:18
  48:5 60:16 66:9 79:9
  82:21 83:15 90:12
  99:14 106:19 109:12
  118:17 119:7 120:23
  121:16 124:11
  126:12 130:22 131:2
  134:13 136:20
  138:19 146:16,23
  147:6,22 148:8
  149:12 156:12 160:1
surgery 67:4 96:23
  109:15,18,22
surrounding 111:1
suspect 132:12
suspected 132:14
swell 106:13 109:20
swelling 104:11,14,16
  107:14 109:7
swollen 97:11 101:22
  103:12,18,20 104:4,7
sworn 4:8 161:20
symptom 103:19 104:3
  112:23 147:5 156:17
  157:13
symptomatology
  102:14
symptoms 94:7,8,10,16
  96:8 101:23 102:9,16
  102:17 104:1 110:12
syndrome 24:17,21,22
  25:2,20 26:6 34:1
  91:16 94:22,23 95:9
  95:14,19 96:5,12,20
  97:1,2,3,6,13
synechia 96:15 137:21
  138:1
systemically 108:12

_____ T _____

take 6:17 39:21 43:19
  56:11 63:18 68:19
  71:6 98:19,20 110:8

112:18 116:6,6 119:3
  160:8
taken 1:15 3:4,6 20:4
  40:1,10 50:20
takes 141:8
taking 2:17 19:7
talk 86:13 90:15
  121:13 145:22,23
  157:12
talked 28:8 31:2 39:1
  80:8 87:18 91:19
  107:13 140:12
  154:17 155:18 157:8
talking 21:8 65:10
  98:22 114:12 122:17
  138:3,5,9
talks 142:15 156:17
  157:5
taught 57:10,12,13,14
  57:16 64:8 117:20,23
  118:23 119:1,8 124:3
  124:4 129:12
teach 19:1 39:9 70:22
  71:2 124:6 125:23
  126:7
Teacher 57:6
teaches 126:2
teaching 64:11 71:4,10
  120:22
technique 136:19
telephone 27:7 28:9
  48:16 50:20 87:19
tell 23:15 28:21 29:1
  33:13 35:3 46:23
  47:10 48:20 49:8
  64:18,22 68:8 88:1
  90:1 94:20 95:5
  102:23 104:9 134:18
  136:7 137:8,9 143:16
  147:16 148:17 158:4
telling 22:5 47:8 123:9
  140:15 141:16
tells 132:2
temporarily 135:13
temporary 63:1
ten 8:21 14:19 15:6
  16:3,4,12 17:3,16
  18:1 65:7,9 68:5 76:1
  77:19 110:1
tends 93:12,14,21 94:1
Tennessee 61:20 62:4
  66:12,13
tenure 126:12
term 35:23 54:11 61:22
  100:3 113:13,23
  137:1 155:20
terms 19:7 23:17 31:14
  45:3 50:9 54:2
  110:13,16,17 122:6
  124:23

test 41:23 42:7,9,22
  44:13 114:16 122:10
  130:19 133:12
  139:10,11,17 150:6
  159:17,18
tested 126:4 148:2
testified 4:9 17:16,23
  42:18,21 65:16 81:1
  82:4,17 83:18,23
  84:9,14 85:6,10,14
  132:17 134:3,6
  136:10 142:16
  144:17 150:20
testify 5:21 80:22 84:7
  150:23 153:18
testifying 106:20 123:4
testimony 13:14 18:3
  33:4 43:10 84:8 86:1
  99:18 106:9 116:23
  118:18 132:8 150:13
  159:7
testing 120:21 122:3
  126:10,18
tests 50:6 156:18
  157:13
text 56:3,6 156:19,20
  157:5,7
textbook 11:5 12:1,6,8
  56:9 156:14 157:9
textbooks 10:19 11:1
  11:23 54:1 102:10
  157:9
texts 156:22
Thank 16:2,23 37:5
their 43:13 47:16 57:18
  63:18,18 67:23 68:15
  68:18 76:16,17,17,20
  94:18 97:15,16 102:3
  102:5,13,14 103:3
  105:21 106:1 107:6
  107:18 109:18
  110:13,16,17,18
  113:10,11 116:8
  117:7,12 118:20
  120:9 123:21 125:23
  126:5,11 150:6
thereof 162:11
thing 12:22,22 13:8
  18:20 20:2,15 33:9
  34:23 48:2,3,8 55:23
  116:12 124:9 142:5
  154:7 155:2,4 158:21
things 6:1,5 18:8,9 27:6
  31:5 53:12 61:15
  86:22 96:14 102:20
  104:6,10 111:21
  149:15 158:3 160:2,4
think 5:22 9:2 11:13,17
  26:20 30:15 31:7
  32:5 38:2 40:8 46:12

