Exhibit "A"

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| KYLE BENGSTON, | ) |
| PLAINTIFF, | ) |
| v. | ) 3:06-cv-00569-MEF |
| DAVID BAZEMORE, O.D. et. al | ) |
| DEFENDANTS. | ) |

STATE OF TENNESSEE
COUNTY OF SHELBY

## AFFIDAVIT OF THOMAS J. LANDGRAF, O.D.

PERSONALLY APPEARED before the undersigned attesting officer, duly authorized by law to administer oaths in this state, Thomas J. Landgraf, O.D., who after being duly sworn, states and deposes under oath as follows:

1.

My name is Thomas J. Landgraf, O.D., I am mentally competent, suffering from no disabilities, and over the age of twenty-one (21).

2.

I am a licensed optometrist in the State of Tennessee. I am a Professor at the Southern College of Optometry in Memphis, Tennessee, and am Chief of the Advanced Care Ocular Disease Service, Division of Clinical Education, at the Southern College of Optometry. I am familiar with the standard of care that must be employed by optometrists. My Curriculum Vitae

(hereinafter "cv") is attached hereto as Exhibit "A" detailing my credentials and publications I have authored within the last ten (10) years.

3.

I obtained a B.A. in Biology/Biology-Chemistry in 1984 from Ripon College, in Ripon, Wisconsin. I obtained a Doctor of Optometry Degree from the Illinois College of Optometry, in Chicago, Illinois, in 1988. Thereafter, I completed my residency training at the Eye Institue of the Pennsylvania College of Optometry in Philadelphia, Pennsylvania, in July of 1989. I held the positions of Instructor and Assistant Professor at the Illinois College of Optometry from 1989 to 1992. I held Assistant and Associate Professor of Optometry positions at the Southern College of Optometry in Memphis, Tennessee from 1992-2006. I was named a Professor of Optometry at the Southern College of Optometry in 2006, and remain in that position today. I was Chief of the Advanced Care Ocular Disease Service at the Southern College of Optometry from 1996 to 2007. My educational background, teaching experience, work experience, registrations, accomplishments and publications are more fully set forth within my curriculum vitae attached hereto as Exhibit "1" and within my deposition taken in this action.

4.

Although I have testified about my opinions and conclusions (in a deposition taken by Defendants' attorneys on June 15, 2007), I am providing this affidavit as additional testimony in support of Plaintiff's Response to Defendants' Motion for Summary Judgment. No testimony contained herein is given for the purpose of changing or correcting my previous testimony, nor is

it intended to do so. This testimony is simply provided as a supplement to my deposition testimony for the purpose of summarizing, amplifying and/or covering areas that were not adequately addressed by defense counsel during my deposition.

5.

I was first contacted in the early winter of 2007 by counsel for Plaintiff Kyle Bengtson regarding the above-referenced case. I was requested to investigate, study, analyze and evaluate the optometry treatment offered to Mr. Kyle Bengtson in August of 2004 by Defendant Dr. David Bazemore, O.D., and the Wal-mart Optometry office in Opelika, Alabama.

6.

I have reviewed the Kyle Bengtson's medical records from the following physicians and healthcare providers: Dr. David Bazemore of Wal-mart's Optometry office in Opelika, Alabama, Dr. Reid Cooper, M.D., Dr. Gregory J. Sepanski, M.D., Dr. Rafael Mollega, O.D., Dr. Phil C. Alabata, D.O., Dr. Magdalena Shuler, M.D., PhD, and East Alabama Medical Center. I have also reviewed the deposition of Dr. David Bazemore and the Affidavit of Dr. Gregory J. Sepanski, M.D.

7.

Based upon my many years of experience as an optometrist and my position as a professor of optometry training optometrists to become licensed and practice in states throughout the United States, including the State of Alabama, I am familiar with the standard of care and skill generally exercised by optometrist in Alabama in 2004. In particular, I am familiar with the

standard of care and skill generally exercised by optometrists in Alabama during 2004 regarding the diagnosis, treatment, prevention, and management of eye diseases.

8.

Based upon my review of the above-referenced medical records, deposition, affidavit, and other evidence, and based upon my years of experience as an optometrist, professor of optometry, and treating optometrist, it is my professional opinion that Dr. David Bazemore, O.D., and Wal-mart through the acts, omissions and conduct of the staff at the Wal-mart Optometry office in Opelika, Alabama, deviated from the standard of care and skill exercised generally by optometrists under like or similar circumstances in the State of Alabama during 2004.

9.

Optometrists are required to recognize the signs and symptoms of glaucoma, in its various forms. Glaucoma is a blinding eye disease. It is a leading cause of blindness in the United States and the world. Glaucoma is an eye disease that causes the intra-ocular pressure of the eye to become elevated. These elevated intra-ocular pressures result in damage to the optic nerve. The damage to the optic nerve causes a reduction of the visual field. As more and more of the visual field is lost, blindness occurs. Screening for and early detection of glaucoma is an important role of any optometrist.

One type of glaucoma is angle-closure glaucoma. Angle-closure glaucoma occurs when the angle of the eye closes and the aqueous flow through the eye is blocked. The closing of the angle of the eye and the disruption of aqueous flow results in elevated intra-ocular pressure. The elevated intra-ocular pressure causes the eye's outer membrane, the cornea, to be swollen. This

is called corneal edema. Corneal edema causes the glaucoma patient's vision to be blurry and patient's often describe seeing "halos" or "rings" around lights. The high intra-ocular pressure damages the optic nerve and there is a loss of visual acuity. Optometrists must screen patients for angle-closure glaucoma in order to detect and prevent this blinding disease. An optometrist screens for angle-closure glaucoma through an understanding of the patient's history, the patient's complaints, tonometry (a measurement of intra-ocular pressure), and the viewing of the angle.

