# DEPOSITION EXCERPTS OF DR. GREGORY SEPANSKI

10-18-2007 Sepanski Dr.txt

23    It is further stipulated and agreed by and

5

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is hereby
3    not waived.
4
5              \* \* \* \* \* \* \* \* \* \* \* \* \*
6
7              GREGORY J. SEPANSKI, M.D.
8       The witness, after having first been duly
9    sworn to speak the truth, the whole truth and nothing
10   but the truth testified as follows:
11            MR. ADAMS:  This will be the
12                deposition of Dr. Gregory J.
13                Sepanski taken for use at trial
14                and any other purpose authorized
15                by the Federal Rules of Civil
16                Procedure.
17             EXAMINATION
18   BY MR. ADAMS:
19   Q.   Dr. Sepanski, I'm David Adams.  You and I have
20       spoken before, and just a few ground rules for
21       the deposition.  I see you nodding your head.
22       I do that.  Everybody does that.  But the
23       court reporter is taking down everything, so

6

1       make sure a verbal response is given to my
2       questions.
3   A.   Okay.
4   Q.   And, obviously, a yes or no is easier for her
5       to take down than an uh-huh or huh-uh as we

```
                          10-18-2007 Sepanski Dr.txt
 6          all do in normal conversation, so ...
 7               We are -- I'm just going to ask you a few
 8          questions here today. As you know, I
 9          represent Kyle Bengston.
10               I am going to hand you what I'm going to
11          mark as Plaintiff's Exhibit 1.
12                    MR. ADAMS: This will be his
13                    affidavit.
14                    (Plaintiff's Exhibit 1 was marked for
15                    identification.)
16    Q.    Dr. Sepanski, what I'm handing you is what I'm
17          going to mark as Plaintiff's Exhibit 1. This
18          is an affidavit that you have given in this
19          case. Unfortunately, in addition to being
20          tardy here today, I did not include Exhibit A
21          to this deposition which is your CV, but your
22          office, I guess, has a copy of your CV here?
23    A.    That's correct.
                                                              7
 1    Q.    well, we may or may not get that before we go,
 2          depending on what we decide is necessary.
 3               Just can you go over your -- where did
 4          you attend undergraduate?
 5    A.    Undergraduate was at the University of
 6          Wisconsin-Parkside.
 7    Q.    Yes, sir. And where did you obtain your
 8          medical degree?
 9    A.    University of Wisconsin in Madison.
10    Q.    And you are a board certified ophthalmologist;
11          is that correct?
12    A.    Yes.
13    Q.    How long have you been a medical doctor?
                              Page 5
```

10-18-2007 Sepanski Dr.txt

14  A.  I graduated from medical school in -- I've got
15      to think back here -- 1990.
16  Q.  Okay. You have been practicing medicine since
17      that time?
18  A.  That's correct.
19  Q.  And you're admitted to practice in the state
20      of Alabama?
21  A.  That's right.
22  Q.  Are there any other states that you are
23      admitted to practice medicine in?

8

1   A.  Not currently right now.
2   Q.  Okay. What other states have you been
3       licensed in in the past?
4   A.  I was licensed in the state of Georgia and in
5       the state of Texas during residency.
6   Q.  All right. And you have --
7   A.  Or I had an exemption in Texas because it was
8       my residency.
9   Q.  Okay. Yes, sir. And you have also, I
10      believe, served in the military as a medical
11      doctor; is that correct?
12  A.  That's correct.
13  Q.  And which branch of the service were you in,
14      please?
15  A.  The Army.
16  Q.  And how long did you do that?
17  A.  Eight years.
18  Q.  When did your -- When did you complete your
19      duty as a medical doctor in the military?
20  A.  1998.

```
                          10-18-2007 Sepanski Dr.txt
21    Q.   All right. When did you become board
22         certified as an ophthalmologist?
23    A.   In 1997.
```
                                                                    9
```
 1    Q.   Where did you do your specialized training in
 2         ophthalmology?
 3    A.   At Brooke Army Medical Center in San Antonio,
 4         Texas.
 5    Q.   You do treat glaucoma patients as a regular
 6         part of your practice; is that correct?
 7    A.   That's correct.
 8    Q.   The affidavit that I've just handed you which
 9         I've identified as Plaintiff's Exhibit 1, what
10         do you recognize that document to be, please?
11    A.   This is the affidavit of Gregory J. Sepanski,
12         M.D.
13    Q.   And that is you, correct?
14    A.   That's me.
15    Q.   And that's your signature?
16    A.   Correct.
17    Q.   You agree that you signed this affidavit?
18    A.   That is correct.
19    Q.   And you signed that before a notary; is that
20         correct?
21    A.   Yes.
22    Q.   All right. You understood that was a sworn
23         statement when you gave it?
```
                                                                   10
```
 1    A.   Yes.
 2    Q.   Okay. And that it was being used as testimony
 3         in a case involving one of your former
 4         patients, Mr. Kyle Bengston?
```
                          Page 7

