# DEPOSITION EXCERPTS OF DR. PHILLIP ALABATA

5OCT07ALABATA[1]

22  A   After completing a residency in ophthalmology, I
23  was transferred to Fort Benning as a general ophthalmologist
24  and later the chief of the ophthalmology service. As I was
25  getting ready to exit the Army, I wanted to further my

6

1   training in a fellowship chosen in the field of glaucoma,
2   so -- that is a very rigorous training program. They don't
3   accept everybody. They accept the best qualified
4   individuals to enter the program, and the program itself is
5   in Atlanta like you had mentioned. We see a lot of special
6   glaucoma cases, not just regular glaucoma cases. We learn
7   how to identity them, how to manage them appropriately, how
8   to follow them, how to provide surgeries, if necessary. It
9   is a year program, which I completed without any problems.
10  Q   Okay. And so is it fair to say that you are a
11  specialist in the area of glaucoma?
12  A   That's correct.
13  Q   And here in the second paragraph of that
14  affidavit, at the last sentence there, could you please read
15  the last sentence into the record?
16  A   "It is my professional opinion that Kyle Bengtson
17  was probably suffering from intermittent angle closure
18  glaucoma at the time of his August 20th, 2004 optometry
19  exam."
20  Q   And that is the statement you gave under oath on
21  August 16th, 2007; is that correct?
22  A   Correct.
23  Q   And you understood that to be a sworn statement at
24  the time you gave it; is that correct?
25  A   Correct.

7

5OCT07ALABATA[1]

1  Q   And do you continue to hold that opinion?
2  A   Yes.
3  Q   All right. And could you please explain and I
4  would say for the jury, we all recognize there's no jury
5  sitting in this room?
6  A   Right.
7  Q   But because they may read it, I would like to ask
8  you to please explain to the jury what the basis for your
9  opinion is that Kyle Bengtson was probably suffering from
10 intermittent angle closure glaucoma at the time of his visit
11 to Wal-Mart Optometry in August 20, 2004?
12 A   Given the fact that approximately seven months
13 later, his pressures were in the high 50s with advanced
14 cupping in his optic nerve, and given the fact that he
15 presented on the 20th of August 2004 with halos -- may I
16 refer to my note?
17 Q   Absolutely, and take your time. What page is
18 that?
19 A   Okay. Per his records on 8/20/04, he complained
20 of trouble with his right eye. He has a film over it. It's
21 worse at night. He sees halos around lights. And it seems
22 to be getting worse over the past couple of months. He was
23 previously correctable to 20/20 in that eye; on that day,
24 however, he was correctable only to 20/25. Although his
25 intraocular pressures were normal, with these types of

8

1  symptoms, you would want to think about some other forms
2  causing this, i.e., glaucoma changes.
3  Q   Okay. And when he presented to Dr. Sepanski in
4  March of 2005, what symptoms did he have at that time?
5  A   He was not complaining of pain, but he was
6  complaining of blurry vision at that time. His pressures

Page 6

5OCT07ALABATA[1]

18  glaucoma. It's a secondary glaucoma. What occurs is the
19  endothelium of the cornea, which is the back surface of the
20  cornea, starts to grow over the drain angle of the eye.
21  Okay. This can happen over a period of several months or
22  even a period of years. People with eye syndrome don't
23  necessarily get glaucoma. About 50 percent of the
24  individuals do get advanced glaucoma. But it is a condition
25  that, if not treated, if the pressures are elevated, can

11

1   lead to severe vision loss.
2      Q   Okay. And if it is treated, what can the outcome
3   be?
4      A   If the treatment is initiated in a timely manner,
5   we could, you know, preserve vision loss.
6      Q   Okay.
7      A   Or rather prevent vision loss.
8      Q   Okay. And now, you have seen Kyle Bengtson as a
9   patient; is that correct?
10     A   That's correct.
11     Q   All right. And in fact, now is probably a good
12  time for me to ask you this: Have I or any other attorney
13  representing Kyle Bengtson retained you as an expert?
14     A   Not as an expert, but as a treating physician.
15     Q   Right, and I have -- in my prior communication
16  with you, that communication, you understood, I was
17  interviewing you as one of Kyle Bengtson's treating
18  physicians; is that correct?
19     A   That's correct.
20     Q   And could you explain Kyle Bengtson's medical
21  condition with respect to his vision to the jury as you
22  understand it, being his present treating ophthalmologist?

Page 9