# EXHIBIT TO PLAINTIFF'S OBJECTION TO DEFENDANT'S DEPOSITION DESIGNATIONS

10-18-2007 Sepanski Dr.txt

15  Q.  How many years ago was that?
16  A.  That was between the years of 1993 and 1996.
17  Q.  So other than Mr. Bengston, you've only
18      treated one other patient in your career who
19      was diagnosed with ICE syndrome?
20  A.  That's correct.
21  Q.  And it's true that you did not diagnose
22      Mr. Bengston with ICE syndrome, correct?
23  A.  That's correct.

0                                                          46

1   Q.  Isn't it true also that many ophthalmologists
2       will go their entire career without ever
3       seeing a patient suffering from ICE syndrome?
4              MR. ADAMS:  Object to the form.
5              Calls for speculation.
6   Q.  You can answer.
7   A.  Yes.
8   Q.  You testified earlier in your deposition that
9       if -- and I wrote down, knowing what I know
10      now, you probably would have -- Mr. Bengston
11      probably would have needed surgery when you
12      first saw him.  What led you to believe that?
13  A.  Say that again.
14  Q.  I just wrote down when you were testifying
15      when Mr. Adams was asking you questions
16      earlier, you testified something to the effect
17      that knowing what I know now, Mr. Bengston
18      probably would have needed surgery when you
19      first saw him.  I wondered what your basis for
20      that opinion was.
21  A.  I don't remember making that statement.
22  Q.  You don't remember --

5OCT07ALABATA[1]

19    and that is the affidavit that you completed earlier this
20    year. What was the reason that you submitted that
21    affidavit?
22            MR. ADAMS: I object to the form. Can you ask
23        that differently?
24    BY MR. OLIVER
25        Q    What was the reason that you signed that

17

1    affidavit?
2        A    I don't understand -- for Kyle Bengtson.
3        Q    And who prepared this affidavit for you?
4        A    I prepared it, I edited it, and then of course,
5    Mr. Adams helped me clarify things on it. But the bottom
6    statement here, you know, which I reviewed all the charts,
7    the bottom statement, that is my statement.
8        Q    And you said you edited it. Do you have a copy of
9    the draft affidavit?
10       A    I don't have a copy of my draft affidavit. My
11   draft affidavit was simply a complete chart review,
12   indicating everything that's in this chart in sort of a long
13   format, okay. It was a historical review indicating what
14   had transpired from the day he saw Dr. Bazemore until the
15   day he saw Dr. Sepanski; it was quite lengthy.
16       Q    Do you have a copy of that?
17       A    I don't have a copy with me, but I could certainly
18   get one if you need it.
19       Q    Sure. Could you get that -- I guess I will give
20   you my address.
21       A    Do you have a copy?
22            MR. ADAMS: I don't have a copy. I don't have a
23        copy on me, and I'm trying to think if I even have a
24        copy at home.

5OCT07ALABATA[1]

25

18

1 BY MR. OLIVER
2    Q   Okay. Can you remember, since we don't have a
3 copy of that document to look at, what, if anything, was
4 left out of this affidavit that was in the larger writings
5 that you had?
6    A   Certainly the bottom line was, you know, he was
7 suffering from intermittent angle closure glaucoma. From
8 the time he saw Dr. Bazemore, you know, like I said, I had,
9 you know, sort of outlined every single visit, practically,
10 what he presented with, that I indicated how there was a
11 delay for about seven months before he was treated when he
12 presented to Dr. Sepanski with a high elevated intraocular
13 pressure. It simply reflects his whole history from the day
14 he saw Dr. Bazemore to the time he saw Dr. Sepanski. Okay.
15 But the bottom line is, he was suffering from intermittent
16 angle closure glaucoma, which resulted in his vision loss.
17    Q   Okay. Did you sign any previous affidavits?
18    A   I did not. This is the only one that was signed
19 under oath.
20    Q   Do you have a copy of that, of your notes that
21 you've just described at your office?
22    A   I could see if I could find it.
23    Q   We may need to take a break and see if you can.
24    A   They are not in this office.
25    Q   Right, right, at your --

19

1    A   I mean, if you see all my paper work, it's all
2 over the place.
3    Q   Right.

5OCT07ALABATA[1]

4   A   It's probably in the -- I don't know where it is.
5   But I certainly can try to produce it. It should be on my
6   emails to my business administrator, but I could find it.
7   And it was my long edification of everything that had
8   transpired throughout this course.
9           MR. OLIVER: Can we get off the record real quick?
10          (Off the record.)
11  BY MR. OLIVER
12  Q   What records did you review in formulating your
13  opinion that you've just given?
14  A   Right. I reviewed every single record that was
15  mentioned in my affidavit.
16  Q   Okay. Did you review any other records other than
17  the ones mentioned in the affidavit?
18  A   No.
19  Q   Who provided those records to you?
20  A   I had my own records from my office, and I had
21  requested records from the other physicians and I requested
22  records through Mr. Adams.
23  Q   And why did you request records from other
24  physicians?
25  A   Anytime I see a new patient, I need to know what