48:1,8,19 49:6 54:10
  58:17 59:10,11,14
  61:18 65:2,4,15
  67:16 69:11 70:2
  80:13 83:22 94:4
  95:15 97:20 98:1
  101:1 111:23 119:21
  122:5 123:16 128:23
  129:2 136:6 141:16
  143:2 151:1 153:3
  158:23 159:4
thinking 90:6
thinner 90:4
Thomas 1:14 3:4 4:6
  4:14 161:19
though 42:18,21 55:3
  68:18
thought 13:15 27:13
  139:1 159:14
threatening 127:5
three 9:6 17:11 63:17
  66:3 68:14 77:22
  86:2 116:19,19,23
  148:22 158:3 159:13
  160:2,6
through 6:19 7:8,12
  8:1 18:17 24:9 26:16
  37:1,3 40:13 49:20
  69:4 80:11,14 85:21
  86:6,12 88:23 98:6
  120:22 126:5 149:12
  149:13 156:18 160:7
throughout 64:15
throw 126:14
time 3:12,12 9:16,23
  23:6 43:14 44:4
  49:15,16 50:22 53:4
  62:2 63:8 70:18
  77:14 78:8 80:5
  81:15 84:2 90:15
  94:3 100:9 101:7,8
  101:10 103:5 106:10
  111:13 112:16 114:6
  119:14 121:18
  125:17 128:17,19
  135:8 142:12 146:6
  150:6 157:22 158:14
  158:19 160:7
times 33:16,17 63:4,6
  65:7,9 66:2,3 68:5
  78:23 79:3,4,18 83:2
  83:4 129:2
title 70:6
today 5:3 7:17 26:23
  78:22 129:21 134:18
  140:15 144:4 149:21
  158:10
together 29:9,11,15
told 21:19 22:6,10,11
  40:23 46:15 64:23

76:14 83:16,17 84:13
86:23 87:5 139:1
Tom 4:18 56:7
tonometer 114:15,22
116:15 118:5 119:12
121:5,14,15 122:1,12
126:1,8,13 127:3,4,8
129:19 130:7 134:7
149:2 150:4
tonometers 123:3,5
tonometry 22:8 41:20
44:4 85:8,12 115:16
115:17,22 116:10,11
116:13 119:3,10
120:21 121:3 122:7
123:20 124:5,10
125:1,8,15 126:3,4
126:20,21 127:10,13
128:9 129:12,15
130:3 134:14,17
147:8 149:17 150:14
156:3,8 157:3
tons 125:17 157:8
top 20:16 34:5 39:5
40:14 49:21 55:8
60:5 133:21
topical 108:12 117:14
117:17
tops 60:17
total 83:2
tough 149:20
toxic 109:1
trabecular 133:7
trabeculectomy 50:15
traditional 126:19
traditionally 74:19
transcript 162:12
transilluminator
142:22,23 143:3,7,13
143:15,22,23 159:15
159:19
transmittal 29:17
trauma 34:22 35:6
89:16,16,20 99:5,20
110:22,23 111:8,15
111:18,20,22 112:1,1
112:5,9
treat 95:8 96:20 105:5
treated 87:7 94:17
treating 75:8 95:16
treatises 10:19 11:2,23
156:23
treatment 12:10 28:5
76:23 147:20 152:21
160:21
trial 3:19 13:14,17 14:3
17:16,23 18:3 54:19
54:21
trouble 136:3 152:13
true 116:14 119:20