Angle-closure glaucoma can be acute or chronic. Chronic or subacute angle-closure glaucoma is characterized by intermittent episodes of angle-closure. This type of angle-closure glaucoma is often referred to as Intermittent Angle-closure Glaucoma. These intermittent episodes of angle-closure, or "glaucoma attacks", often occur when the patient is tired or stressed. Patients with this condition often describe the symptoms as being worse at night. If not detected and left untreated, these intermittent episodes of angle-closure will result in severe vision loss and blindness. Optometrists are required to screen for and detect subacute angle-closure glaucoma.

The most common symptoms of subacute angle-closure glaucoma are seeing halos or rings around lights, blurry vision, and a loss of visual acuity. Patients suffering from subacute angle-closure glaucoma must be managed by an ophthalmologist. Subacute angle-closure glaucoma is treated by laser or surgery. Optometrists do not perform these procedures.

A patient reporting the symptoms of subacute angle-closure glaucoma must have his IOP checked using contact tonometry and have his eye angles checked using a gonioscope. If the

patient reports the symptoms of subacute angle-closure glaucoma, the optometrist must refer the patient to an ophthalmologist for further testing to insure the prevention or management of this blinding disease. This is true whether or not the patient has an elevated intra-ocular pressure at the time of his optometry exam, as the nature of subacute angle-closure glaucoma is the occurrence of intermittent episodes of angle-closure, or glaucoma attacks. It is the standard of care among optometrists in Alabama to refer any patient who is suspected of having subacute angle-closure glaucoma to an ophthalmologist.

One symptom of subacute, or intermittent, angle-closure glaucoma is the loss of visual acuity. A patient whose best corrected vision has been 20/20 in the past, but whose best corrected vision cannot be corrected to 20/20 at the time of his present exam, must be referred to an ophthalmologist to determine the origin of the vision loss. A referral under these circumstances is particularly needed where the patient presents with the symptoms of subacute angle-closure glaucoma.

Screening for and detection of all types of glaucoma is an important role of the optometrist. A failure to adequately screen for and detect this debilitating eye disease can result in blindness.

10.

Kyle Bengtson presented to Dr. Bazemore at the Wal-mart Optometry office on August 20, 2004, reporting symptoms of seeing halos around lights, blurry vision (right eye looks like it "has a film over it")– with symptoms worse at night, and a loss of visual acuity– his best corrected vision in his right eye was for the first time (according to records from three prior visits

in 2000, 2001, and 2003) not correctable to 20/20. Kyle Bengtson presented with the three most common symptoms of subacute angle-closure glaucoma. Further, his report that the blurry vision and seeing halos around lights was "worse at night" is a strong indication that he was suffering from episodes of elevated IOP, which commonly occur when the patient is tired.

It is my professional opinion that Dr. Bazemore breached the standard of care for optometrists by not conducting appropriate testing on Kyle Bengtson to more accurately view the angle of his eye via gonioscopy, and more accurately measure the IOP of his eyes via Goldmann tonometry.

It is my professional opinion that Dr. Bazemore breached the standard of care for optometrists by not referring Kyle Bengtson to an ophthalmologist in light of these symptoms of subacute angle-closure glaucoma, including the inability to attain a best corrected vision in the right of 20/20.

Optometrists are required to recognize the symptoms of intermittent, or subacute, angle-closure glaucoma and are responsible to know that patients may have this blinding disease even if the patient does not have an elevated IOP at the time of his optometry exam. Optometrists are required to recognize the symptoms of angle-closure glaucoma whether or not the patient is experiencing a "glaucoma attack" at the time of the examination.

It is my professional opinion that in light of the fact that:

(1) Kyle Bengtson presented to Dr. Bazemore with the characteristic symptoms of subacute angle-closure glaucoma on August 20, 2004, to wit: seeing halos around lights, blurry vision, symptoms worse at night, and a loss of visual acuity;

(2) Kyle Bengtson presented to Dr. Reid Cooper in February of 2005 complaining of several months of blurry vision; and

(3) Upon examination by Dr. Gregory J. Sepanski in March of 2005, Mr. Bengtson was found to have severe nerve cupping (demonstrating damage to the optic nerve over time), a severe loss of visual field, and an afferent pupillary defect (often caused by damage to the optic nerve over an extended period of time),

that Kyle Bengtson was in all probability suffering from subacute angle-closure glaucoma at the time of his August 20, 2004, optometry exam.

11.

Dr. Bazemore's failure to adequately screen for and diagnose subacute angle-closure glaucoma, and his failure to refer Kyle Bengtson to an ophthalmologist for treatment and management of angle-closure glaucoma, resulted in a delay in treatment and severe vision loss in Kyle Bengtson's right eye. Had Dr. Bazemore referred Kyle Bengtson to an ophthalmologist on August 20, 2004, Mr. Bengtson's vision loss would have in all probability been prevented.

12.

This is not an exhaustive list of my opinions and conclusions, but is intended to summarize some of the opinions and conclusions that I have developed in this matter. This affidavit is given by me in support of certain elements of Plaintiff Kyle Bengtson's Response to Defendants' Motion for Summary Judgment. As such, it does not express all of my observations, opinions or conclusions with respect to the subject case or with respect to the other parties in the case, nor is it intended to do so.

FURTHER AFFIANT SAYETH NOT.

This 17 day of August, 2007.

_____
Thomas J. Landgraf, O.D.

Sworn to and subscribed before me this
17 day of August, 2007.

Notary Public _____

[NOTARY SEAL]

My commission expires:

MY COMMISSION EXPIRES:
February 23, 2009

[Seal: JO-ANN B. AUGUSTINE, STATE OF TENNESSEE NOTARY PUBLIC, SHELBY COUNTY]