10-18-2007 Sepanski Dr.txt

```
 5   A.   Yes.
 6   Q.   If you would, in the second paragraph there,
 7        you have given your professional opinions. Do
 8        you stand by those opinions given in paragraph
 9        two as we sit here today?
10   A.   Yes.
11   Q.   All right. Can you tell us, what is the basis
12        for your opinion that Kyle Bengston was
13        suffering from angle closure glaucoma in his
14        right eye -- or let me back up there. Can you
15        just explain your opinions, the ones contained
16        in paragraph two, please.
17             MR. WHITE:  May I interject? When
18                  you talk about paragraph two,
19                  are you talking about the second
20                  full paragraph in the affidavit?
21             MR. ADAMS:  Yes.
22             MR. WHITE:  Okay.
23   Q.   Go ahead, Doctor.
```
                                                                    11
```
 1   A.   Well, I first saw Kyle back --
 2             Is it okay if I look at my notes?
 3   Q.   Yes, sir.
 4   A.   Can I do that?
 5             Well, I saw -- Kyle first presented to my
 6        office on March 7th, 2005. And at that time,
 7        Kyle had complaints of blurred vision in his
 8        right eye and was having headache problems on
 9        and off, had had a previous eye exam several
10        months prior and was actually referred to me
11        by his primary medical doctor.
```

Page 8

10-18-2007 Sepanski Dr.txt

12    when I first saw him, his vision in his
13    right eye was at best corrected to 20/30 and
14    20/20 in the left eye. He had a very elevated
15    intraocular pressure in his right eye, and it
16    was normal in his left eye.
17        I'm not going to go through the entire
18    exam summary, but he had findings consistent
19    on his exam of angle closure glaucoma. It was
20    in my opinion a secondary angle closure
21    glaucoma as a result of having strips of
22    tissue blocking his drainage angle. And
23    that's called commonly peripheral anterior

                                                    12
1     synechia, and it was rather diffuse on the
2     right. He had significant optic nerve cupping
3     which can be a sign of damage, and he had a
4     pupillary abnormality called an APD which is
5     also a sign of optic nerve damage.
6  Q. And APD, what does that stand for?
7  A. Afferent pupillary defect, and that was in the
8     right eye.
9  Q. What is afferent pupillary defect indicative
10    of?
11 A. That is indicative of either extensive retinal
12    damage or extensive optic nerve damage. In
13    his case, he had the optic nerve damage as was
14    seen with the extensive optic nerve cupping.
15 Q. Now, you are welcome to refer to notes if you
16    have them in front of you. On August the
17    20th, 2004, Mr. Bengston was seen by -- at the
18    Wal-Mart optometry office in Opelika. Are you
19    aware of what his optic nerve cupping was on

Page 9

10-18-2007 Sepanski Dr.txt

```
20         that day?  And I'll give you a minute just to
21         get to those notes, or I can -- I can
22         certainly provide it to you.
23   A.    August 20th, 2004?
                                                                    13
 1   Q.    Yes, sir.
 2   A.    The cup-to-disc ratio -- this, I believe, is
 3         Dr. Bazemore's note.  He had put down .4.
 4   Q.    Okay.  And when you saw Mr. Bengston in March
 5         of 2005, on March 7th, 2005, what was Kyle
 6         Bengston's cup-to-disc ratio in his right eye?
 7   A.    .8.
 8   Q.    And what is -- That increased cup-to-disc
 9         ratio from August to March, what is that
10         indicative of?
11   A.    That was a result of the elevated intraocular
12         pressure, and it usually signifies that there
13         is loss of nerve fibers in the optic nerve,
14         meaning optic nerve damage.
15   Q.    Is this -- This optic nerve cupping that had
16         gone up to .8 when you saw him from .4 and the
17         APD, is that indicative of high intraocular
18         pressure occurring over an extended period of
19         time?
20   A.    Yes.
21   Q.    And can you explain that, please.
22   A.    Well, usually, in order -- an APD can happen
23         in a very brief period of time if there is a
                                                                    14
 1         sudden traumatic injury to the optic nerve,
 2         but it usually comes about -- since most
```