                                                        20

1   had transpired previously, so that's my standard of care.
2   Q   Okay. Was there any reason in particular you
3   requested additional records from Mr. Adams?
4   A   Well, the reason was because there has been some
5   question about Kyle Bengtson's care.
6   Q   And when did you receive all of your records in
7   this case?
8   A   I don't know the particular dates, but several
9   months ago when his case came up.

5OCT07ALABATA[1]

22  Mr. Adams?

23  A   The discussion was, you know, could Kyle Bengtson

24  have been undergoing episodes of angle closure glaucoma at

25  the time of his visit with Dr. Bazemore.

29

1   Q   And what was your initial impression?

2   A   My initial impression was certainly with the

3   complaints of halos, blurred vision, et cetera, but normal

4   pressures, certainly there is a chance of him having

5   intermittent angle closure glaucoma, but you can also have

6   those changes with refractive changes in the glasses.  Okay,

7   but given the fact that, you know, he presented with

8   increased intraocular pressures, you know, the most likely

9   cause was him suffering from the intermittent angle closure

10  glaucoma.

11  Q   And the words in your affidavit, again, was

12  probably suffering from -- are those your words?

13  A   Those are my words.

14  Q   Do you have any explanation as to why those exact

15  words were used by Dr. Sepanski?

16  A   I have no explanation, but these are my words.

17  Q   Did any of Mr. Bengtson's attorneys suggest those

18  words to you?

19  A   No.  Those are my words.

20  Q   What do those words, "was probably suffering from

21  intermittent angle closure glaucoma" mean to you, if you

22  could just describe what those words mean to you to the

23  jury?

24  A   Can you say that again?

25  Q   The words "was probably suffering from

30

1   intermittent angle closure glaucoma."

5OCT07ALABATA[1]

24    A    I have -- not in my practice. In fellowship and
25    in residency.

35

1    Q    How long have you been a practicing
2    ophthalmologist?
3    A    Seven years.
4    Q    Is eye syndrome difficult to diagnose?
5    A    Certainly eye syndrome can be difficult to
6    diagnose. The first signs would be sort of a hammered look
7    appearance in the cornea. You can have sort of a hammered
8    sheen appearance on the cornea, okay, on slit-lamp
9    examination, but if you compare it to the other eye, you
10    should be able to detect that. You will start to get some
11    stretch holes in the iris. All right. You will start to
12    get some PAS formation, which, you know, you need to look
13    with an gonioscopy to see that. So it can be a difficult
14    thing to diagnose. But when you have symptoms, you have to
15    keep track of patients with glaucoma symptoms.
16    Q    Sure. Can trauma cause eye syndrome?
17    A    Trauma cannot cause eye syndrome, but it can cause
18    glaucoma.
19    Q    And can it cause intermittent angle closure
20    glaucoma?
21    A    It depends on the amount of trauma. If you had
22    trauma to the eye -- I understand that he had laceration to
23    the bridge of his nose, but it never mentioned an eye
24    injury.
25    Q    Do you, in your practice, deal with optometrists?

36

1    A    We have optometrists that refer patients to us for
2    opinions.

### Page 9

```
 1        of this deposition; correct?
 2        Because this has been asked
 3        and answered.
 4        MR. WHITE: I don't know that it
 5        has. I've read his previous
 6        deposition. I don't know that
 7        it was asked whether he had
 8        any correspondence.
 9        MR. ADAMS: Okay. Well, you can
10        ask him. I thought it had.
11        Go ahead.
12   Q.   My question is if you got a letter or if
13        you sent a letter on behalf of
14        Mr. Bengston, would it be in the file
15        that's there in front of you?
16   A.   Every -- All my correspondence is in here.
17        The affidavit, no, I don't think it's in
18        here. That was faxed to him which was
19        faxed to you guys.
20   Q.   Did you not keep a copy of it after you
21        faxed it?
22   A.   I don't have a copy of it, no.
23   Q.   (E) is any and all affidavits, draft
```