137:18 138:12
140:23 162:12
trustee 63:23
truth 4:8,8,9 127:21
161:20,21,21
try 115:17
trying 65:2,4 73:1,3
tube 120:23
turn 97:4 120:11
TV 73:8,19,23
twelve 17:15
twice 153:1
two 10:7 14:13 15:4
29:17 32:22 37:7
39:4 52:1 69:21
71:23,23 72:1 78:6
79:23 80:1,17 82:19
84:23 86:2 116:21
142:10 146:5 159:13
type 23:10 35:5 48:5,9
69:14 81:7 88:8,11
89:18,20 108:8
111:20 131:20 139:5
types 60:15 72:15
88:14 89:6 93:9,10
94:9
typically 145:16

_____ U _____

UAB 61:8,13
UAB's 19:20,22
ultimate 25:5
ultimately 24:23 25:1
34:3 36:2 46:5,14
88:6 124:15 151:10
Umbach 1:18 2:8
under 49:22 76:23 77:5
93:13 132:11 136:1
151:2 161:2
undergrad 58:2
understand 5:4 56:6
83:15 99:14 118:17
121:20 123:9 134:2
understanding 22:3
127:11
United 1:1 61:1,6,10
98:16,21
universe 98:21 117:1
123:22
university 78:5
unsigned 30:4 32:8
55:14
until 94:5 120:11
unusual 107:6 109:10
140:4 155:20
up-to-date 9:23 19:7
70:21
usage 130:6
use 13:14,16,20,22 22:1
35:23 53:18 85:7,11

85:12,16,16 111:2
113:13 114:10 115:8
115:11 116:15 117:2
117:7 119:5 121:23
122:11 123:12 124:4
126:1,23 127:1,3,8
131:11,15 136:23
143:9 159:16
used 3:14,20 11:6 22:9
43:4 53:16 100:6
114:22 115:20
117:15 118:6 123:5
129:19 130:2 143:2
143:22,23 158:5
using 14:9 54:22 124:16
125:9 142:21 143:7
usually 50:13 103:9,11
105:23 107:2 108:4
112:9 113:1,6
utilize 116:8 131:13
utilized 44:12,13
utilizes 123:20
utilizing 118:14
U.S 162:6

_____ V _____

vacation 78:7
varies 102:14
variety 73:4
various 104:6,9
vascular 90:18
verbally 86:23 87:5
verifying 55:18
version 29:22 30:2,5,8
31:18,20 32:9 33:5,6
56:23
versions 33:2
versus 34:2 35:23
47:19,21 51:21 55:1
55:2 130:3 143:13,15
very 30:12,15 48:7
61:18 95:3,4 106:8
106:21 108:11
109:10 127:14
131:23 139:11 142:3
vessels 89:7
via 38:19 41:19 42:7
101:18 134:6 138:15
138:16 156:2
view 95:23 96:9,11
130:16,18 133:9
viewing 133:6
vision 46:10 47:16
48:15 75:12 77:9
94:12,18 102:3
107:23 110:2 125:19
140:2,3 141:6,14,23
142:5,13 147:4 155:6
155:19
visit 2:21 44:5,8,16,18

45:1 47:19,22 114:4
122:17 125:7 133:17
133:20 134:1 138:20
145:11 148:21
150:15 151:19 152:8
156:3 157:4
visited 133:18
visual 13:13 88:5
125:17 141:5,10
142:6,7,9,10
visually 106:22
vomiting 94:12,13
102:8,12
Von 130:19 131:11,22
133:11,11 136:15
vortex 109:6
Vs 1:7 54:23 55:1 162:2