Page 10

10-18-2007 Sepanski Dr.txt

```
 3            diseases are kind of chronic in nature, it
 4            usually comes about over time, so ...
 5       Q.   Based on your affidavit, it was not your
 6            opinion that Kyle was suffering from a sudden
 7            traumatic --
 8       A.   No, he was not.
 9       Q.   Okay.  The last sentence of the second
10            paragraph of your affidavit said that
11            Mr. Bengston was absolutely not suffering from
12            an acute angle closure attack when you saw him
13            for the first time in March of 2005.
14       A.   That is correct.
15       Q.   Moving on to the third paragraph of your
16            affidavit, if you would, please, just read
17            that opinion, and what I'm going to say to the
18            jury -- that's just because this may be read
19            later on by a jury when this case goes to
20            trial.  So if, in fact, it is, if you don't
21            mind, read the opinions contained in paragraph
22            three to the jury, please.
23       A.   Based upon Wal-Mart optometry exam notes of
```

                                                                    15

```
 1            August 20, 2004, Mr. Bengston had an
 2            unexplained diminished best corrected visual
 3            acuity in his right eye.  At the time of the
 4            August 20, 2004, exam, he was in all
 5            probability suffering from subacute angle
 6            closure glaucoma.
 7       Q.   Is that your opinion as we sit here today?
 8       A.   Yes.
 9       Q.   I'm sorry?
10       A.   Yes.  Yes, it is.
```
                           Page 11

10-18-2007 Sepanski Dr.txt

11  Q.  What is the basis of that opinion?
12  A.  Well, I had the luxury of being able to see
13      him later on in several months when he was
14      obviously having trouble with angle closure.
15      I felt as though when he was seen on the
16      exam --
17          If you look at Dr. Bazemore's note in
18      August 2004, his pressure was normal. Pupils
19      were regarded as normal. Optic nerves were
20      regarded as normal. But the most troubling
21      thing was that he had complained of halos, and
22      he also had diminished vision in that eye
23      where it was previously normal, and there

                                                                16

1       really was no explanation given as to why that
2       was.
3           And as I said here on the bottom, I felt
4       as though he needed to at the very least be
5       sent for a second opinion to be able to figure
6       out what exactly was going on, even if he
7       didn't find something wrong.
8   Q.  Okay. Where there's an unexplained diminished
9       best corrected visual acuity, that's something
10      that in your practice you would follow up on?
11          MR. WHITE: Object to leading.
12  Q.  You can go ahead. What would you do if a
13      patient had an unexplained diminished best
14      corrected vision?
15  A.  I would bring them back to repeat different
16      aspects of my exam. I might order some
17      additional tests. If I could not figure out

Page 12

```
                        10-18-2007 Sepanski Dr.txt
18          why they weren't seeing as well as they
19          should, I would refer them to somebody else to
20          get a second opinion.
21    Q.    The bottom statement there where you state had
22          Mr. Bengston been referred for ophthalmic
23          evaluation on August 20, 2004, his vision in
                                                                    17
 1          all likelihood would have -- his vision loss,
 2          excuse me, in all likelihood would have been
 3          prevented.  As we sit here today, is that --
 4          does that continue to be your opinion?
 5    A.    Yes.
 6    Q.    If Kyle Bengston had been referred to you in
 7          August of 2004, what would you have done?
 8    A.    I would have repeated a full eye exam on him
 9          and just looked to see if I could find an
10          explanation for what is his diminished
11          vision.  That may or may not have led me to
12          doing an immediate gonioscopy, but he clearly
13          needed more evaluation and more tests done,
14          so ...
15    Q.    Okay.
16    A.    It just would have depended on what I had seen
17          on him at that particular time.
18    Q.    And is intermittent, or as is sometimes
19          referred to as chronic angle closure glaucoma,
20          is that something that is treatable?
21    A.    Yes.
22    Q.    And if a patient has that condition, can
23          vision loss be prevented?
                                                                    18
 1    A.    Yes.
                              Page 13
```