### Page 10

```
 1        affidavits or writings relating to your
 2        opinions regarding Kyle Bengston. And
 3        you -- Let me do this. Let me show you
 4        what I've marked as Defendant's Exhibit 2
 5        to your deposition.
 6            (Defendant's Exhibit 2 was marked
 7            for identification.)
 8   A.   Uh-huh (positive response).
 9   Q.   Do you recognize that?
10   A.   I do.
11   Q.   And is that the affidavit that you're
12        referring to in regards to Kyle Bengston?
13   A.   This is.
14   Q.   And I'm going to come back and ask you some
15        more detailed questions about that --
16   A.   And it --
17   Q.   I'm sorry?
18   A.   This affidavit I did not have
19        Dr. Bazemore's record in front of me when I
20        wrote it. This is all from recollection.
21   Q.   Other than that affidavit, which is
22        Defendant's Exhibit 2, were there any other
23        affidavits that you've drafted in this
```

### Page 11

```
 1        matter?
 2   A.   No. Except for the one that we brought.
 3   Q.   The short affidavit?
 4   A.   Yeah.
 5   Q.   The final affidavit?
 6   A.   Correct. The final.
 7   Q.   Well, let me ask you this: Prior to it
 8        being typed -- and Defendant's Exhibit 2 is
 9        in a typed format -- did you ever handwrite
10        an affidavit that you sent to Mr. Adams or
11        anyone else?
12   A.   No handwritten ones. I always sent it like
13        this.
14   Q.   How did it get in this format?
15   A.   I typed it up. And I don't have copies of
16        that.
17   Q.   Where did you type it up at?
18   A.   On my computer, which I didn't save
19        anything.
20   Q.   You don't save anything on your computer?
21   A.   Not this stuff. It's all sent here to
22        him. And I don't want anything to do with
23        saving any type of legal files. All I need
```

### Page 12

```
 1        to have is his medical records.
 2   Q.   Why don't you want to have anything to do
 3        with saving legal files?
 4   A.   Because I have everything I need in here.
 5   Q.   And you're referring to your chart?
 6   A.   My medical records.
 7   Q.   Well, when you typed it up -- When you
 8        typed what you typed -- You have a computer
 9        here in your office. Did you type it on
10        this computer here in your office?
11   A.   No, I didn't.
12   Q.   Where did you type it?
13   A.   At my home.
14   Q.   Your home computer?
15   A.   (Witness nods head).
16   Q.   And did you not save it? Did you not push
17        save when you typed it?
18   A.   That's not saved, no.
19   Q.   Did you delete it for some reason?
20   A.   I don't want any files that are not
21        business related on my home computer.
22   Q.   So my question is, did you delete --
23   A.   Yeah. I deleted it --
```

Page 13

1  Q. You deleted it?
2  A. -- after I sent it to him. So he has the
3     files, not me.
4  Q. And so just so I'm clear, let me get you to
5     mark on this affidavit where -- everything
6     that you typed on the affidavit.
7  A. I typed everything.
8  Q. You typed everything?
9  A. Yes.
10 Q. Okay. Well, do you mind if I look at it?
11    This part up top here, which is what we
12    call the style of the case, where it says
13    Kyle --
14 A. I didn't do that. There was -- I didn't do
15    that part. That was given to me.
16 Q. That was given to you?
17 A. Right.
18 Q. And then the first paragraph that says I am
19    Phil Alabata, DO, did you write that --
20    type that?
21 A. Okay. Let's back up. There was a template
22    format for me to use and I edited the whole
23    thing. And all the words -- Everything

Page 14

1     related to his medical case are mine -- my
2     words.
3  Q. You said there was a template format for
4     you to use. What are you talking about?
5  A. Well, a template is a standardized format
6     that has the form that you needed to make
7     that affidavit. And that's what I used.
8  Q. Do you still have the template --
9  A. I do not.
10 Q. -- format?
11 A. I do not.
12 Q. Who provided that to you?
13 A. Mr. Adams.
14 Q. And do you remember what the template
15    format said?
16 A. I don't remember what it said. I did edit
17    it. I put everything in my own words. But
18    all this top stuff for sure is --
19 Q. Well, what I'd like for you to do, then, if
20    you could -- if you could review
21    Defendant's Exhibit Number 2 for me and if
22    you could indicate everything on there that
23    are your words as opposed to words that

Page 15

1     came from the template format.
2  A. Okay. Give me a few minutes.
3  Q. Take your time, please.
4        (Brief pause.)
5  A. Everything that's bracketed are my words.
6     And, again, that's before -- I didn't have
7     Dr. Bazemore's records in front of me.
8     That was all from recall.
9  Q. All right. And you also underlined which I
10    do not have available. Were those your
11    words?
12 A. That's correct.
13 Q. Was the rest of that paragraph in the
14    template format that you described?
15 A. As far as I remember.
16 Q. Did someone tell you to delete your
17    opinions that you created at your home, or
18    is that something that you did on your own?
19 A. It's something I did on my own. No one
20    told me to delete it. I don't want
21    anything at my home.
22 Q. Is there any reason you didn't print it out
23    and keep it in the file?