_____ W _____

W 2:3,7
waived 3:18 4:3 162:15
waiving 3:21
walk-ins 75:10,15
Wal-Mart 1:8 12:23
13:3 37:12 65:3,17
65:21 66:6,10 162:4
Wal-Marts 65:11
want 5:21 18:5,17
50:10 53:19 56:15,20
64:22 72:3 75:17
76:18 77:11 79:8
87:22 110:12,15,18
120:4 124:18 133:23
145:19
wanted 5:23 27:7,11
54:8,10
wants 152:16
wasn't 26:18 77:10
80:7 87:4 93:1
125:15 149:12
watch 120:22
watched 37:3
water 104:22
way 29:12 35:12 70:3
75:6 78:11 87:16
115:15 116:9,12
117:17 119:3,21
122:19 129:14 139:9
141:12 153:21
ways 119:23 126:19
wear 105:5,8
web 24:16
week 50:18 64:16 67:7
68:11 70:9,10,11
weeks 14:14 20:20
69:21 86:2
week's 49:14
well 32:19 46:23 54:18
91:3 135:20 136:10
142:3 154:9

went 26:16 42:6 55:18
118:9 129:11 137:14
140:23 149:13
were 25:20 29:12,18,21
32:5,6,11 34:3 36:2
39:18,19 40:4 47:3
49:8,13 50:16,20
53:10,12 66:23 79:4
79:6 80:17 82:11
84:13 85:21 86:1,9
93:5 102:3 117:15,18
124:12 137:20,20
142:17 143:18
147:22 154:18 158:3
158:4,23 159:15
160:6
we'll 9:5 18:13 75:1
we're 14:7 20:4 45:11
73:3 90:6 92:10
122:3
we've 11:8 158:10
whatsoever 18:11
while 45:13 128:16
white 1:19 2:7,8,13
4:11 6:19,23 11:12
11:15 14:1,16 18:15
84:10 85:20 87:22
98:10 99:3,18 112:18
112:21 123:16
128:10 160:8,11
161:5
whole 4:8 43:18 64:12
161:21
wide 136:12,22,23
137:1,19
wider 112:12
width 131:8
Wilbanks 1:16 3:7
161:15 163:7
Will's 12:8 157:7
Wisconsin 58:3,8
wish 23:8 137:7
witness 2:20 4:1,2,7
15:10 48:20 56:19
78:19 79:1,13,19
80:2 155:11 162:13
word 35:20 45:2,8 69:4
78:14 100:7 111:1
words 30:20,21 65:20
88:1 127:15
wore 105:16
work 4:19 43:5 67:5,8
68:3,9,21 69:14
70:10 73:10,20 74:3
74:8,11 75:19,22
76:4,6 96:22 138:5
worked 52:21 61:11
64:15,18,19,23 65:17
65:21,23,23 67:7

68:6 70:9 76:8
122:22
**working** 69:17 71:7,8
104:21 107:18
112:13 153:5
**works** 66:5 104:21
112:14
**workup** 155:22 157:2
**worn** 152:16
**worried** 108:23 109:2
124:12
**worse** 135:7
**wouldn't** 122:23
127:20 148:4
**write** 30:16,18 31:3,5,6
51:6 147:19 148:6
**writing** 30:23 46:12
49:13 51:13 136:5
156:6
**writings** 51:7 118:3
129:17 156:23
**written** 34:12,16 146:7
146:18
**wrong** 48:14 143:14
**wrote** 22:23 23:12
30:14 31:12 45:13
49:10 101:4 136:18
144:9

--- **Y** ---
**yeah** 11:17 14:10 37:18
55:22 62:19 111:16
115:7 129:5 140:6
153:2
**year** 24:10 40:19 57:1
57:6 58:19 60:15,20
67:9 70:2 84:23
116:6 124:3
**years** 14:19 15:4,6 16:5
16:12 17:3,17 18:1
40:18 52:2 54:3 59:5
65:7 66:4 67:8 68:5
69:19 75:3,3,4 76:1,4
76:10,12 77:4,19
82:5 84:22 93:23
99:4 110:1 111:16
116:11 117:21 122:4
124:4 129:3,3 148:22
159:22
**year's** 18:23
**Yellow** 73:5
**yellows** 107:4
**Yesterday** 20:6
**young** 93:21 99:2,3,18
**younger** 93:13 127:9
**y'all** 69:10,16 72:8,14
90:15 111:2 115:8