10-18-2007 Sepanski Dr.txt

```
 2   Q.   How do you treat a patient with that
 3        condition?  And I understand no two patients
 4        are exactly alike, but just tell -- if you
 5        would, explain how patients with that
 6        condition are often treated.
 7   A.   With the intermittent angle closure?
 8   Q.   Yes, sir.
 9   A.   Usually they're treated with a combination of
10        laser peripheral iridotomy and topical
11        eyedrops to control the eye pressure.
12   Q.   Okay.
13   A.   Sometimes they require surgery if the pressure
14        is not controllable with the first two.
15   Q.   All right.  Do you have an opinion as to
16        whether -- Let me ask you this.  Is it
17        possible that Kyle Bengston might have been
18        able to avoid surgery if he had seen an
19        ophthalmologist earlier?
20             MR. WHITE:  Object to the form.
21   Q.   You can go ahead and answer.  It's just a
22        lawyer thing.
23   A.   I think that given that -- knowing what I know
```

                                                              19

```
 1        now, with the type of glaucoma that he had, he
 2        probably would have needed surgery in the end
 3        anyway, but sometimes you are able to avoid
 4        having to do surgery.
 5   Q.   Okay.  Could his vision loss have been
 6        prevented?
 7   A.   Absolutely.
 8   Q.   You've testified a little bit earlier that as
```

```
                              10-18-2007 Sepanski Dr.txt
 9           a common part of your practice, you see
10           patients with glaucoma; is that correct?
11    A.     That's correct.
12    Q.     In your experience, what limitations -- I'll
13           tell you what.  Let me -- I'm not asking this
14           the right way.
15                You have other patients who have --
16           who've lost vision in one eye; is that
17           correct?
18    A.     That's correct.
19    Q.     Okay.  And based on your experience in
20           treating those patients, what limitations do
21           those patients have?
22    A.     Well, some are not able to continue with their
23           job/career that they have.  For example, if
                                                                          20
 1           they're a pilot, they can't --
 2                MR. WHITE:  We object to the form.
 3    A.     -- they can't be a pilot anymore.  Some are
 4           not able to drive, although most -- most
 5           states in the United States allow people to
 6           drive legally with just one eye, so usually
 7           driving is not too much of a problem, but
 8           career change is one of the biggest ones.
 9    Q.     Okay.  Any lifestyle changes that you
10           typically see with individuals who have lost
11           just about all their vision in one eye?
12    A.     Well, they have to be certainly more
13           cautious.  They have to -- you know, they
14           can't do certain lifestyle activities.  If
15           they are enjoying karate or soccer or other
16           sports endeavors, they have to be a lot more
                              Page 15
```

10-18-2007 Sepanski Dr.txt

17  leery that they have one eye and should they
18  sustain an injury to that eye, it may have
19  devastating effects on their lifestyle. They
20  certainly have to be leery of that.
21 Q. As far as my -- let me just ask it. Have I
22  retained you as an expert in this case?
23 A. No.

21

1 Q. And, in fact, have I through today paid you
2  for any conversations or --
3 A. No.
4 Q. -- anything that -- any communication that you
5  and I have had?
6 A. No.
7 Q. Or for your involvement in this case at all?
8 A. No.
9      MR. ADAMS: I don't have anything
10         else at this time.
11              EXAMINATION
12 BY MR. WHITE:
13 Q. Dr. Sepanski, I'm Matt White. I'm one of the
14  lawyers for Dr. Bazemore. We met previously,
15  and I want to ask you some questions --
16  follow-up questions as well.
17      Mr. Adams just asked you about whether
18  you have -- whether he has paid you any monies
19  for your services. I wanted to ask you, how
20  many times prior to this deposition today have
21  you either spoken with or met with Mr. Adams?
22 A. We had lunch together twice.
23 Q. Where did that occur?