Page 16

1  A. No. I don't put anything in this except
2     medical or any correspondence that was
3     requested in here.
4  Q. You wouldn't consider that correspondence
5     between you and the attorney for
6     Mr. Bengston?
7  A. Well, I sent it to him. He has a copy and
8     obviously you have a copy. There's no need
9     for me to keep a copy of it.
10       (Defendant's Exhibit 1 was marked
11       for identification.)
12 Q. Let me show you what I've marked as
13    Defendant's Exhibit 1. Do you recognize
14    that?
15 A. I do.
16 Q. What is that?
17 A. That's when I faxed this to Mr. Adams.
18 Q. That's when you faxed Defendant's Exhibit
19    2?
20 A. Exactly right.
21 Q. And that's dated October 12, 2007; is that
22    correct?
23 A. That's correct.

Page 17

```
 1   Q.  And that was done after your first
 2       deposition was taken in this case?
 3   A.  That's correct.  At the request of your
 4       partner.
 5   Q.  That's right.  Blake Oliver was here the
 6       first time --
 7   A.  That's correct.
 8   Q.  -- taking your deposition?
 9   A.  That's correct.
10   Q.  Let me say this.  It's difficult for the
11       court reporter to take down if we're both
12       speaking at the same time --
13   A.  Right.
14   Q.  -- so if you'll wait.
15   A.  Sure.
16   Q.  Is there any reason -- I know Mr. Oliver,
17       from reading your deposition, had asked
18       that you fax it to us.  Is there any reason
19       that you chose to fax the affidavit,
20       Defendant's Exhibit 2, to Mr. Adams instead
21       of faxing it to Mr. Oliver?
22   A.  It's Kyle's lawyer.
23   Q.  I'm sorry?
```

Page 19

```
 1       just send it to him if possible.
 2   Q.  Okay.  In Defendant's Exhibit 1, if you'll
 3       take a look at that.  I wanted to ask
 4       you -- You begin that letter by saying this
 5       is my original planned affidavit.
 6   A.  Uh-huh (positive response).
 7   Q.  What do you mean by that term original
 8       planned affidavit?
 9   A.  That was my first affidavit that I had
10       written out, planned for the case here.
11       And, of course, it was based on my review
12       of Dr. Bazemore's notes, which I -- which
13       Mr. Adams showed it to me when he had a
14       meeting with me, which I did not have
15       available at the time that I wrote out
16       my -- this first affidavit.
17   Q.  And you're referring to Defendant's Exhibit
18       2?
19   A.  That's correct.
20   Q.  And is there any reason why you didn't have
21       Mr. -- Dr. Bazemore's records when you
22       drafted that affidavit, Defendant's Exhibit
23       2?
```

Page 18

```
 1   A.  Because it's Kyle's lawyer.  That's why I
 2       faxed it to him.
 3   Q.  Is there some distinguishment in your mind
 4       between faxing it to Kyle's lawyer as
 5       opposed to faxing it to Mr. Oliver?
 6   A.  The end report -- the result is everything
 7       is unchanged.  It was faxed to him.  The
 8       original was faxed to you.  There's no
 9       difference.
10           MR. ADAMS:  And I can tell you
11       that apparently it was an
12       off-the-record agreement.  I
13       didn't see it in his
14       affidavit.  But Blake and I
15       agreed that that's the way it
16       would be handled.  And this is
17       Kyle's physician and anything
18       Kyle's physician generates he
19       has a superior right to and I
20       asked to see it first and that
21       was our agreement.
22   A.  That's correct.  It was our agreement.  He
23       didn't officially ask.  He asked if I could
```

Page 20

```
 1   A.  I didn't have it available.  It wasn't
 2       provided to me.
 3   Q.  But you had seen those records?
 4   A.  That's correct.
 5   Q.  When had you seen the records?
 6   A.  When Mr. Adams came over.  It was at the
 7       first --
 8           MR. ADAMS:  Yeah.  This has all
 9       been asked and answered.  We
10       talked about this the first
11       go-around.
12           MR. WHITE:  Well, I would
13       respectfully disagree with
14       you.  I've read the
15       deposition.  I don't believe
16       that it was asked and
17       answered.
18   A.  It was.
19   Q.  When did you draft Defendant's Exhibit 2?
20   A.  I don't know the exact date, but it was
21       after -- after his visit with me.
22   Q.  How many visits with Mr. Adams had you had
23       before you drafted Defendant's Exhibit 2?
```

5 (Pages 17 to 20)