--- **Z** ---
**zero** 63:7

--- **$** ---
**$96,000** 70:2

--- **1** ---
**1** 2:17 5:8,11 7:2 99:10
99:11,21 136:8
**10** 55:21 60:17,22
77:14 122:4 124:3
128:5,18,19
**10/2/01** 148:20 150:15
151:3,19 152:8
**100** 99:17,21 119:15
**11** 51:17
**12** 128:21 129:8 134:3
135:19
**120** 60:6 124:3
**13** 100:14,16 121:5
127:16 134:3 135:19
**13/4** 136:7
**133** 2:21
**14** 75:4 151:12
**15** 1:20 20:4,5 60:5,22
65:7 66:3 68:5 69:19
75:3,4 76:4 79:2,3,18
116:11 122:4 124:3
127:17 162:10
**150** 2:4
**160** 2:14
**161** 162:11
**178** 2:5
**19** 150:18 151:2,7
**1970s** 117:14
**1980s** 121:17
**1984** 58:20 129:11
**1988** 60:7 62:8 129:11
**1989** 62:13
**1996** 62:5

--- **2** ---
**2** 2:18 7:14,22 8:7 9:11
9:14,19 12:4,21
13:10 18:16 85:22
86:13 98:18 145:21
146:9
**2/18/05** 33:16
**2/25** 33:19
**2/28** 49:6,7,9
**20** 61:2 99:3 117:21
122:4 128:20 133:20
134:8 143:17 144:7
145:11 148:10
150:18 151:2,5,7
154:10
**20th** 162:19
**20-year-old** 98:10
**20/20** 142:5,9
**20/30** 141:15,16,20
**2000** 67:10
**2001** 40:19 41:7,9,15
42:13

**2004** 133:20 134:9
143:17 144:8 145:11
148:10 154:10
**2005** 51:17
**2007** 1:20 18:21 20:4,5
27:16,22 34:17 40:6
162:10,19
**205** 1:19 2:9
**21** 113:16,17 151:5
**24** 41:10 42:4 149:3,5
150:21,22 151:20
**25** 99:3 111:16
**28** 34:17 42:4 121:10
121:11 150:22
**28th** 40:5

--- **3** ---
**3** 2:20 56:13,18 145:18
145:21 151:15,16
154:8 160:16
**3.15** 58:14
**3.6** 59:14
**3.70** 59:10,11
**3.75** 60:3
**3/4** 136:8
**3:00** 161:7
**3:06-CV-0059-MEF**
1:7 162:9
**3:50** 149:2
**30** 27:22 159:22
**30004** 2:5
**32** 127:17
**33** 128:17 129:8
**35** 74:9 144:22 145:4
145:14
**36803** 2:10
**38** 41:10 42:4 149:3,5
150:21 151:19
**38/24** 40:20 41:7 42:13

--- **4** ---
**4** 2:13,21 133:13,16
136:11,23 137:1
138:8,13,17 144:22
145:4,14
**40** 79:8 93:14,23
**40U** 136:8
**45** 73:15 74:4

--- **5** ---
**5** 2:17 33:16 114:2,10
**5-by-7** 40:9
**5/6/07** 33:13 34:6
**50** 48:12 119:15
**52** 101:9,13
**55** 92:11
**56** 2:20

--- **6** ---
**6** 161:2

**6-year-old** 127:9
**60** 79:7

--- **7** ---
**7** 2:18
**7/28/07** 49:5
**75** 92:12

--- **8** ---
**8/20** 139:7
**8/20/04** 134:20 142:14
**8/20/2004** 157:16
**80s** 118:8 150:11

--- **9** ---
**9** 27:15
**9th** 2:9
**99** 103:5